IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---

| | |
|---|---|
| In re: | Chapter 11 |
| | Case No. 16-31959 |
| JUNIPER GTL LLC[1] | |
| Debtor. | |

---

**DEBTOR'S EMERGENCY MOTION
PURSUANT TO 11 U.S.C. §§ 105, 361, 363, AND 364 FOR
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO
(A) OBTAIN POST-PETITION FINANCING AND (B) GRANT SENIOR LIENS,
JUNIOR LIENS, AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS;
(II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE BANKRUPTCY COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU**

---

[1] The last four digits of the Debtor's federal tax identification number is 3161. The Debtor's mailing address is 3 Riverway, Suite 1050, Houston, Texas 77056.

28225400.v13

**SHOULD FILE AN IMMEDIATE RESPONSE. REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.**

Juniper GTL LLC (the "Debtor"), pursuant to section 105, 361, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code"), files this *Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 363, and 364 for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Post-Petition Financing and (B) Grant Senior Liens, Junior Liens, and Superpriority Administrative Expense Status; (II) Scheduling a Final Hearing; and (III) Granting Related Relief* (the "Motion") on an emergency basis (I) seeking entry of interim and final orders authorizing the Debtor to obtain post-petition financing and grant senior liens, junior liens, and superpriority administrative expense status; and (II) requesting that the Court schedule a final hearing on the Motion (the "Final Hearing") and grant related relief.  In support of this Motion, the Debtor respectfully represents as follows:

## SUMMARY OF RELIEF REQUESTED[2]

By this Motion, the Debtor seeks entry of interim and final orders authorizing the Debtor to obtain post-petition financing, scheduling a final hearing, and granting related relief (the "Interim DIP Order" and the "Final DIP Order", respectively).  In particular, the Debtor seeks authority, on an interim and final basis, to obtain post-petition financing in the aggregate amount of up to $3.0 million (the "DIP Facility"), subject to the terms and conditions of the Debtor-in-Possession Loan and Security Agreement attached hereto as **Exhibit A** (collectively with all agreements, documents, and instruments delivered or executed in connection therewith, the "DIP Facility Documents") between the Debtor and Westlake GTL LLC.  In accordance with Rule

---

[2]   Capitalized terms not defined herein are defined later in the Motion or in the DIP Facility Documents.

4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), below is a summary of the terms of the proposed DIP Facility:[3]

(a) Borrower: Juniper GTL LLC (the "Borrower")

(b) Lender: Westlake GTL LLC (the "DIP Lender")

(c) Commitment and Availability. The DIP Facility Documents provide for an interim lending limit of $1.2 million and a total lending commitment of $3.0 million.

(d) Term: The DIP Facility will terminate on the earliest of (the "Termination Date"): (i) three (3) days after the Petition Date if the Interim DIP Order has not been entered in that period; (ii) twenty-five (28) days after the Petition Date if the Final DIP Order has not been entered in that period; (iii) the date of July 5, 2016; (iv) the date of the consummation of a sale of all or substantially all of the Borrower's assets pursuant to Bankruptcy Code §363(b); (v) the date on which the DIP Lender accelerates the obligations under the loan agreement to be entered into between the Borrower and the DIP Lender and terminates its commitment to make advances under the DIP Facility after the occurrence of an event of default (and the passage of any applicable cure period) in accordance with the terms of the DIP Facility Documents; (vi) the date on which the Chapter 11 Case is dismissed or converted to a chapter 7 proceeding.

(e) Purpose: The DIP Facility shall be used to provide liquidity to the Borrower during the Chapter 11 Case pursuant to the Budget.

(f) Priority and Liens: All obligations of the Borrower under the DIP Facility shall be secured by the following: (i) pursuant to section 364(c)(2) of the Bankruptcy Code, liens on and security interests in all cash advanced to the Borrower under the DIP Loan; (ii) pursuant to section 364(c)(2) of the Bankruptcy Code, first-priority liens on and security interests in all assets, excluding the Excluded Assets, of the Borrower that are not subject to existing liens on the Petition Date, if any; and (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens on and security interests in all assets, excluding the Excluded Assets, of the Borrower that are subject to existing liens on the Petition Date ((i) , (ii), and (iii), collectively, the "DIP Liens" and the assets subject to the DIP Liens, the "DIP Collateral"), and (iv) pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative expense claims against the Borrower's bankruptcy estate; provided, however, the DIP Lender shall have no lien, security interest, or priority of any kind in the Excluded Assets.

(g) Carveout: The liens and claims of the DIP Lender securing the DIP Facility shall be subject to a carve-out only for payment of (i) accrued and unpaid U.S. Trustee and Bankruptcy Court fees, plus (ii) allowed fees and expenses of professionals retained in the Chapter 11 Case (other than ordinary course

---

[3] This summary is qualified in its entirety by reference to the provisions of the DIP Facility Documents attached as **Exhibit A.** To the extent of any discrepancy among this summary, any term sheet or the DIP Facility Documents provided at or before the hearing, the terms of the DIP Facility Documents as approved by the Bankruptcy Court shall govern and control.

3

28225400.v13

professionals) that are incurred after the occurrence of an Event of Default (as defined below), in an amount not to exceed $50,000, plus (iii) allowed accrued but unpaid fees and expenses of professionals retained in the Chapter 11 Case that were accrued on or before the occurrence of an Event of Default to the extent consistent with the Budget (the "Carve-Out"), and each of the professionals retained shall have separate line item carve-outs for their fees and expenses as provided in the Budget.

(h) Interest: The rate of 12% per annum on the outstanding principal amount of the DIP Loans, compounded monthly. Interest shall accrue and be payable at maturity of the DIP Facility (whether at stated maturity, by acceleration or otherwise). At all times that an Event of Default exists, the non-default interest rate shall be increased by 2% per annum. Default interest shall be payable in cash, upon demand.

(i) Conditions Precedent: The DIP Facility Documents will contain conditions precedent customary for facilities and transactions of this type and others as the DIP Lender may require (including compliance with the 363 Sale Milestones).

(j) Events of Default: The DIP Facility Documents will contain events of default customary for facilities and transactions of this type and others as the DIP Lender may reasonably require, including certain milestones related to the maturity of the DIP Facility.

(k) Costs and Expenses; Indemnification: Subject to the entry of the Final DIP Order, the Borrower shall accrue (i) all 363 Sale Fees and Expenses and (ii) all actual and documented out-of-pocket costs and expenses of the DIP Lender (including, without limitation, fees and disbursements of counsel, including local counsel, and financial advisors) in connection with (a) the negotiation, preparation, execution and entry, as applicable, of the DIP Facility Documents and DIP Orders, and (b) the enforcement of any rights and remedies under the DIP Facility Documents and DIP Orders. All such expenses accrued prior to the maturity of the DIP Loans shall be automatically added to the principal amount of the DIP Loans (and begin to bear interest) following the Borrower's receipt of an invoice therefor from the DIP Lender.

The Borrower shall indemnify the DIP Lender and their respective affiliates, successors and assigns against any liability arising in connection with the transactions contemplated in the DIP Facility Documents (other than in the case of the gross negligence, bad faith or willful misconduct of any indemnified person).

(l) Relief From Automatic Stay: The automatic stay will be lifted without further Court order, (a) to implement the post-petition financing arrangements authorized by the DIP Orders and pursuant to the terms of the DIP Facility Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral, (c) to assess, charge, collect, advance, deduct and receive payments with respect to the DIP Facility, including, without limitation, all interest, fees, costs and expenses permitted under the DIP Orders, and to apply such payments pursuant to the DIP Facility Documents and the DIP Orders, as applicable, and (d) to permit the DIP Lender to pursue its remedies set forth in the DIP Facility Documents, subject to the notice requirements described therein.

4

**STATEMENT REGARDING SIGNIFICANT PROVISIONS**

1. The proposed Interim DIP Order, attached hereto as **Exhibit B**, contains certain of the provisions (the "Significant Provisions") identified on Exhibit B to the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Bankruptcy Cases (the "Complex Chapter 11 Procedures') as summarized in the Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral attached hereto as **Exhibit C**.

2. Specifically, the Interim DIP Order contains the following Significant Provisions: (a) it imposes deadlines on the Debtor for consummating a sale of substantially all of the Debtor's assets pursuant to Bankruptcy Code section 363; (b) subject to entry of the Final DIP Order, the Interim DIP Order provides that the Debtor will seek a waiver of rights under Bankruptcy Code section 506(c) at the Final Hearing; and (c) it grants an administrative claim in favor of the DIP Lender.  The explanation for the inclusion of the foregoing Significant Provisions, as required by rule 4(C)(vi) of the Complex Chapter 11 Procedures, made applicable to this proceeding by Bankruptcy Local Rule 1075-1, is that the DIP Facility, which is secured only by junior liens on encumbered property and senior liens on unencumbered property, if any, was conditioned on such provisions and without such Significant Provisions the DIP Lender would not offer the proposed DIP Facility and the Debtor would have insufficient liquidity to operate as a going concern.  Indeed, given the Debtor's limited liquidity position, failure to meet the sale deadlines would threaten the administrative solvency of the Debtor's estate.  In addition, the value of the statutory liens on the Debtor's assets likely renders the DIP Lender unsecured, or at best, undersecured on the DIP Liens and supports the conclusion that no financing was available on better terms that those in the DIP Facility.

28225400.v13

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this case and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

### A. General Background

4. On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas. The Debtor continues to operate its business and manage its properties as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No request has been made for the appointment of a trustee or examiner. No official committee has been designated or appointed.

5. A detailed description of the Debtor, its business, its capital structure, and the facts and circumstances surrounding the Debtor's chapter 11 case are set forth in greater detail in the *Declaration of David Rush in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration") filed concurrently herewith.

### B. Specific Background

6. As set forth in detail in the First Day Declaration, the Debtor is a special-purpose vehicle created to build, own and operate a gas-to-specialties plant in Westlake, Louisiana (the "Facility"). After one of the Debtor's equity participants withdrew its participation, the Debtor was left with insufficient funds to complete the Facility. Accordingly, the Debtor engaged in a marketing process to identify a replacement investor, but was unable to secure additional equity

6

investment. As a result, the Debtor, in consultation with its advisors, began a marketing process to identify a purchaser for a sale of the Debtor's assets, including the facility.

7. During the marketing process, the Debtor entered into negotiations with Westlake GTL LLC ("Westlake"), an affiliate of a publicly-traded energy company, and Richard Construction, Inc. ("RCI"), an affiliate of Richard Design Services, Inc. ("RDS"), the Facility's general contractor and largest creditor, regarding an orderly sale of the Facility to Westlake and RCI. The result of these negotiations is that certain Stalking Horse and DIP Financing Support Agreement (the "Support Agreement") dated as of March 13, 2016 and as amended and restated on April 12, 2016, by and among the Debtor, Westlake, and RDS and RCI, which was executed prior to the Petition Date. The Support Agreement provides for, among other things, the sale of substantially all of the Debtor's assets, including the Facility, to Westlake and RCI as the "stalking horse"—subject to higher or better offers—pursuant to Bankruptcy Code section 363 (the "Sale") and post-petition debtor-in-possession financing in an amount not to exceed $3.0 million. The bidding procedures and terms associated with the Sale are set forth in the Debtor's *Motion for an Order Pursuant to Sections 105, 363, 364 and 541 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 And 9014, (A) Approving Bidding Procedures and Stalking Horse Protections for the Sale of Substantially All of the Debtor's Assets; (B) Approving Stalking Horse Purchase Agreement; (C) Approving Procedures for the Assumption and Assignment and Rejection of Designated Executory Contracts; (D) Scheduling the Auction and Sale Hearing; (E) Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; And (F) Granting Related Relief* filed concurrently herewith. In addition, prior to the Petition Date, to provide the Debtor with liquidity to enable it to file an orderly chapter 11 case and finalize negotiations on the Sale and DIP Facility, the DIP Lender and RCI provided

28225400.v13

unsecured and subordinated bridge loans to the Debtor in the aggregate amount of $820,000, which loans are not being rolled-up into the DIP loans.

8. The Debtor requires the DIP Facility to pay administrative costs associated with this case, provide the cash necessary to maintain and maximize the going concern value of its assets through a sale of substantially all of its assets pursuant to Bankruptcy Code section 363, satisfy payroll and employee obligations, and avoid the immediate liquidation of its estate. The Debtor simply does not have available sources of working capital to take such actions without the proposed DIP financing. The proposed use of the DIP Facility will maintain the value of the Debtor's estate for the benefit of all parties in interest, and will provide working capital to the extent necessary to cover cash shortfalls during this case. In light of the foregoing, the Debtor has determined, in the exercise of its sound business judgment, that the proposed DIP Facility, which permits the Debtor to obtain up to $3.0 million in financing and to use such credit to finance the operation of its business and maintain its assets, is critical to its ability to reorganize.

## RELIEF REQUESTED

9. The Debtor seeks, pursuant to Bankruptcy Code sections 105, 361, 362, 363, and 364 and Bankruptcy Rules 4001(b) and (c), the entry of interim and final orders, *inter alia,* authorizing the Debtor to obtain post-petition financing under the DIP Facility in an aggregate amount of up to $3.0 million from the DIP Lender on the terms detailed herein, secured by senior liens on substantially all of the Debtor's unencumbered assets, if any, and junior liens on all of the Debtor's assets already subject to liens (in each case excluding all causes of action under chapter 5 of the Bankruptcy Code and all cash, cash equivalents, and marketable securities as of the Petition Date, other than proceeds of the DIP loans, collectively, the "Excluded Assets") and given an administrative "super-priority" claim as discussed herein, authorizing the Debtor to

8

execute all documents, including the DIP Facility Documents, and take all actions necessary to obtain the proposed financing, scheduling a final hearing, and granting related relief.

## BASES FOR RELIEF REQUESTED

### A. DIP Financing

#### i. Legal Standard

10. Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in Bankruptcy Code sections 503(b) or 507(b), (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364(c).

#### ii. The Debtor Has No Viable Alternative to the DIP Facility

11. The Debtor has been unable to obtain unsecured credit or debt allowable as an administrative expense under Bankruptcy Code section 503(b)(1) in an amount sufficient and readily available to maintain ongoing operations, and has been unable to obtain financing from an alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

12. A working capital facility of the type needed in this case could not have been obtained on an unsecured basis. Moreover, potential sources of the proposed DIP Facility for the Debtor, obtainable on an expedited basis and on reasonable terms, were extremely limited under the current conditions in the capital markets. In these circumstances, "[t]he statute imposes no

9

duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co., Inc.,* 789 F.2d 1085, 1088 (4th Cir. 1986).

13. A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Bankruptcy Code section 364(c) and (d). *Id.* Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd,* 99 B.R. 117 (N.D. Ga. 1989). Thus, evidence to be introduced at the interim hearing on this Motion will satisfy the requirement of Bankruptcy Code section 364(c) and (d) that alternative credit on more favorable terms was unavailable to the Debtor.

14. The Debtor believes that the financing arrangements provided by the DIP Lender are the best available at this time. The terms and conditions of the DIP Facility are fair and reasonable and were heavily negotiated by the parties in good faith and at arm's length.

### iii. Application of the Business Judgment Standard

15. After appropriate investigation and analysis and given the exigencies associated with the Debtor's chapter 11 filing, the Debtor's management has concluded that the DIP Facility is the only available alternative in the circumstances of this case. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. *See Grp. of Institutional Investors v. Chicago, Mil., St. P., & Pac. R.R. Co.,* 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy

Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N. A.,* 762 F.2d 1303, 1311 (5th Cir. 1985).

16. In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.,* 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of authority under the Code." *Id.* at 513-14 (footnotes omitted).

17. The Debtor has exercised sound business judgment in determining that the DIP Facility is appropriate, and the Debtor has satisfied the legal prerequisites to borrow under the DIP Facility. The terms of the DIP Facility are fair and reasonable and are in the best interests of the Debtor's estate. Accordingly, the Debtor should be granted authority to enter into the DIP Facility and borrow funds from the DIP Lender on the secured, administrative super-priority basis described above, pursuant to Bankruptcy Code section 364(c) and take the other actions contemplated by the DIP Facility Documents and as requested herein.

### iv. The DIP Facility is Necessary to Preserve the Value of the Debtor's Assets, Permit the Debtor to Operate Its Business, and Successfully Maximize Value of the Debtor's Estate

18. No party in interest can seriously contend that the Debtor does not need immediate access to additional liquidity. As seen in the DIP Budget, the Debtor has significant cash needs to operate in chapter 11 and pursue and consummate the Sale. Accordingly, access to credit is necessary to meet any cash shortfalls associated with the sale of the Debtor's assets and otherwise finance its operations.

11

28225400.v13

19. The DIP Facility will permit the Debtor to maximize the value of its assets for its creditors through the consummation of the sale of its assets. The DIP Facility will permit the Debtor to maintain and maximize the value of its assets in several ways. First, certain of the Debtor's employees have received specialized training regarding the operation and maintenance of the Facility and those employees possess the expertise necessary to maintain the Facility during the chapter 11 case. The DIP Facility will enable the Debtor to retain those employees, which will allow the Debtor to maintain the Facility during the case until it is sold. Thus, retention of these employees will help retain the Facility's value by preventing its deterioration prior to its sale during the chapter 11 case. Additionally, proceeds from the DIP Facility will permit the Debtor to remain administratively solvent during the chapter 11 case, which will permit the consummation of the sale of the Facility, enable the Debtor to realize funds from the Sale to confirm its liquidating plan, and provide a recovery to the Debtor's creditors instead of the likely zero recovery for creditors in a chapter 7 proceeding.

20. If the DIP Facility, however, is not approved, the Debtor will be unable to retain the employees described in the preceding paragraph and will be unable to take other steps necessary to preserve the value of its assets. Further, absent the proposed DIP Facility, there is a high likelihood that the Debtor will be forced to convert the case to a chapter 7 proceeding and liquidate its assets, which will likely involve the piecemeal fire sale of parts for a small fraction, if any, of the Facility's going concern value. This result, which will likely result in almost no recovery for the Debtor's creditors, which is contrary to the interests of the Debtor's creditors and all parties in interest.

### v. The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate

21. The proposed terms of the DIP Facility referenced herein are fair, reasonable and adequate in that these terms neither (a) tilt the conduct of this case and prejudice the powers and

12

28225400.v13

rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits.  The purpose of the DIP Facility is to enable the Debtor to maintain the value of its assets and to meet ongoing operational expenses, including administrative expenses.

22. The proposed DIP Facility provides that the DIP Liens and administrative expense claims granted to the DIP Lender are subject to the Carve-Out.  Bankruptcy courts generally find that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel.  *See In Ames Dep't Stores, Inc.,* 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).  Not only are the DIP Liens and administrative expense claims granted to the DIP Lender subject to the Carve-Out, but the DIP Lender has agreed to fund all or part of the Carve-Out in cash under the DIP Credit Agreement. Such funding is further evidence of the reasonableness of the terms of the DIP Facility.

23. Likewise, the various fees and charges required by the DIP Lender under the DIP Facility are reasonable and appropriate under the circumstances. In fact, there are no commitment, monthly servicing, termination, or other such fees payable to the DIP Lender, and all customary fees and expenses that are payable to the DIP Lender are to be capitalized and thus will not be paid in cash.  Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Bankruptcy Code section 364.  *See Miller v. Greenwich Capital Fin. Prods. (In re Am. Bus. Fin. Servs.),* 375 B.R. 112, 115 (Bankr. D. Del. 2007) (noting the fees and other terms previously approved by the court); *In re Stoney Creek Techs., LLC*, 364 B.R. 882, 885 (Bankr. E.D. Pa. 2007) (same); *In re Defender Drug*

*Stores, Inc.,* 145 B.R. 312, 316-18 (9th Cir. BAP 1992) (authorizing credit arrangement under Bankruptcy Code section 364, including a lender "enhancement fee").

24. The terms and conditions of the DIP Facility Documents are fair and reasonable and were negotiated by the parties in good faith and at an arm's length. Accordingly, the DIP Lender under the DIP Facility Documents should be accorded the benefits of Bankruptcy Code section 364(e) in respect of such agreement.

25. The fairness and reasonableness of the terms of the DIP Facility will be further shown at the Interim and Final Hearings.

### vi. Request for Modification of Automatic Stay

26. The proposed DIP Facility contemplates a modification of the automatic stay established pursuant to Bankruptcy Code section 362 under terms usual and customary with transactions of this nature. Such stay modification provisions are ordinary and usual features of post-petition debtor-in-possession financing facilities and, in the Debtor's business judgment, are reasonable under the present circumstances. The Court accordingly should modify the automatic stay to the extent contemplated by the DIP Facility Documents and the Interim DIP Order.

### vii. DIP Proceeds Constitute Cash Collateral

27. The proposed DIP Facility contemplates that the DIP Facility proceeds made available to the Debtor, including all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Debtor in which the DIP Lender asserts security interests, liens or mortgages, regardless of (a) whether such security interests, liens, or mortgages existed as of the Petition Date or arose thereafter pursuant to the Interim DIP Order or Final DIP Order and (b) whether the property converted to cash existed as of the Petition Date or arose thereafter shall constitute the DIP Lender's "<u>Cash Collateral</u>"). For the avoidance of doubt, Cash Collateral does not include the Excluded Assets, or the proceeds therefrom.

28225400.v13

28.     Bankruptcy Code section 363(c)(2) provides that a debtor may not use, sell, or lease cash collateral unless: "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the only cash collateral that the Debtor seeks to use is the Cash Collateral, which are proceeds of the DIP Facility that the Debtor will use pursuant to the DIP Facility Documents with the DIP Lender's consent. Accordingly, the subpart a of Bankruptcy Code section 363(c)(2) is satisfied because (a) the DIP Lender has consented to the Debtor's use of the Cash Collateral pursuant to the terms of the DIP Facility Documents and (b) the Debtor is not seeking to use the Cash Collateral without the DIP Lender's consent.

29.     The Debtor submits that the Cash Collateral made available to the Debtor through the DIP Facility and the Debtor's use thereof will allow the Debtor to administer and preserve the value of its estate during the pendency of the Debtor's chapter 11 case and realize the highest and best value for the sale of substantially all of its assets. For the foregoing reasons, the Debtor submits that it is in the best interest of the Debtor's estate and its creditor to establish the DIP Facility pursuant to the terms of the DIP Facility Documents.

**REQUEST FOR EMERGENCY INTERIM RELIEF**

30.     Pending the Final Hearing, the Debtor requires immediate use of the financing provided by the DIP Facility. It is essential that the Debtor immediately stabilize its operations and pay for ordinary, post-petition operating expenses. Absent immediate use of the DIP financing, the Debtor will be unable to pay ongoing operational expenses and violate the terms of the Support Agreement. Consequently, if interim relief is not obtained, the Debtor's assets will

be immediately and irreparably jeopardized, to the detriment of its estate, its creditors and other parties in interest.

31. Accordingly, the Debtor requests that, pending the Final Hearing, the Court schedule the Interim Hearing as soon as practicable, but not later than April 19, 2016 to ensure the Debtor complies with its obligations under the Support Agreement, to consider the Debtor's request for authorization to obtain interim credit under the DIP Facility, in accordance with and pursuant to the terms and conditions contained in the DIP Facility Documents and the Interim DIP Order.

32. Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for financing during the 15-day period following the filing of a motion requesting authorization to obtain post-petition financing, "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2). In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., In re Ames Dep't Stores, Inc.,* 115 B.R. at 38. After the 15-day period, the request for financing is not limited to those amounts necessary to prevent destruction of the debtor's business. A debtor is entitled to borrow those amounts that it believes prudent in the operation of its business. *See, e.g., In re Simasko Prod. Co.,* 47 B.R. at 449*; In re Ames Dep 't Stores, Inc.,* 115 B.R. at 36.

## NOTICE

33. Notice of this Motion has been provided by first class mail to: (a) the United States Trustee for Region 7; (b) counsel to the DIP Lender; (c) the creditors listed on the Debtor's list of 20 largest unsecured creditors, as filed with the Debtor's chapter 11 petition; (d) the Internal Revenue Service; and (e) all parties requesting notice pursuant to Bankruptcy Rule

16

2002. In light of the nature of the relief requested, the Debtor submits that no further notice is required or needed under the circumstances.

## **CONCLUSION**

WHEREFORE, PREMISES CONSIDERED, the Debtor requests that this Court enter interim and final orders authorizing the Debtor to obtain post-petition financing on an interim and final basis on the terms detailed herein, and as will be further detailed in the DIP Documents and other materials furnished subsequently to the Court, as well as schedule a final hearing on or before May 12, 2016 to ensure the Debtor complies with its obligations under the Support Agreement, and grant related relief.

Date: April 14, 2016
Houston, Texas

/s/ Mark W. Wege
Mark W. Wege (Texas Bar No. 21074225)
Edward L. Ripley (Texas Bar No. 16935950)
Jason S. Sharp (Texas Bar No. 24079897)
KING & SPALDING, LLP
1100 Louisiana, Suite 4000
Houston, Texas 77002
Telephone: 713-751-3200
Facsimile: 713-751-3290
Email: MWege@kslaw.com
 ERipley@kslaw.com
 JSharp@kslaw.com

*Proposed Counsel for the Debtor and Debtor in Possession*