IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

---

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| | : | Case No. 16-31959 |
| JUNIPER GTL LLC[1] | : | |
| | : | |
| | : | |
| Debtor. | : | |

---

**DECLARATION OF JAMES DECKER
IN SUPPORT OF DEBTOR'S EMERGENCY MOTION
PURSUANT TO 11 U.S.C. §§ 105, 361, 363, AND 364 FOR
INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO
(A) OBTAIN POST-PETITION FINANCING AND (B) GRANT SENIOR LIENS,
JUNIOR LIENS, AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS;
(II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF**

I, James D. Decker, under 28 U.S.C. § 1764, declares as follows under the penalty of perjury:

1. I am employed by Guggenheim Securities, LLC ("Guggenheim"), an investment banking firm that maintains offices at, among other places, 3414 Peachtree Road, Suite 960 Atlanta, Georgia 30326, and I make this Declaration in support of Juniper GTL LLC's (the "Debtor") *Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 363, and 364 for Interim and Final Order (I) Authorizing the Debtor to (A) Obtain Post-Petition Financing and (B) Grant Senior Liens, Junior Liens, and Superpriority Administrative Expense Status; (II) Scheduling a Final Hearing; and (III) Granting Related Relief* (the "DIP Motion").

2. Except as otherwise stated, I have personal knowledge of the facts set forth herein, and if called upon to testify, would testify competently to all of the facts set forth herein.

---

[1] The last four digits of the Debtor's federal tax identification number is 3161. The Debtor's mailing address is 3 Riverway, Suite 1050, Houston, Texas 77056.

28736273.v7

3.     In forming the opinions set forth herein, I have relied upon and/or considered, among other things, the following: (i) my experiences in chapter 11 cases, including with debtor-in-possession ("DIP") financing facilities; (ii) the DIP Motion; (iii) the Debtor's financial statements, reports, and financial projections; (iv) documents related to the proposed DIP financing; (v) Guggenheim's analyses regarding the proposed DIP financing and DIP financings in other chapter 11 cases; (vi) discussions with the Debtor's management concerning the Debtor's business and finances; (vii) discussions with alternative prospective sources of DIP financing; and (viii) discussions with my colleagues and other advisors to the Debtor.

4.     As a Senior Managing Director at Guggenheim, I have significant experience in a wide variety of corporate finance transactions, including restructurings, acquisitions, debt and equity financings, leveraged buyouts, business valuations and intangible asset valuations. I focus on middle market merger and acquisition, financing, and restructuring advisory services. In the course of my career, I have completed in excess of 150 assignments across a variety of industries and situations for companies and creditors. I have worked with clients across a diverse range of industries, including in the energy sector. Prior to joining Guggenheim in 2013, I was a Managing Director with Morgan Joseph TriArtisan LLC and Head of the firm's Recapitalization & Restructuring Group. Prior to joining Morgan Joseph, I was a Managing Director with Alvarez & Marsal, and served as co-head of the firm's Corporate Finance Group headquartered in New York. Before joining Alvarez & Marsal, I was a Managing Director with Houlihan Lokey Howard & Zukin, where I served as co-head of the firm's Atlanta office and was responsible for new client development, engagement management, and personnel development for its Restructuring and Corporate Finance practices. Previously, I founded and served as president of Inverness Partners Incorporated, a boutique mergers and acquisitions firm that was

acquired by Houlihan Lokey Howard & Zukin in July of 1999.  Before Inverness Partners, I was head of the Mergers and Acquisitions department of SunTrust Capital Markets, Inc.  I began my career as an investment banker in the Corporate Finance department of Bear, Stearns & Co., Inc.

5.      I received my Bachelor of Arts degree in Economics and Geology from Vanderbilt University and my Masters in Business Administration with a concentration in Finance from The Wharton School of the University of Pennsylvania.  I am a licensed FINRA General Securities Registered Representative (Series 7, 24, 64) and a Certified Insolvency and Restructuring Advisor (CIRA).  Additionally, I am a 1983 Smithsonian Institution Fellow and a frequent speaker on the topics of corporate finance, mergers and acquisitions, capital markets and financial restructuring.

6.      The Debtor retained Guggenheim in November 2015 to assist with securing permanent funding for its gas-to-liquids facility under construction in Westlake, Louisiana (the "Facility").  I understand that, in the months prior to Guggenheim's engagement, the Debtor had been attempting to raise the incremental capital required to complete the Facility without third-party investment banking advisory assistance.  I also understand that, despite several investors progressing to advanced stages of diligence, those efforts had not resulted in a viable alternative for the infusion of either debt or equity capital.  I understand further that, without access to the additional capital required to complete the Facility and without the ability to generate revenue, the Debtor began experiencing increasing liquidity constraints, and engaged Guggenheim to assist with raising the capital necessary to complete construction of the Facility.

7.      Based on previous experiences in attempting to raise incremental capital, the Debtor anticipated that the level of marketing and diligence necessary to identify and consummate a transaction that would result in a permanent capital solution (the "Permanent

Capital") would be significant given the highly technical nature of the project and the macroeconomic factors that were negatively impacting the universe of investors with the most experience in similar assets. The Debtor's limited liquidity, however, was not sufficient to provide for the operational costs expected during this period of time, and Guggenheim was requested to conduct a process to identify an interim funding source that would provide a smaller amount of capital (the "Interim Funding") that would be utilized to fund the Debtor's operations in support of the marketing and diligence process associated with identifying the Permanent Capital.

8. The Debtor, after consultation with Guggenheim and its other advisors, determined that the Interim Funding structure that was most likely to be successful was a secured debt facility secured by the partially-completed Facility. Guggenheim contacted twenty-eight (28) parties to solicit interest in providing Interim Financing, including parties known to provide equipment-backed loans, as well as other parties known to Guggenheim to make investments in situations with some similar characteristics. Of those parties, twelve (12) executed non-disclosure agreements and were granted access to a data room containing relevant diligence information, and four (4) parties conducted on-site visits at the Debtor's facilities in Houston, Texas and Westlake, Louisiana.

9. At the conclusion of the Interim Financing process, none of the parties contacted were willing to provide financing. In discussions with these financing sources, the reasons offered in explanation of declining the opportunity included, among others, the following: the specialized nature of the assets, the view that the resale value of the assets did not exceed the level of financing necessary, and the presence of a significant number of mechanics liens.

10. In the absence of viable Interim Funding alternatives, the Debtor was reliant on incremental equity injections from its existing equity holders. On or about December 30, 2015, the Debtor informed Guggenheim that its equity sponsors had declined to offer the financing necessary to conduct the contemplated process to identify Permanent Capital. Shortly thereafter, the Debtor determined to focus its efforts on developing a transaction to be consummated inside of chapter 11, including obtaining DIP financing.

11. In conjunction with the process of identifying a stalking horse, Guggenheim solicited potentially interested parties to provide the Debtor with the DIP financing necessary to consummate a transaction. Ultimately, the DIP Lender (as defined in the DIP Motion) agreed to provide DIP financing that is secured on junior basis as it relates to the Debtor's assets that are subject to existing liens as of the Petition Date and does not seek to encumber the Excluded Assets (as defined in the DIP Motion), and was the only party that agreed to do so.

12. Guggenheim subsequently contacted five (5) of the parties who had previously executed non-disclosure agreements to provide Interim Financing to determine interest in providing DIP financing to the Debtor. In the discussions with potential lenders, I and my team inquired as to the willingness to provide financing subordinated to existing liens, and none of the lenders were willing to provide financing on that basis.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

28736273.v7

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 14, 2016, at Atlanta, Georgia.

By: _____
James D. Decker
Senior Managing Director
Guggenheim Securities, LLC