**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---------------------------------------------------------------
                                    :
In re:                              :        Chapter 11
                                    :
                                    :        Case No. 16-31959
JUNIPER GTL LLC[1]                  :
                                    :
                                    :
                    Debtor.         :
---------------------------------------------------------------

**DECLARATION OF DAVID RUSH IN SUPPORT
OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

    Pursuant to 28 U.S.C. § 1746, I, David Rush, declare under penalty as follows:

    1.    I am a Senior Managing Director with FTI Consulting, Inc. ("FTI"). I have been employed by FTI since 2006. As part of my duties with FTI, I also serve as the President, Chief Restructuring Officer ("CRO") and Secretary of Juniper GTL LLC (the "Debtor"). I have served in this capacity for the Debtor since January 19, 2016, and I am familiar with the Debtor's business, day-to-day operations, and financial affairs.

    2.    I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the Debtor's commencement of this chapter 11 case (the "Case") and in support of the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the pleadings filed by the Debtor on the date hereof (the "Petition Date") in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). I have reviewed the factual support set forth in each of the Debtor's "First Day" pleadings (described below) and attest to the accuracy thereof. Except as

---

[1]     The last four digits of the Debtor's federal tax identification number is 3161. The Debtor's mailing address is 3 Riverway, Suite 1050, Houston, Texas 77056.

indicated otherwise, all facts set forth herein are based on my personal knowledge, discussions with current and former members of the Debtor's senior management and professional advisors, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtor's operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on the Debtor's behalf.

## OVERVIEW OF THE DEBTOR'S BUSINESS

3.      The Debtor is a Delaware limited liability company formed in 2012 for the sole purpose of building and operating a "gas-to-liquids" facility in Westlake, Louisiana (the "Facility").  The Debtor maintains its headquarters in Houston, Texas.  Upon completion, the Facility is estimated to convert 13,600 MMBtu/day (million British thermal units/day) of pipeline natural gas into 1,170 bpd (barrels per day) Fischer-Tropsch ("FT") products consisting of 768 bpd of wax, 315 bpd of diesel, and 87 bpd of naphtha.  The Facility has been in development since May 2012 by SGC Energia Co, LLC ("SGC Energia") and Great Northern Project Development, LLC ("GNPD"), and since June 2014 together with Calumet Specialty Products Partners, L.P. ("Calumet" and together with SGC Energia and GNPD, the "Equity Sponsors").

4.      The Facility is located on a 4.2 acre parcel, part of which is occupied by a steam methane reformer (the "SMR") that was acquired by the Debtor.  The Debtor intends to refurbish the SMR and construct a new FT process area that will convert synthesis gas produced by the SMR into the wax, diesel, and naphtha, as discussed above.  The Debtor initiated preliminary groundwork on the Facility in July 2013 and began the bulk of the new construction in April 2014.  The refurbishment of the SMR was completed in July 2015.  In April 2014, the Debtor

2

entered into a lump sum, fixed price contract with Richard Design Services Inc. ("RDS") for the engineering, procurement, and construction work associated with the new FT process area.  In addition, to provide for the integration of the SMR and FT processes, design of the facility, and supply of the licenses and permits necessary for the Facility's completion and operation, the Debtor entered into a service and support agreement and an XTLH License agreement with SGC Energia.  As of the Petition Date, the construction of the Facility was approximately sixty percent (60%) complete.

5.     In addition to the refurbishment, design, and construction work at the Facility, the Debtor also entered into supply and sales agreements to ensure that the Facility had a supply of natural gas feedstock for the SMR and customers for the products produced by the Facility. Specifically, in June 2013, the Debtor entered into a supply agreement with one of the largest North American independent midstream companies for a five-year, renewable, supply of natural gas, with no take-or-pay provisions, to support the Facility's startup and ramp-up of operations. In July 2013, the Debtor entered into a seven (7) year wax sales and purchase agreement with a leading trader of FT wax, for the offtake of the wax produced at the Debtor's facility once complete.  And, in June 2014, the Debtor entered into a seven (7) year sales and purchase agreement with a North American specialty products company for offtake of the diesel produced by the Debtor.  Finally, in February 2014, the Debtor executed a sales and purchase agreement with a private petrochemicals company for a six (6) year sale of the naphtha produced at the Facility.[2]

---

[2]     The Debtor has also received a tax incentive plan and air permit from the state of Louisiana.

3

## DEBTOR'S CAPITAL STRUCTURE

*Equity in the Debtor*

6.      New Source Fuels, LLC ("NSF"), a special-purpose entity and Delaware limited liability company, owns 100% of the Debtor's equity interests.   In turn, Clean Fuels North America LLC ("CFNA") owns 70.6% of the equity interests in NSF and Calumet owns 29.4% of NSF's equity interests.   CFNA, a Delaware limited liability company, is a joint venture of SGC Energia and GNPD.   The Equity Sponsors have contributed approximately $80.0 million to the Facility to date in development, construction, and operating expenses.   A chart detailing the Debtor's organizational structure is attached hereto as **Exhibit A**.

*Debt*

7.      As set forth above, the Facility is not yet completed or operational; therefore, the vast majority of the Debtor's debt is to parties that have provided goods or services related to the Facility's construction.   Specifically, as of the Petition Date, the total amount of the Debtor's obligations is approximately $43.0 million.   Of that amount, $37.5 million, is for obligations related to the Facility's construction, which includes $27 million by parties claiming liens, and who may have valid liens, under the Private Works Act (defined below).

8.      Under the Louisiana Private Works Act, La. R.S. 9-4801 (the "Private Works Act"), certain parties, *e.g.*, taxing authorities, subcontractors, materialmen, and laborers, among others, can file lien claims against a construction project's owner to secure payment for their work.   Claims under the Private Works Act are classified by priority under the statute regardless of when they are filed; for example, claims for *ad valorem* taxes have the highest priority (Category 1), and therefore, have a higher priority than all other claims regardless of when lower priority claims are filed.   As of the Petition Date, the Debtor's books and records show Category

4

1 lien claims in the aggregate amount of $0.2 million; no Category 2 or Category 3 lien claims; Category 4 lien claims in the aggregate amount of $21.7 million; and Category 5 lien claims in the aggregate amount of $5.3 million.  The Debtor estimates that $17.6 million, *i.e.*, the vast majority of the Category 4 lien claims against the Debtor, are held by Richard Construction, Inc.("RCI"), an affiliate of RDS.

9.     In addition to the lien claims asserted under the Private Works Act, the Debtor has certain unsecured debts arising from operating loans made to the Debtor during its attempts to obtain additional funding for the Facility.  Specifically, in January 2016, the Debtor obtained an unsecured loan from SGC Energia in an aggregate amount of $1.23 million.  In connection with its negotiations (discussed herein) with Westlake (defined below) and RCI, the Debtor obtained eight additional unsecured loans in an aggregate amount of $820,000 on substantially the same terms as the loans from SGC Energia for the Debtor's operating expenses while the various agreements with Westlake and RCI were being negotiated and finalized.

## EVENTS LEADING TO CHAPTER 11

10.     In March 2015, the Debtor's fourth equity investor determined that it could no longer invest in the Facility.  In response to the investor's withdrawal, between April 2015 and July 2015, the Debtor engaged in extensive investment diligence with a potential investor.  In August 2015, however, the potential investor decided not to pursue an investment with the Debtor.  As a result of a liquidity shortfall caused by the withdrawal of the prior equity investor and the Debtor's inability to identify a replacement investor, the Debtor halted construction on the Facility in September 2015.  At the time of the halt of the Facility's construction and through the Petition Date, approximately ninety-eight percent (98%) of the Facility's design and engineering work and sixty percent (60%) of the construction had been completed.

11.     In November 2015, the Debtor retained Guggenheim Securities, LLC ("Guggenheim") to assist with securing permanent funding for the Facility.  Between the Debtor's engagement of Guggenheim in November 2015 and December 2015, Guggenheim contacted approximately 154 parties to determine their interest in investing in, or providing debt financing to, the Debtor.  Guggenheim, however, was unable to identify any party who desired to provide capital to the Debtor in its current financial condition.

12.     Concurrent with the Debtor's engagement of Guggenheim, the Debtor also retained FTI to assist it with contingency planning and provide restructuring services in the event the Debtor was unable to secure additional investment.  Despite the Debtor's and its professionals' efforts, it became clear in January 2016 that the efforts to secure additional investment would be unsuccessful.  Accordingly, on January 19, 2016, I was appointed to manage the Debtor's business affairs and prepare for a sale of the Debtor's assets.  Between January 19, 2016 and April 11, 2016, I had numerous discussions and negotiations with at least eight (8) parties interested in purchasing the Debtor's assets and providing additional monies to pay the Debtor's lien creditors and costs to complete the Facility.  As set forth below, I have been closely involved with the Debtor during the period immediately preceding the Petition Date negotiating terms of a sale of substantially all of the Debtor's assets and debtor-in-possession financing.

13.     The proposed sale of the Debtor's assets in this case will enable a purchaser to complete the Facility, while providing distributions to the Debtor's creditors that would be greater than a forced liquidation in chapter 7, where the vast majority—if not all—of such creditors would likely receive nothing.  Indeed, while an appraisal of the Debtor's assets in a chapter 7 liquidation scenario conducted by Heritage Global Valuations, as of December 3, 2015

28279848.v9

reflected forced and orderly liquidation values of $1.3 million and $2.7 million, respectively, the Debtor has received only a single bid[3] in the amount of $632,000 for its assets, despite soliciting bids from several liquidation firms.

14.     Accordingly, the Debtor entered into negotiations with Westlake GTL LLC ("Westlake"), an affiliate of a publicly-traded energy company, and RCI, the Debtor's largest creditor, regarding an orderly sale of the Facility to Westlake and RCI.  The result of these extensive negotiations is that certain Stalking Horse and DIP Financing Support Agreement (the "Support Agreement") dated as of March 13, 2016 by and among the Debtor, Westlake, RDS, and RCI.[4]  The Support Agreement provides for, among other things, the sale of substantially all of the Debtor's assets, including the Facility, to Westlake and RCI as the "stalking horse" (together the "Stalking Horse Purchaser")—subject to higher and better offers—pursuant to Bankruptcy Code section 363 (the "Sale") and post-petition debtor-in-possession financing in an amount not to exceed $3.0 million.  The Sale also provides for payment in full of all taxes (Category 1 lien claims), essentially payment in full for Category 4 lien claims, and significant payment of Category 5 lien claims.  In addition, there will also be funds and a liquidation trust for distributions to general unsecured creditors.

15.     The Debtor believes that the Support Agreement and the transactions contemplated thereunder are in the best interest of the Debtor, its estate, its creditors, and all parties in interest.  Specifically, the Debtor has reached this conclusion because the Support Agreement will provide (i) debtor-in-possession financing to provide liquidity for the Debtor

---

[3]     This bid was also subject to several diligence contingencies, which would permit the bid to be withdrawn.

[4]     The Support Agreement was subsequently amended by that certain Amended and Restated Stalking Horse and DIP Financing Support Agreement dated as of April 12, 2016 by and among the Debtor, Westlake, RDS, and RCI to reflect the later filing of the Debtor's chapter 11 petition and certain other changes since the execution of the original Support Agreement.

28279848.v9

during the Case; (ii) net proceeds from the Sale (either to the Stalking Horse Purchaser or a higher bidder) that will yield recoveries greatly in excess of the potential liquidation value of the Facility under a chapter 7 liquidation; and (iii) a proposed path forward for the Facility to be completed, which will allow certain of the Debtor's creditors to continue working on the Facility.

## FIRST DAY MOTIONS[5]

16.     Contemporaneously with the filing of this Declaration, the Debtor has filed a number of motions (the "First Day Motions") in the Case seeking orders granting various forms of relief.  I believe that the relief requested in the First Day Motions is necessary to, among other things, enable the Debtor to operating with minimal disruption during the pendency of the Case.

**A. Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 363, and 364 for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Post-Petition Financing and (B) Grant Senior Liens, Junior Liens, and Superpriority Administrative Expense Status; (II) Scheduling a Final Hearing; and (III) Granting Related Relief (the "DIP Motion")**

17.     In connection with the filing of the Case, the Debtor is seeking approval of the proposed debtor-in-possession financing facility, as more fulling described in the DIP Motion, the proposed interim order on the DIP Motion, and the Debtor-in-Possession Loan and Security Agreement (collectively with all agreements, documents, and instruments delivered or executed in connection therewith, the "DIP Facility Documents").  As set forth above, the DIP Facility is a critical component of the Support Agreement and the Debtor's path toward maximizing creditor recoveries.  Indeed, absent the DIP Facility, the Debtor will be administratively insolvent and forced to convert the Case to a chapter 7 proceeding, which could result in minimal recoveries, if any, to the Debtor's creditors and a loss of the Facility's remaining value.

---

[5]     Capitalized terms used in this section not otherwise defined shall have the meaning ascribed to such terms in the applicable motion.

18.     As part of the Debtor's marketing process, Guggenheim contacted approximately 154 parties to make an equity investment in the Debtor or purchase the Facility.  Of the 154 parties contacted, thirty-four (34) indicated a potential interest in some type of investment in the Facility and executed a confidentiality agreement with the Debtor to allow for due diligence and other exchanges of information.  Thereafter, five (5) parties, including the Stalking Horse Purchaser and the aforementioned liquidator party, provided term sheets to the Debtor for the purchase of the Facility, some of which also contemplated providing DIP financing.

19.     Certain other parties expressed interest in purchasing the Facility, but were unwilling to provide operational funding to the Debtor while completing due diligence.  Absent third-party operational funding, the Debtor determined, in exercise of its business judgment, that proceeding with a chapter 11 filing and seeking approval of the DIP Facility was in the best interest of its creditors.  The Debtor believes that this option is superior to its only alternative, which was to fund its operations out of the $1.475 million in natural gas hedge fund proceeds, while waiting for other parties to conduct diligence.  The Debtor believes that utilizing its lone remaining significant asset would not be in the best interest of its creditors, especially considering that offers to purchase the Facility and provide DIP financing were speculative at best.  Moreover, any parties wishing to provide DIP financing on better terms now have additional time to conduct diligence, and will have an opportunity to do so in connection with the auction of the Facility.

20.     As set forth more fully in the DIP Motion, the Debtor requires the DIP Facility to pay administrative costs associated with this case, provide the cash necessary to maintain and maximize the going concern value of its assets through a sale of substantially all of its assets pursuant to Bankruptcy Code section 363, satisfy payroll and employee obligations, and avoid

9

the immediate liquidation of its estate.  The Debtor simply does not have available sources of working capital to take such actions without the proposed DIP financing.  The proposed use of the DIP Facility will maintain the value of the Debtor's estate for the benefit of all parties in interest, and will provide working capital to the extent necessary to cover cash shortfalls during this case.

21.     The basic terms of the DIP Facility are favorable for the Debtor's estate; the DIP Facility will be secured on a junior basis to existing creditors, with no transaction or financing fees (other than the DIP Lender's legal fees), there is no roll-up or payment of any pre-petition loans, and the DIP Liens exclude chapter 5 causes of action and the Debtor's unencumbered cash.  In light of the foregoing, the Debtor has determined, in the exercise of its sound business judgment, that the proposed DIP Facility, which permits the Debtor to obtain up to $3.0 million in financing and to use such credit to finance the operation of its business and maintain its assets, is critical to its ability to reorganize.

**B. Emergency Motion to Implement Certain Notice Procedures (the "<u>Notice Procedures Motion</u>")**

22.     The Debtor has identified approximately 350 parties in interest to whom notice must be given under the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas.  Such notice would be extremely burdensome to the Debtor, costly to its estate and, in many instances, unnecessary, as many matters have no bearing on certain parties.  Accordingly, the Debtor requests that the Court approve the proposed Notice Procedures (as set forth and defined in the Notice Procedures Motion) that will afford due and adequate notice to all parties in interest without burdening the Debtor's estate with substantial administrative costs.  The Notice Procedures are consistent with

similar procedures approved in this district (and other courts) and provides proper due process pursuant to the Bankruptcy Rules.

**C. Emergency Motion for Order Authorizing Payment by Debtor of Pre-Petition Employee Obligations and Authorized Pre-Petition Benefit Programs (the "<u>Employee Wages Motion</u>")**

    i.  <u>The Employee Obligations</u>

23. As of the Petition Date, the Debtor has approximately five employees comprised of three salaried employees and two hourly employees. None of the Debtor's employees are members in a labor union.

24. As described more fully below, in the ordinary course of business the Debtor has incurred certain pre-petition employee obligations that remain unpaid as of the Petition Date. Even though arising prior to the Petition Date, these obligations (collectively, the "<u>Employee Obligations</u>") will become due and payable in the ordinary course of the Debtor's business on and after the Petition Date.  These obligations can generally be categorized as follows:  (a) wages, salaries, and other compensation; (b) payroll taxes; (c) vacation and holiday programs; (d) qualified 401(k) plan obligations; (e) health and welfare benefits and (f) miscellaneous other benefits provided to the employees in the ordinary course of business.  These obligations are described as follows:

 a. *Wages, salaries, and other compensation*

  Wages, salaries, and other compensation consist of pre-petition wages and salaries owed to the Debtor's employees (the "<u>Payroll Obligations</u>"). All salaried employees are paid semi-monthly, while all hourly employees are paid weekly.  The Debtor's average monthly gross Payroll Obligation over the past six months is approximately $26,400. As of the Petition Date, some Payroll Obligations were unpaid because (a) they constitute wages and salaries earned but unpaid as of the Petition Date, or (b) certain paychecks issued pre-petition remained uncashed on the Petition Date.  The Debtor estimates that the gross amount of the Payroll Obligations owed as of the Petition Date is approximately $0.00.

The Debtor has contracted with Netchex[6] to process the payment of all wages, salaries, employment taxes and garnishments. Netchex sweeps the gross payroll amount from the Debtor's operating bank accounts one to two days after the close of a given payroll period[7] and distributes the funds to employees one to two days after the sweep occurs.

b. *Payroll taxes*

The Debtor's payroll taxes consist of federal, state, and local income taxes, Social Security, and Medicare taxes (the "Payroll Taxes").  The Payroll Taxes include the amounts owed by employees that the Debtor withholds from the gross amount of employees' wages or salary as well as the amounts separately owed by the Debtor.  The Debtor's average monthly Payroll Taxes over the last six months is approximately $10,000.  As of the Petition Date, the Debtor estimates that it owes approximately $0.00 in pre-petition Payroll Taxes.

c. *Vacation and holiday programs*.

These programs consist of time off for vacation and holidays ("PTO").  The Debtor recognizes ten company holidays per year, including New Year's Day, Mardi Gras, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving, the day after Thanksgiving, Christmas Eve and Christmas Day.  In addition, the Debtor recognizes one floating holiday per year to be used at the employee's discretion. The Debtor also allows full time employees fifteen vacation days per year. Up to 40 hours of vacation can be carried forward into the next calendar year. As of the Petition Date, the Debtor estimates that it owes approximately $1,200.00 in pre-petition vacation and floating holiday PTO.

d. *Qualified 401(k) plan obligations*.

The Debtor maintains a 401(k) plan through  John Hancock (the "401(k) Plan"), under which all Eligible Employees[8] may defer a portion of their pre-tax salary to the 401(k) Plan. Each participant may elect to have between 0% to 100% of their salary deferred[9]. The Debtor matches 100% of an employee's elective deferrals that do not exceed 4% of the employee's compensation. The average aggregate monthly amount of employee contributions and matching contributions over the last six months is approximately $2,000.  As of the Petition Date, the Debtor estimates that it owes approximately $0.00 in pre-petition 401(k) contributions.

---

[6]     As of the Petition Date, the Debtor does not owe any amounts to Netchex.

[7]     Netchex automatically sweeps funds from the Debtor's operating account bearing account number XXXXX2300.

[8]     Employees become "Eligible Employees" on the first day of the month following 90 days of consecutive employment.

[9]     Total annual contribution to the 401(k) Plan is subject to applicable statutory limits.

e.  *Health and welfare benefits.*

Prior to the Petition Date, the Debtor offered employees and their eligible spouses and dependents various standard employee benefits, including, without limitation: (i) medical and dental coverage; (ii) vision coverage, group life insurance, supplemental life insurance, accidental death and dismemberment insurance ("AD&D"), short-term and long-term disability insurance, cancer  insurance, accident insurance; and (iii) flexible health care spending and flexible dependent care spending accounts (collectively, the "Employee Benefits"). As of the Petition Date, the Debtor was obligated to pay certain contributions to or provide benefits under such plans, programs and policies.

    i.   Medical, Dental and Vision

All employees are given the opportunity to participate in a medical, dental, and vision plans. The medical plan is administered by Blue Cross/Blue Shield of Louisiana. (the "Medical Plan"), under which employees and their family members have the choice to use providers within the network or to use providers outside of the network (the latter option being subject to higher costs). The Medical Plan also offers employees the option to participate in a high-deductible health plan, under which employees may contribute to a health savings account. Approximately 100% of active employees have chosen to participate in the Medical Plan as of the Petition Date.

All employees are given the opportunity to participate in a dental plan (the "Dental Plan") and a vision plan (the "Vision Plan") administered by Reliance Standard.

The Debtor's average monthly cost in the aggregate on account of the Medical Plan, the Dental Plan, and the Vision Plan over the last six months is approximately $6,000. As of the Petition Date, the Debtor owes approximately $6,000 under the terms of the Medical Plan, the Dental Plan, and the Vision Plan.

    ii.   Life, AD&D, Short Term Disability, Long Term Disability, Supplemental Life Insurance, and Accident Insurance Coverage

The Debtor offers employees coverage for life, AD&D, short term disability ("STD"), long term disability ("LTD"), supplemental life insurance, accident indemnity insurance, cancer care, and hospital protection. Employees are eligible for these benefits on the first day of the month following the first month of consecutive employment.

The Debtor offers employees basic life and AD&D insurance coverage which is provided by Reliance Standard (the "Life Policies")[10] and is fully funded by the

---

[10]   Employees have the option to purchase supplemental life and insurance through AFLAC ("the Supplemental Plan") for themselves and /or their immediate family members at their own cost. The Debtor's average monthly

13

Debtor. The basic life insurance provides a flat rate benefit of $50,000 in case of death or the accidental death or dismemberment of an employee (such as the loss of a hand, or foot or the total loss of sight in an eye). The obligations that the Debtor has incurred on behalf of the employees on account of the Life Policies have approximated $80 per month over the last six months.  As of the Petition Date, the Debtor owes approximately $80 to Reliance Standard relating to the Life Policies.

The Debtor also offers employees a STD plan (the "STD Plan") which is administered by Reliance Standard. If an employee's absence qualifies for STD benefits, the employee will receive 60% of their weekly salary up to a maximum $1,500 per week for thirteen weeks. The Debtor paid 100% of premiums for the LTD Plan. the obligations that the Debtor has incurred on behalf of the employees on account of the STD Plan have approximated $200 per month over the last six months.  As of the Petition Date, the Debtor does not owe any amounts to employees relating to the STD Plan.

Additionally, the Debtor offers employees a LTD plan which is administered by Reliance Standard (the "LTD Plan") and provides benefits to employees who have been disabled for at least 90 days. Employees that qualify for the LTD Plan are eligible to receive 60% of their monthly salary up to a maximum of $7,500 per month. The Debtor pays 100% of premiums for the LTD Plan. The obligations that the Debtor has incurred on behalf of the employees on account of the LTD Plan have approximated $300 per month over the last six months.  As of the Petition Date, the Debtor owes approximately $300 to Reliance Standard relating to the LTD Plan.

Finally, the Debtor offers employees the opportunity to participate in supplemental life insurance, accident indemnity, cancer care, hospital protection, and term life insurance plans administered by AFLAC (the "AFLAC Plans"). The AFLAC Plans are 100% employee funded.  The Debtor's average monthly cost on account of the AFLAC Plans over the last six months is approximately $400[11]. As of the Petition Date, the Debtor owed approximately $0.00 to AFLAC for premiums due under the terms of the AFLAC Plans.

f.   *Miscellaneous other benefits.*

Prior to the Petition Date, the Debtor offered certain employees miscellaneous benefits, including, without limitation, an expense reimbursement program.

i.   Expense Reimbursement Program

---

cost on account of the Supplemental Plan over the last six months is approximately $2,300.  As of the Petition Date, the Debtor owed approximately $340.00 under the terms of the Supplemental Plans.

[11]   This monthly cost is 100% funded by the employee's via paycheck deduction on a pre-tax basis.

The Debtor maintained an Expense Reimbursement Program (the "Reimbursement Program") prior to the Petition Date. In the ordinary course of business, certain employees incurred business expenses including, but not limited to travel and related expenses. All such expenses were incurred on behalf of the Debtor in the ordinary course of business with the expectation that such expenses would be reimbursed in accordance with past practice. It is essential to the continued operation of the Debtor's businesses that the Debtor continue to reimburse employees for such business-related expenses.

Under the policies of the Reimbursement Program, once reimbursement requests are submitted, reviewed and approved, payment is typically processed within approximately one week. Because employees do not always submit claims for reimbursement promptly, it is difficult to determine the exact amount outstanding at any particular time. The Debtor estimates that pre-petition expense reimbursements will include reimbursable business expenses of approximately $1,000 as of the Petition Date.

25. The Debtor seeks authority, but not direction, to pay the Employee Obligations that become due and owing during this chapter 11 case and to continue its practices, programs, and policies that were in effect as of the Petition Date.[12] Furthermore, because it is difficult for the Debtor to determine with precision the accrued amount for many of the Employee Obligations, to the extent that the Debtor subsequently determines that there are any additional outstanding Employee Obligations related to the programs and policies described herein and in the Employee Wages Motion, the Debtor requests authority to pay such pre-petition amounts.[13] No employee will an amount greater than the statutory priority amount pursuant to Bankruptcy Code section 507. No bonus or extraordinary payment will be made, only normal payroll and employee-related payments.

26. The Debtor's ability to preserve its assets and successfully reorganize is dependent on the continued enthusiasm, services, and expertise of its employees. The Debtor believes that the morale of its employees will be adversely affected if the Debtor is not able to

---

[12] The Debtor may separately seek authorization to implement new programs designed to incentivize current Employees and to encourage continued employment.

[13] Nothing herein is intended to be an admission of the validity of any claim against the Debtor or an assumption or rejection of any contract or lease under Bankruptcy Code section 365.

28279848.v9

assure them that they will be fully paid for work they have performed, whether before or after the Petition Date.  Thus, payment of the Employee Obligations described above is vital to the Debtor's ability to preserve employee morale during this case and reduce the level of attrition.

ii.    <u>Direction to Banks to Honor and Pay Checks Issued and Make Other Transfers Related to the Employee Obligations</u>

27.    The Debtor requests that all banks and other financial institutions be authorized and directed, when requested by either Debtor and in the Debtor's sole discretion, to receive, process, honor, and pay any and all checks drawn on the Debtor's accounts to pay the Employee Obligations, provided that sufficient funds are available in the applicable accounts to make the payments and transfers.  The Debtor believes that each of payment of an Employee Obligation can be readily identified as such.  Accordingly, the Debtor believes that unrelated checks and transfers will not be honored inadvertently.

28.     The Debtor similarly requests that it be authorized to pay any cost or penalty incurred by its Employees in the event that a check issued by the Debtor for payment of the Employee Obligations is inadvertently not honored because of the filing of the Debtor's bankruptcy case.  Though the Debtor estimates any such costs or penalties to be *de minimis* in amount, if the Debtor is not authorized to pay such costs or penalties, then its employees will suffer the exact type of harm that the Employee Wages Motion seeks to prevent and the Debtor will suffer from loss of employee goodwill.

29.    The relief requested by the Employee Wages Motion is similar to and consistent with relived approved by courts in this district (and other districts) and should be approved.

16

**D. Emergency Motion for Order (A) Authorizing Maintenance of Pre-Petition Bank Accounts and Cash Management System and Continued Use of Existing Business Forms, Books and Records, and (B) Approving Investment Guidelines (the "Cash Management Motion")**

30.     The Debtor uses a cash management system (the "Cash Management System") in the ordinary course of business which permits the efficient collection, investment and application of funds.  The Debtor maintains two bank accounts with JPMorgan Chase Bank, N.A. ("Chase") as set forth on Exhibit A to the Cash Management Motion (the "Bank Accounts").  The Debtor's existing Bank Accounts function smoothly and permit the efficient collections and disbursements of cash for the benefit of the Debtor and all parties in interest.

31.     The Debtor's Cash Management System is managed by the financial personnel at the Debtor's headquarters in Houston, Texas, and can be summarized as follows:

(a)     The Debtor has one operating account (*****2300) with Chase (the "Operating Account") which the Debtor uses to process the majority of its day-to-day cash needs. Disbursements can be sent via check[14], ACH[15] or wire[16] depending on the preference of the intended recipient.

(b)     The debtor has one permitted account (*****1785) with Chase (the "Permitted Account") which the Debtor uses to hold funds from a liquidated natural gas hedge. These funds equal $1.475 million.

32.     The Cash Management System allows the Debtor to efficiently (a) identify the Debtor's cash requirements, (b) transfer cash as needed to respond to these requirements, (c) track all intercompany transfers; (d) forecast cash needs; (e) and maintain accounting records.  In the ordinary course of business, the Debtor accurately records such collections, transfers, and disbursements as they are made.

---

[14]    Check payments are processed by the Debtor's Accounts Payable group NetSuite (the Debtor's accounting software).
[15]    ACH payments are processed via Chase.
[16]    Wire payments are processed via Chase.

*Requested Waiver of Certain U.S. Trustee Guidelines*

33.     The U.S. Trustee has established guidelines (the "Guidelines") to supervise the administration of chapter 11 cases and prevent post-petition payments for pre-petition claims. The Guidelines require a chapter 11 debtor to, among other things: (i) close its existing books, records and bank accounts, and open new post-petition books, records and bank accounts (which must bear debtor in possession labels, and must be opened at banks approved by the U.S. Trustee); (ii) establish separate bank accounts for operations, payment of taxes, cash collateral and payroll (to the extent that the debtor had a separate payroll account pre-petition); and (iii) obtain new checks bearing the designation "Debtor in Possession," along with additional information.

34.     The Debtor submits that compliance with these requirements would create substantial and unnecessary administrative burdens.  Requiring the Debtor to open new bank accounts and alter its cash management system would impose unnecessary expense, confusion, and diversion of scarce time and personnel, and would hinder the efficient use of the Debtor's resources at the critical first days of this case.  On the other hand, permitting the Debtor to maintain its existing bank accounts and existing cash management system (or to make only such changes as are appropriate in the ordinary course of business) will prevent disruption of the Debtor's operations and will not prejudice any party in interest.

35.     The Debtor's existing procedures, along with additional safeguards proposed herein, adequately address the concerns that underlie the Guidelines.  The Debtor has in place sophisticated, computerized record keeping systems and will be able to ensure that all pre-petition and post-petition transactions are properly accounted for and can easily be distinguished.

28279848.v9

The Debtor will continue to maintain complete and accurate records of all transfers of funds in and out of the Debtor's bank accounts.

36.     In addition to the protections inherent in the Debtor's existing procedures, the Debtor proposes to provide additional safeguards.  First, to provide a clear line of demarcation between pre-petition and post-petition transactions and operations and to prevent the inadvertent post-petition payment of pre-petition claims, the Debtor will establish a 100 number break in the sequence of its checks to clearly designate pre-petition from post-petition transactions.  Second, the Debtor has retained professional financial and legal advisors that will work with the Debtor to ensure that pre- and post-petition obligations are properly demarcated.  Third, the Debtor will freeze any intercompany accounts between the Debtor and any non-debtor affiliates (with the exception of intercompany transactions with SGC Energia, which the Debtor will need to pay for certain services provided to Juniper).[17]

37.     Based on the foregoing, the Debtor seeks the following specific relief with respect to its books and records, cash management system, and business forms:

  a.   a waiver of the requirement that the Debtor's pre-petition bank accounts be closed and new post-petition bank accounts be opened;

  b.   approval to maintain and continue to use without change in account style its existing bank accounts;

  c.   approval to maintain and continue to use its existing Cash Management System;

  d.   approval to use, in their present form, existing checks and other business forms related to the Debtor's bank accounts; *provided, however*, that upon depletion of the Debtor's current supply of such checks and forms, the Debtor will have the debtor in possession nomenclature added to such checks and forms;

---

[17]   The Debtor has submitted motions with respect to the payment of certain pre-petition obligations, including payment of pre-petition employee salaries and wages.  The Debtor submits that no such pre-petition obligations will be paid or honored by its existing banks by virtue of this Motion except as specifically authorized by this Court.

e.     approval to use the Debtor's existing books and records with appropriate notations to reflect the filing of the chapter 11 petition; and

f.     entry of an order authorizing the banks at which the Debtor has bank accounts to maintain and administer the Debtor's bank accounts in accordance with the contracts entered into between the Debtor and such banks before the filing of the Debtor's chapter 11 petition and otherwise in accordance with past practice, and enjoining such banks from freezing or otherwise impeding the Debtor's bank accounts; *provided, however*, that such banks shall not honor any checks issued on such bank accounts on a date prior to the commencement of this chapter 11 case and presented for payment to the banks post-petition unless otherwise authorized to do so by order of this Court (such as the authority to pay all pre-petition employee obligations).

*Requested Waiver of the Requirements of Bankruptcy Code Section 345(b)*

38.     Bankruptcy Code section 345(b) requires the holders of deposits that are not insured by the United States or backed by the full faith and credit of the United States to obtain a bond or other security.  11 U.S.C. § 345(b).

39.     The Debtor's Bank Accounts are either (a) with banking institutions that have standing collateral agreements with the U.S. Trustee and/or (b) covered by FDIC insurance and contain amounts which are within the limits of such insurance.  Accordingly, the Debtor submits that the Bank Accounts are in compliance with the requirements under Bankruptcy Code section 345(b).  To the extent that the Bank Accounts are not in strict compliance with Bankruptcy Code section 345(b), however, the Debtor believes that a waiver of Bankruptcy Code section 345(b) is appropriate and requests a waiver of Bankruptcy Code section 345(b) as to the Bank Accounts.

**E.  Emergency Motion to Continue Pre-Petition Insurance and Workers' Compensation Programs and to Pay Pre-Petition Premiums, Related Obligations, and Premium Financing Payments (the "<u>Insurance Motion</u>")**

40.     The Debtor requests entry of an order, pursuant to Bankruptcy Code sections 105(a) and 363(b), granting it authority to continue its pre-petition insurance and workers'

compensation programs and to pay pre-petition premiums, related obligations, and premium financing payments.

41.     In connection with the operation of its business, the Debtor maintains various workers' compensation, liability, and property insurance policies and programs (collectively, the "Programs") through several different insurance carriers (the "Carriers"), as described below. The Debtor's insurance policies are listed on Exhibit A to the Insurance Motion, together with the applicable Carrier, policy period, policy number, deductible or self-insured retention, annual premium and policy limits.   The Debtor spends approximately $1.6 million annually on insurance premiums.

*The Debtor's Premium Financing Agreements*

42.     The Debtor is currently party to three premium finance agreements (collectively, the "Premium Financing Agreements")—two with First Insurance Funding and one with IPFS Corporation (collectively, the "Premium Financing Lenders')—that cover certain of the annual premiums due under the Programs (the "Premium Finance Payment Obligations").[18]  Pursuant to the terms of the Premium Financing Agreements, the Debtor has assigned to the respective Premium Financing Lender all of its rights, title and interest in the underlying insurance policies. As of the Petition Date, the Debtor is current on its payments under the Premium Finance Agreements.

---

[18]      Policy 1) First Insurance Funding Commercial Premium Finance Agreement #6224901 providing financing for one General Liability policy and six Excess Liability Policies, $50,865  per month with the last payment made in March 2016; Policy 2) First Insurance Finance Agreement #6003867, providing financing for Property Builders Risk Insurance, $31,472.85 per month with last payment in February 2016; and Policy 3) IPFS Corporation Agreement #3948591, providing financing for the Debtor's Pollution Policy, $7,729 per month with last payment in March 2016.

28279848.v9

*Workers' Compensation Programs*

43.     Under Louisiana law, the Debtor is required to maintain workers' compensation policies and programs to provide its employees with coverage for claims arising from or related to their employment with the Debtor.  The Debtor maintains a workers' compensation policy through Hub International Gulfsouth Ltd. (the "Workers' Compensation Program").  Exhibit A to the Insurance Motion lists the Workers' Compensation Program's policy period, policy number, annual premium, and policy limit.

*Liability and Property Insurance*

44.     The Debtor also maintains various liability and property insurance policies (collectively, the "Liability and Property Policies"), which provide the Debtor with insurance coverage for claims relating to, among other things, general liability, automobile liability, pollution liability, and directors' and officers' liability.  Exhibit A to this Motion lists each of the Debtor's various Liability and Property Policies, including the applicable Carrier, policy period, policy number, deductible or self-insured retention, annual premium and policy limit for each policy.  The premiums for certain of the Liability and Property Policies are paid as part of the Premium Financing Agreements.

45.     Pursuant to Bankruptcy Code sections 105(a) and 363(b), the Debtor seeks authorization to continue the Programs on an uninterrupted basis, consistent with pre-petition practices, and to pay, when due, and in the ordinary course of the Debtor's business, all pre-petition amounts due under the Premium Financing Agreements to the Premium Financing Lenders, to the extent due and payable post-petition.  Additionally, to the extent a premium payment or similar payment under the Programs was due prior to the Petition Date but remains outstanding, the Debtor seeks authority to make such payment.  Further, the Debtor seeks

22

authorization to pay amounts under the Premium Finance Agreements that become due post-petition in the ordinary course pursuant to the agreements.

46.     It is essential to the continued operation of the Debtor's business and its efforts to reorganize that the Programs be maintained on an ongoing and uninterrupted basis.  The failure to pay the Premium Finance Payment Obligations when due may affect the Debtor's ability to obtain or renew coverage.  In addition, the Premium Financing Lenders hold security interests in the underlying policies noted in the above footnote.  If the Debtor fails to make payments due under the Premium Financing Agreements, the Premium Financing Lenders would likely seek adequate protection for its security interests or relief from the automatic stay to terminate the Programs.

47.     If the Liability and Property Policies are terminated or lapse, the Debtor could be exposed to substantial liability for damages resulting to persons and property of the Debtor and others, which exposure could have an extremely negative impact on the Debtor's ability to successfully reorganize. Such a result would also place at risk the Debtor's estate assets necessary to satisfy the secured and unsecured claims of creditors. Additionally, continued effectiveness of the directors' and officers' liability policies is necessary to the retention of qualified and dedicated senior management. Moreover, pursuant to the terms of many of its leases and commercial contracts, as well as the guidelines established by the Office of the United States Trustee, the Debtor is obligated to remain current with respect to many of its primary insurance policies.  Likewise, the Debtor's proposed DIP Facility Documents requires that the Debtor maintain proper insurance.

48.     The maintenance of the Workers' Compensation Program is likewise justified because applicable state law mandates this coverage, and 28 U.S.C. § 959(b) requires the Debtor

23

to comply with valid state laws. In addition, the Debtor employs approximately three employees, all of whom depend on the protection that the Workers' Compensation Program provides.

**F. Emergency Application for An Order Appointing Donlin, Recano & Company, Inc. as Noticing and Balloting Agent for the Debtor Pursuant to 28 U.S.C. § 156(C), Effective From the Petition Date (the "DRC Retention Application")**

49.     As set forth above, the Debtor has identified approximately 350 creditors and other parties in interest who will be entitled to notice in the Debtor's chapter 11 case.  In view of the number of creditors and the complexity of the Debtor's business, the Debtor submits that the appointment of a noticing and balloting agent is both necessary and in the best interests of both the Debtor's estate and its creditors.

50.     By appointing DRC as the noticing and balloting agent in this chapter 11 case, the distribution of notices and the solicitation of votes on the Debtor's chapter 11 plan will be expedited.  Importantly, the DRC Retention Application requests approval for DRC to perform noticing and balloting services for the Debtor and does not contemplate DRC serving as the Debtor's claims agent.  Rather, as set forth in the Bar Date Motion (defined below), the Debtor expects that claims will be filed with the Clerk of the Court.

**G. Emergency Motion for an Order Establishing Bar Dates for Filing Claims and Approving Form and Manner of Notice Thereof (the "Bar Date Motion")**

51.     Given the Debtor's liquidity constraints, the Debtor has endeavored to structure its chapter 11 case to provide for a swift administration of its estate, thus minimizing administrative expenses and providing for a swift distribution to creditors.  To that end, the Debtor has filed its schedules of assets and liabilities and statement of financial affairs, motions to provide for the sale of substantially all of its assets, a chapter 11 plan of liquidation, and associated disclosure statement.  Furthermore, the Debtor entered into restructuring support agreements with certain of its creditors prior to the Petition Date and has been in regular contact

24

with its creditors to ensure they were aware of the Debtor's intentions moving forward. Finally, although the Debtor has identified approximately 350 parties in interest, it estimates that it has less than 100 actual creditors. Given the foregoing, the Debtor submits that its creditors will not be prejudiced by the Court granting the relief requested in the Bar Date Motion.

52.     Both the consummation of the sale of the Debtor's assets and the plan are dependent upon knowledge of the full universe of claims asserted against the Debtor. Specifically, the Stalking Horse Agreement contains provisions regarding the amount and category of the claims secured by liens under the Private Works Act. And, before the Debtor will be able to provide estimated distribution to the various classes of creditors under the Debtor's chapter 11 plan, knowledge of the claims, their asserted amounts, priorities, classification, and secured status is required.

53.     Immediate consideration of the Bar Date Motion, provided that the Court sets the General Bar Date for the proposed May 25, 2016 deadline, will not prejudice creditors, rather it will provide them with over thirty (30) days' notice, well in excess of the twenty-one (21) days' notice required under Bankruptcy Rule 2002. Conversely, considering the Bar Date Motion at a later date could either (a) give the Debtor's creditors less than thirty (30) days' notice or (b) delay consummation of the sale of the Debtor's assets, which could, at a minimum, delay the consummation of the sale or at worst, risk the Debtor's administrative insolvency. Accordingly, the Debtor requests that the Court consider the Bar Date Motion, at its earliest convenience and with the Debtor's other "first day" motions, if possible.

**H. Motion for an Order Pursuant to Sections 105, 363, 364 and 541 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 And 9014, (A) Approving Bidding Procedures and Stalking Horse Protections for the Sale of Substantially All of the Debtor's Assets; (B) Approving Stalking Horse Purchase Agreement; (C) Approving Procedures for the Assumption and Assignment and Rejection of Designated Executory Contracts; (D) Scheduling the Auction and Sale Hearing; (E)**

28279848.v9

**Approving Forms and Manner of Notice of Respective Dates, Times, and Places in Connection Therewith; And (F) Granting Related Relief (the "Bidding Procedures and Sale Motion")**

54.     As described earlier herein, prior to the Petition Date, the Debtor engaged in lengthy process to raise additional capital to complete its gas-to-liquids Facility currently under construction in Westlake, Louisiana.  After it became clear that the Debtor would be unable to secure additional investment on its own, it engaged Guggenheim to assist it with identifying a path forward either through additional capital investment or a sale of the Facility.  Under my direction, Guggenheim conducted a fulsome sale and marketing process for the Facility. Guggenheim contacted approximately 154 entities to gauge the interest in the market for the Debtor and the Facility, either through a capital investment or sale.  Guggenheim also prepared an extensive data room for interested parties to conduct due diligence.  Over thirty-four (34) interested parties executed non-disclosure agreements, and nine (9) entities made on-site visits to the Facility or the Debtor's facilities in Houston, Texas.  There can be no credible dispute that the Debtor's assets and business have been thoroughly marketed by an experienced and well-respected investment banking firm.

55.     Despite the fulsome marketing campaign, the Debtor was unable to secure an offer that would satisfy its secured obligations in full.  During the marketing process, the Debtor's liquidity became constrained, and the Debtor was left with the prospect of filing a chapter 7 petition, which would result in its creditors likely receiving little to no return and selling the Facility for scrap value in a liquidation.

56.     In February 2016, the Debtor entered into discussions with the Stalking Horse Purchaser for a potential sale of the Facility.  Throughout the marketing process and the negotiations with the Stalking Horse Purchaser, I provided regular updates to the board of

26

managers of the Debtor's parent entity.  Following a hard-fought, arm's-length negotiation, the Debtor and the Stalking Horse Purchaser agreed on the form of the Support Agreement, which set forth the material terms of the DIP Facility and sale of substantially all of the Debtor's assets, including the Facility, to the Stalking Horse Purchaser.  After the Support Agreement was finalized, I presented it to the Board for review and approval.  After reviewing the Support Agreement, the Board authorized a sale of substantially all of the Debtor's assets pursuant to the terms of the Support Agreement and subject to Court approval.

57.     The sale of the Facility to the Stalking Horse Purchaser, subject to an auction for higher and better offers ensures that sufficient proceeds are realized from the sale to provide a recovery for all of the Debtor's creditors, represents a valid exercise of the Debtor's business judgment, and is consistent with its fiduciary obligations to its stakeholders, especially when compared to the alternative of a chapter 7 liquidation where the Debtor's creditors would likely receive little to no recovery.  Given the Debtor's pre-petition marketing efforts, it is unlikely that any parties that have not already been contacted and had an opportunity to conduct diligence will submit a bid for the Facility and associated assets.  Likewise, any party that is likely to submit a bid has either already conducted diligence or is conducting diligence presently.  Finally, despite the interest expressed by other parties, the Stalking Horse Purchaser is the only party that offered out-of-court financing to the Debtor while it conducted diligence.  The Debtor submits that given the Stalking Horse Purchaser's support, its role as a "stalking horse" is appropriate, especially considering the almost certainty of a chapter 7 liquidation had such support not been provided. Accordingly, the Debtor believes that the marketing and sale process pursuant to the Bidding Procedures, as set forth in the Bidding Procedures and Sale Motion, is in the best interest of its estate and creditors and should be approved.

28279848.v9

**I.  Motion of the Debtor for Administrative Order Under 11 U.S.C. §§ 105 and 331 Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (the "<u>Interim Compensation Procedures Motion</u>")**

58.     The Debtor has filed or intends to file applications to retain King & Spalding LLP as counsel and Guggenheim Securities, LLC as investment banker.  In addition, the Debtor may need to retain additional professionals in connection with the continued prosecution of this chapter 11 case.  In addition, an official committee of unsecured creditors (the "<u>Committee</u>") may be appointed in this case and may wish to retain professionals.

59.     The Debtor believes that establishing orderly procedures for payment of the Retained Professionals will streamline the administration of this chapter 11 case and otherwise promote efficiency for the Court, the United States Trustee, and other parties in interest.  A streamlined process for serving fee applications is in the best interest of the Debtor because it will facilitate efficient review of the Retained Professionals' fees and expenses, while saving the Debtor unnecessary copying and mailing expenses.  Accordingly, the Debtor believes that it is in the best interest of the Debtor, its estate, and all parties in interest for the Court to authorize the Compensation Procedures as set forth in the Interim Compensation Procedures Motion for the Retained Professionals.

**J.  Motion for Entry of an Order Under 11 U.S.C §§ 105 and 363 Authorizing and Approving, *Nunc Pro Tunc* to the Petition Date, the Agreement with FTI Consulting, Inc. to Provide (I) David Rush to Serve as the Debtor's Chief Restructuring Officer, (II) Michael Bui to Serve as the Debtor's Interim Chief Financial Officer, and (III) Temporary Staff and Related Services (the "<u>FTI 363 Motion</u>")**

60.     As explained above, the Debtor's equity is held by a sole member, New Source Fuels, LLC, which is governed by a three-member Board of Managers (the "<u>Board</u>").  The Debtor's Equity Sponsors comprise the membership of the Board.

61.     The interrelated interests held and represented by the Board members creates an inherent conflict of interest for those members, making it difficult for each of them to clearly act only in the best interest of the Debtor, especially in light of the high probability that the Debtor's unsecured creditors are unlikely to receive a full recovery in the Debtor's chapter 11 case, which will necessarily result in no recovery for the Debtor's equity holders.

62.     Given that conflict and consistent with their fiduciary duties, the Board determined that it was in the best interest of the Debtor's creditors and other parties in interest that an independent CRO should be appointed to evaluate the Debtor's strategic options and determine the best path for maximizing recoveries for the Debtor's creditors.   Accordingly, effective as of January 19, 2016, the Board approved my appointment as CRO, Michael Bui as interim CFO, and the Debtor entered into the Engagement Letter.  Mr. Bui and I are currently the Debtor's only officers.

63.     Subsequent to the Debtor's engagement of FTI, Mr. Bui and I began to provide the Debtor with services relating to the evaluation of strategic and tactical alternatives available to maximize the Debtor's value.  In connection with providing such services, we have become familiar with the Debtor, its business and financial condition, and other matters relevant to the Debtor's chapter 11 case.

64.     FTI possesses extensive knowledge and expertise in the areas of bankruptcy and financial matters relevant to these chapter 11 cases, and is well qualified to serve as the Debtor's interim management service providers. In selecting FTI, the Debtor sought an advisor with experience in providing similar services in complex cases.  FTI employs seasoned professionals, such as the FTI professionals in this case, with C-level and relevant experience to assist

distressed companies with financial and operational challenges, and FTI regularly assists middle market, large and complex businesses similar to the Debtor.

65.     The Debtor requires knowledgeable advisors during the pendency of the Debtor's chapter 11 case, especially given the myriad events occurring simultaneously on a compressed timeline.  As described above, the Board has recognized its inherent conflict with the Debtor's creditors and selected Mr. Rush and Mr. Bui to serve as the Debtor's officers in recognition of that conflict.  Based on their experience, knowledge and familiarity with the Debtor and its business and financial condition, the Board has determined that I am well suited to serve as the Debtor's CRO and Mr. Bui is well suited to serve as the Debtor's interim CFO.  Other FTI personnel who may assist the Debtor will also be experienced in providing restructuring services that will be important to the Debtor during its chapter 11 case.  Accordingly, the Debtor, as authorized by the Board, submits that my employment as the Debtor's CRO, Mr. Bui's employment as the Debtor's interim CRO, and the performance of related services by FTI personnel should be approved.

**K. Application for Entry of an Order Authorizing the Employment and Retention of King & Spalding LLP as Counsel for the Debtor and Debtor-in-Possession Effective From the Petition Date (the "K&S Retention Application")**

66.     The Debtor has determined that it is necessary to engage attorneys with knowledge and experience in the areas of, among others, bankruptcy, finance, tax, and corporate governance.  Such legal counsel will enable the Debtor to carry out its duties in Case and will assist the Debtor in the orderly sale of substantially all of its assets and distribution of sale proceeds to the Debtor's creditors.  Accordingly, the Debtor proposes to retain King & Spalding LLP ("K&S") as its bankruptcy counsel in this Case.

28279848.v9

67.    The Debtor has selected K&S as its bankruptcy counsel because of the firm's extensive experience and knowledge and its recognized expertise in the field of debtor protections, creditor rights, and business reorganizations under chapter 11 of the Bankruptcy Code, as well as other areas of law related directly or indirectly to this chapter 11 case.  K&S has the necessary background to deal effectively with the potential legal issues and problems that may arise in the context of the Debtor's chapter 11 case.  The Debtor believes that K&S is both well qualified and uniquely able to represent it in this case in an efficient any timely manner.

68.    In assisting with the preparation for, and filing of, this chapter 11 case, K&S's attorneys have become familiar with the complex factual and legal issues that have to be addressed.  The retention of K&S, with its knowledge of and experience of the Debtor, will assist in the efficient administration of the Debtor's estate, thereby minimizing the expense to the estate .  Accordingly, I believe that the Debtor's retention of K&S is appropriate and necessary to enable the Debtor to faithfully execute its duties as a debtor and debtor in possession and implement the transactions contemplated in the Support Agreement.

**L.  Application for Entry of an Order Authorizing the Employment and Retention of Guggenheim Securities, LLC as Investment Banker for the Debtor and Debtor-in-Possession Pursuant to 11 U.S.C. § 327(a) and 328(a) Effective From the Petition Date (the "Guggenheim Retention Application")**

69.    The Debtor submits the Guggenheim Retention Application because of its need to retain a qualified investment banker to assist it in the critical tasks associated with guiding the Debtor through its chapter 11 case.  The Debtor believes that its retention of an investment banker is necessary and appropriate to enable it to evaluate the financial and economic issues raised by the Debtor's chapter 11 proceedings, successfully consummate the orderly sale of substantially all of its assets and to fulfill its statutory duties.

28279848.v9

70.     The Debtor selected Guggenheim as its investment banker in this case based upon Guggenheim's extensive experience in matters involving complex financial restructurings and Guggenheim's excellent reputation for the services that it has rendered in chapter 11 cases on behalf of debtors and creditor constituencies throughout the United States.

71.     Guggenheim and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court.   Guggenheim is also familiar with the Debtor's financial and business operations.   Guggenheim has been employed by the Debtor since November 2015 and has been assisting the Debtor in its efforts to market and sell it assets which is to be consummated in this chapter 11 case.   I believe that Guggenheim is both well-qualified and uniquely able to advise the Debtor in this chapter 11 case in an efficient and timely manner.

**M. Motion for an Order (I) Approving Disclosure Statement, (II) Approving Solicitation Package, (III) Establishing Voting Record Date for Entitlement to Solicitation Package and to Vote on Plan of Liquidation, (IV) Approving Procedures for Distribution of Solicitation Package, (V) Approving Form of Ballots, (VI) Establishing Last Date for Receipt of Ballots, (VII) Approving Procedures for Vote Tabulation, (VIII) Establishing Deadline and Procedures for Filing Objections to Confirmation of Plan of Liquidation, and (IX) Approving Form of Manner of Notice of Confirmation Hearing and Related Issues (the "Disclosure Statement Motion")**

72.     In addition to the Sale, the Debtor has already identified an exit from chapter 11 and intends to file a chapter 11 plan of liquidation (the "Plan") and associated disclosure statement (the "Disclosure Statement") on or about the Petition Date that will provide for the distribution of the Sale proceeds to the Debtor's creditors through the formation of a liquidating trust.   To that end, the Disclosure Statement Motion, among other things, requests that the Court

32

schedule a hearing to determine whether the Disclosure Statement contains adequate information on the first available date that is at least thirty (30) days after the Petition Date.  With its filing of its schedules of assets and liabilities, statement of financial affairs, the DIP Motion, the Bidding Procedures and Sale Motion, the Plan, the Disclosure Statement, and the Disclosure Statement Motion, the Debtor has completely and transparently laid out its path for the chapter 11 case.

73.     The Bidding Procedures and Sale Motion and the Stalking Horse Agreement do not provide for the distribution of the sale proceeds to creditors.  As such, the Plan will provide for the distribution of the sale proceeds, but otherwise is independent from the sale process. Given the liquidity constraints in this chapter 11 case, the Debtor filed the Plan to enable a dual track process that minimizes administrative expenses for the Debtor's estate and provides for quick and efficient distributions to the Debtor's creditors.  As explained above, the Debtor engaged in communications with its creditors prior to the Petition Date to ensure that those parties were informed of the Debtor's strategy for the case.  Indeed, prior to the Petition Date, the Debtor entered into restructuring support agreements with certain of its creditors, which represent 96% of the amount of Category 4 lien claims, 98% of the amount of Category 5 lien claims, and 55% of the amount of general unsecured claims.  Given the foregoing, the Debtor submits that its creditors will not be prejudiced and will have ample notice of the Plan and Disclosure Statement and requests that the Court set the hearing on the Disclosure Statement Motion for the first available date that is at least thirty (30) days after the Petition Date  and grant the relief requested therein at the hearing on the matter.

## CONCLUSION

74.     The Debtor believes that the Sale, the proposed Plan, and the support of a substantial number of the Debtor's creditors provide an expeditious path forward and exit

28279848.v9

strategy for this chapter 11 case and is in the best interest of the Debtor, its estate, and its creditors.

Under penalty of perjury, I declare that the foregoing is true to the best of my knowledge and belief.

Dated: April 14, 2016
   Houston, Texas            David Rush