**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

---------------------------------------------------------------
                                       :

In re:                               :       Chapter 11

                                     :

                                     :       Case No. 16-31959

JUNIPER GTL LLC[1]             :

                                     :

                                     :

                        Debtor.         :
---------------------------------------------------------------

**DEBTOR'S MOTION FOR AN ORDER PURSUANT TO SECTIONS 105, 363, 364 AND 541 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 6004, 6006 AND 9014, (A) APPROVING BIDDING PROCEDURES AND STALKING HORSE PROTECTIONS FOR THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) APPROVING STALKING HORSE PURCHASE AGREEMENT; (C) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT AND REJECTION OF DESIGNATED EXECUTORY CONTRACTS; (D) SCHEDULING THE AUCTION AND SALE HEARING; (E) APPROVING FORMS AND MANNER OF NOTICE OF RESPECTIVE DATES, TIMES, AND PLACES IN CONNECTION THEREWITH; AND (F) GRANTING RELATED RELIEF**

**NOTICE UNDER BLR 9013-1(B) AND 9013-1(I)**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE BANKRUPTCY COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

---

[1]      The last four digits of the Debtor's federal tax identification number is 3161. The Debtor's mailing address is 3 Riverway, Suite 1050, Houston, Texas 77056.

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEYS.**

**IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

Juniper GTL LLC (the "Debtor") seeks entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Protections and Procedures Order"), (a) approving bidding procedures and stalking horse protections for the sale of substantially all the assets of the Debtor (attached as **Exhibit 1** to the Bidding Protections and Procedures Order, the "Bidding Procedures"), (b) approving stalking horse purchase agreement (attached as **Exhibit B** (the "Stalking Horse Purchase Agreement"); (c) approving procedures for the assumption and assignment and rejection of designated executory contracts (the "Assignment and Rejection Procedures"); (d) scheduling the auction (the "Auction") and the date and time of the sale hearing (the "Sale Hearing"); (e) approving forms and manner of notice of respective dates, times, and places in connection therewith; and (f) granting related relief, by which the Debtor will solicit and select the highest or otherwise best offer for the sale of substantially all of its assets (the "Assets").  The Debtor further requests that, at the Sale Hearing, the Court enter an order (the "Sale Order"), which will be filed before the Sale Hearing, (i) authorizing the Sale of the Assets free and clear of all Claims and Interests;[2] (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief.

---

[2] "Claims and Interests" means all liens, claims, encumbrances, defenses, rights of setoff and recoupment, and interests, including, without limitation, security interests of whatever kind or nature, mortgages, pledges, deeds of trust, property or ownership interests (including in the Purchased Assets), rights of title (including with respect to the Purchased Assets), exploitation rights, hypothecations, assignments, preferences, debts, easements, charges, suits, licenses, options, rights-of-recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state and local taxes), covenants, restrictions, indentures, instruments, leases, options, off-sets, claims for reimbursement, contribution, indemnity or exoneration, successor, product, tax, labor, alter ego and other liabilities, causes of action, contract rights and claims and claims of intellectual property abandonment, to the fullest extent of the law, in each case, of any kind or nature, known or unknown, whether pre-petition or post-petition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable. For the avoidance of doubt, the term "Claims and Interests" shall exclude all Assumed Liabilities.

In support of this motion, the Debtor relies upon and incorporates by reference the *Declaration of David Rush in Support of Chapter 11 Petition and First Day Motions*, filed with the Court concurrently herewith (the "First Day Declaration").

## PRELIMINARY STATEMENT

Prior to the Petition Date, the Debtor engaged in a lengthy process to raise additional capital to complete its gas-to-liquids facility currently under construction in Westlake, Louisiana (the "Facility"), contacting numerous potential investors.  Although several potential investors progressed to advanced diligence, it became clear that the Debtor would be unable to secure additional equity investment on its own.  In light of the challenges experienced in securing an investment and the mounting liquidity concerns, the Debtor engaged an experienced investment banker to assist it with identifying a path forward either through additional capital investment, funding of operations, or a sale of the facility.  Ultimately, despite a robust marketing campaign that involved contacting approximately 154 potential interested parties and entering into numerous confidentiality agreements to perform diligence, the Debtor was unable to secure a viable offer that would satisfy its debt obligations in full.

Certain events during the marketing process resulted in an inability and/or unwillingness of the existing equity holders to continue to fund the Debtor's operations, and the Debtor's liquidity became highly constrained.  With no apparent alternative for further operational funding, the Debtor was faced with the prospect of filing a chapter 7 petition, which would result in its creditors likely receiving little to no return and selling the facility for scrap value in a liquidation.  Following hard-fought, arm's-length negotiations, the Debtor and the Stalking Horse Purchaser have agreed to a sale of the Debtor's Assets pursuant to that certain Asset Purchase Agreement dated April 12, 2016, by and between the Debtor as seller and Westlake

GTL LLC ("Westlake"), as purchaser, (the "Stalking Horse Purchase Agreement", attached hereto as **Exhibit B**[3], subject to higher and better offers and the approval of this Court.  Under the Stalking Horse Purchase Agreement, the Purchase Price is composed of the following:

(1) cash in the amount of (a) $2,504,923 plus (b) an amount necessary to satisfy all Lien 4 Priority Creditor Claims (subject to cap of $6,150,000);

(2) a credit bid by the Purchaser of the full amount of the DIP Loan Obligations (if fully drawn $3 million);

(3) a credit bid by RCI of all obligations secured by the RCI Lien in the amount of not less than $17,559,718.07, plus all accrued interest thereon or the amount of the RCI Lien ultimately allowed by the Bankruptcy Court as part of the Purchase Price hereunder; and

(4) the assumption of the Assumed Liabilities.[4]

The Sale of the Assets with a Stalking Horse Purchaser setting the opening bid for the Assets ensures that sufficient proceeds are realized from the sale to provide a recovery for all of the Debtor's creditors.  The Debtor seeks to sell its Assets free and clear of all liens, interests, claims and encumbrances to the fullest extent possible pursuant to Bankruptcy Code section 363(f), including without limitation, successor liability or similar theories of relief (except for those Assumed Liabilities and obligations, expressly assumed by the Purchaser pursuant to the Stalking Horse Purchase Agreement). All liens, claims, encumbrances and interests, including any claims for successor liability or similar theories of relief will be transferred to and attach to the sale proceeds.  The Sale Order will provide that the Purchaser will not be liable for and cannot be pursued for any of the Debtor's claims (other than Assumed Liabilities and obligations, expressly assumed by the Purchaser pursuant to the Stalking Horse Purchase

---

[3] Richard Construction Inc. ("RCI"), which holds the largest claim against the Debtor, is also a party to the Stalking Horse Purchase Agreement, and has been extensively involved in the negotiations leading to the execution of this document.
[4] Notwithstanding the definition of "Assumed Liabilities" in the Stalking Horse Purchase Agreement, the Assumed Liabilities, for purposes of these Bidding Procedures, shall not include any amounts related to the payments, assumption, or other satisfaction of any indebtedness owed by the Debtor to Richard Design Services, Inc. (excluding the RCI Lien in the amount of $17,559,718.07 referenced above.

Agreement).  This process represents a valid exercise of the Debtor's business judgment and is consistent with its fiduciary obligations to its stakeholders, especially when compared to the alternative of a chapter 7 liquidation where the Debtor's creditors would likely receive little to no recovery.  Accordingly, the Debtor believes that the marketing and sale process pursuant to the Bidding Procedures is in the best interest of its estate and creditors and should be approved.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157(b) and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The predicates for the relief requested herein are sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code") and rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**A.      General Background**

4.      On the date hereof (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "Court").  The Debtor has continued in possession of its properties and has continued to operate and manage its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No request has been made for the appointment of a trustee or examiner, and no official committee has yet been established in this case.

5.      A description of the Debtor's business and the reasons for filing this chapter 11 case are set forth in the First Day Declaration filed on the Petition Date and incorporated by reference as if fully set forth herein.  Additional facts specific to this Motion are set forth below.

**B.      The Marketing Process and the Stalking Horse Purchase Agreement**

6.      As described above, the Debtor engaged in a lengthy process prior to the Petition Date to raise the additional capital necessary to complete its gas-to-liquids facility in Westlake, Louisiana, both prior to and following the engagement of the outside chief restructuring officer (the "CRO") and Guggenheim Securities, LLC ("Guggenheim").  Prior to the engagement of the CRO and Guggenheim, the Debtor self-directed an extensive process to identify potential investors.  In several instances, potential investors progressed to advanced stages of diligence before making a determination not to move forward.  Faced with limited liquidity and macroeconomic headwinds that dimmed the hope of identifying an investor, the Debtor engaged the CRO and Guggenheim to assist in managing liquidity, sourcing third party interim financing and ultimately obtaining the funding necessary to complete construction of the Facility.  Under the direction and oversight of the Debtor's CRO, Guggenheim conducted a robust marketing process for obtaining funding and marketing of the Assets.  Guggenheim actively solicited over 154 entities to gauge the interest in the market for providing interim funding to, investing capital in, or a purchase of the Debtor and its Assets.  Additionally, an extensive data room was maintained, containing the essential information needed for interested parties to conduct due diligence.  Over thirty-four (34) interested parties executed non-disclosure agreements, and nine (9) entities made on-site visits to the Debtor's facilities in Westlake, Louisiana and Houston, Texas.  It is clear that the Debtor's assets and business have been thoroughly marketed by an

experienced and well-respected investment banking firm under the oversight of the Debtor's independent CRO.

7.      Despite the robust marketing campaign, the Debtor was unable to secure an offer that would satisfy its debt obligations in full out of a court controlled process.  During the marketing process, the Debtor's liquidity became constrained, and the Debtor was left with the prospect of filing a chapter 7 petition, which would result in its creditors likely receiving little or no return and selling the Facility for scrap value in a liquidation.  To preserve value for creditors, the Debtor sought and obtained unsecured, subordinated financing to continue its marketing process and seek a potential buyer, either through a chapter 11 plan, or through a sale process.  In this regard, during the pre-petition period Westlake and RCI provided collectively $820,000 in unsecured, subordinated financing to the Debtor.

8.      In February 2016, the Debtor entered into discussions with the Stalking Horse Purchaser for a potential sale of the Facility.  Throughout the marketing process and the negotiations with the Stalking Horse Purchaser, the Debtor's CRO provided regular updates to the board of managers of the Debtor's sole member (the "Board").  Following hard-fought, arm's-length negotiations, the Debtor and the Stalking Horse Purchaser agreed on the form of the purchase agreement and other documents related to the sale, and the CRO presented the Stalking Horse Purchase Agreement, to the Board for review and approval.  Subsequently, the Board authorized the Debtor's chapter 11 filing and a sale of substantially all of the Debtor's assets pursuant to the terms of the Stalking Horse Purchase Agreement and subject to Court approval.

9.      The sale of the Facility in an auction with the Stalking Horse Purchaser setting the opening bid ensures that sufficient proceeds are realized from the sale to provide a recovery for all of the Debtor's creditors, represents a valid exercise of the Debtor's business judgment, and is

consistent with its fiduciary obligations to its stakeholders, especially when compared to the alternative of a chapter 7 liquidation where the Debtor's creditors would likely receive little or no recovery.  Accordingly, the Debtor believes that the marketing and sale process pursuant to the Bidding Procedures as set forth in the Bidding Procedures and Sale Motion is in the best interest of its estate and creditors and should be approved.

## RELIEF REQUESTED

A.      **Bidding Protections and Procedures Order**

10.      By this Motion, the Debtor seeks entry of the Bidding Protections and Procedures Order: (i) approving the Bidding Procedures; (ii) approving the Stalking Horse Protections in accordance with the Stalking Horse Purchase Agreement; (iii) establishing the Assumption and Rejection Procedures; and (iv) scheduling the Auction (if necessary) and a Sale Hearing, and approving the form and manner of notice thereof.

### (i)         The Bidding Procedures

11.      To maximize value for the benefit of the Debtor's estate and its stakeholders, the Debtor seeks to implement a competitive bidding process that is designed to generate maximum value for the Assets.  As described more fully in the "Bidding Procedures", attached as Exhibit 1 to the Bidding Protections and Procedures Order, the Debtor seeks approval to sell the Assets to a Qualifying Bidder that makes the highest or otherwise best offer for the Assets.  The Debtor requests that competing bids for the Assets be governed by the Bidding Procedures, the material terms of which are set forth below:[5]

---

[5] The following description of the Bidding Procedures is only a summary of the terms set forth in the Bidding Procedures and is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures as approved by the Court shall control.

**(ii)     Stalking Horse Protections**

12.     The Debtor seeks approval of the Stalking Horse Protections in the Stalking Horse Purchase Agreement, which consist of the Expense Reimbursement and the Break-Up Fee.  The Expense Reimbursement provides that the Debtor will reimburse the Stalking Horse Purchaser actual and documented out-of-pocket fees and expenses actually incurred in connection with the transactions contemplated in the Stalking Horse Purchase Agreement in an amount not to exceed $500,000.  The Break-Up Fee provides that the Stalking Horse Purchaser would be entitled to a cash payment in an amount equal to four percent (4%) of the Purchase Price set forth in the Stalking Horse Purchase Agreement for the Stalking Horse Purchaser's preparation, negotiation, and execution of the Stalking Horse Purchase Agreement.   Importantly, the Expense Reimbursement and the Break-Up Fee will be payable to the Stalking Horse Purchaser only in the event that the Debtor seeks and receives approval of a Sale of the Assets with a party other than the Stalking Horse Purchaser, and then from the sale proceeds or the proceeds of the forfeited good faith deposits of the successful competing bidder and/or Back-Up Bidder in the event they shall fail to close on their purchase of the Purchased Assets with the Debtor, subject to certain conditions set forth in the Stalking Horse Purchase Agreement.  If the Stalking Horse Purchaser is the Back-Up Bidder, and closes on the purchase of the Purchased Assets, it will not be entitled to receive the Expense Reimbursement and the Break-Up Fee.

13.     These provisions provide the Stalking Horse Purchaser with some assurance that it will be compensated for the considerable time and expense it has incurred negotiating and preparing the Stalking Horse Purchase Agreement and other related definitive documentation and the risk that arises from participating in the bidding and subsequent auction process.  Other potential bidders will also benefit from the time and expense that the Stalking Horse Purchaser

spent negotiating and finalizing such documents.  As such, the Debtor believes that providing the Stalking Horse Purchaser with the Stalking Horse Protections is appropriate.

14.      In addition to compensating the Stalking Horse Purchaser, providing the Stalking Horse Purchaser with the Stalking Horse Protections (which the Stalking Horse Purchaser required as a condition to entering into the Stalking Horse Purchase Agreement) will benefit the Debtor's estate because the purchase price in the Stalking Horse Purchase Agreement establishes a floor and promotes more competitive bidding.  Specifically, the purchase price in the Stalking Horse Purchase Agreement sends a message to the marketplace that the Assets are worth at least such price.  Without that floor, there is a real risk that the ultimate purchase price for the Assets may be undervalued.

         **(iii)**       **Assumption and Rejection Procedures**

15.      The Debtor requests the following procedures (the "<u>Assumption and Rejection Procedures</u>") for notifying counterparties to executory contracts and unexpired leases of potential Cure Amounts (as defined below) with respect to those executory contracts and unexpired leases that the Debtor proposes to assume and assign to the Stalking Horse Purchaser (or Successful Bidder) (the "<u>Transferred Contracts</u>").

16.      As soon as reasonably practicable after entry of the Bidding Protections and Procedures Order, the Debtor will file a notice of potential assumption, assignment and/or transfer of the executory contracts and unexpired leases listed therein (such list, the "<u>Transferred Contract and Cure Schedule</u>"), substantially in the form attached as **Exhibit A** to the Notice of Proposed (I) Assumption and Assignment of Designated Executory Contracts and (II) Rejection of Contracts (the "<u>Assignment and Rejection Notice</u>"), attached as **Exhibit 3** to the Bidding Protections and Procedures Order, and serve such notice on all non-debtor parties to the

Transferred Contracts (the "Contract Counterparties").  The Assignment and Rejection Notice shall identify the calculation of the cure amounts, if any, that the Debtor believes must be paid to cure all defaults outstanding under each Transferred Contract (the "Cure Amounts") as of such date.  The Assignment and Rejection Notice shall set a deadline by which the non-debtor party to a Transferred Contract may file an objection to the Cure Amount or the assumption and assignment of such Transferred Contract.  In addition, if the Successful Bidder or Back-Up Bidder identifies additional executory contracts or unexpired leases that it wishes to add to the Transferred Contracts and Cure Schedule (each an "Additional Contract") (or wishes to remove a Transferred Contract from the Transferred Contracts and Cure Schedule), the Debtor shall, within two calendar days thereafter, send a supplemental Assignment and Rejection Notice to the applicable counterparties to such executory contracts or unexpired leases added or removed from the Transferred Contracts and Cure Schedule.  To the extent an executory contract or lease is not assumed and assigned to the Purchaser/Successful Purchaser, the Debtor will reject unassigned such executory contract or lease pursuant to its plan of liquidation.  In such event, the plan provides for a process for counterparties to assert contract rejection damage claims.  In no event will the Purchaser/Successful Bidder be responsible for any unassigned executory contracts or leases.

17.     The Debtor requests that the Court require that any objections to the assumption and assignment, or sale and transfer, of the Debtor's rights and interests of and in any of the Transferred Contracts (each, an "Assignment Objection") must: (i) be made in writing and filed on the docket no later than ten (10) business days prior to the Bid Deadline (the "Assignment Objection Deadline"), (ii) state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged by such counterparty, and include complete contact

information for such counterparty (including address, telephone number and email address), (iii) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and (iv) be served on the parties set forth in the Bidding Procedures, so as to be actually received on or before 4:00 p.m. (Central Time) on the Assignment Objection Deadline.

18.     In addition, the Debtor requests that objections from any counterparty to an Additional Contract (an "Additional Assignment Objection") must: (i) be made in writing and filed on the docket no later than ten (10) calendar days after the Debtor has sent notice to such contract party of its intention to assume and assign, assign, or reject such Additional Contract (as applicable, the "Additional Assignment Objection Deadline"), (ii) state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged by such counterparty, and include contact information for such counterparty, (iii) comply with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and (iv) be served upon counsel to: (a) the Debtor and the United States Trustee (addresses for the foregoing are set forth in the Bidding Procedures), and (b) the Successful Bidder, and the Back-Up Bidder (addresses for the foregoing may be obtained from the Debtor's counsel, so as to be actually received on or before 4:00 p.m. (Central Time) on the Additional Assignment Objection Deadline.

19.     The Assignment and Rejection Notice shall also provide that Assignment Objections, if any, will be heard at a hearing to be held prior to the Bid Deadline or at such other date prior to or after the Sale Hearing, as the Court may designate.   Any supplemental Assignment and Rejection Notice relating to an Additional Contract shall provide that Additional Assignment Objections will be heard by the Court on or before five (5) calendar days from the

timely filing of the Additional Assignment Objection (or such other date designated by the Court).

20.     At the Sale Hearing, the Debtor or the Stalking Horse Purchaser/Successful Bidder shall (i) present evidence necessary to demonstrate adequate assurance of future performance by the Stalking Horse Purchaser/Successful Bidder and (ii) request entry of an order approving the assumption and assignment of any or all Transferred Contracts to be assumed and assigned to the Stalking Horse Purchaser/Successful Bidder.  For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

### (iv)        Scheduling and Notice

21.     Pursuant to section 5.9 of the Stalking Horse Purchase Agreement, the Debtor is obligated to cause the hearing on entry of the Bidding Protections and Procedures Order to be held on or before May 12, 2016.[6]  In addition, the Debtor is required to seek entry of the Bidding Protections and Procedures Order on or before May 12, 2016, which order shall (i) establish the bid deadline for competing bids to be June 7, 2016, (ii) fix the date of the Auction to be not later June 9, 2016, and (iii) fix the date of the Sale Hearing to be not later than June 13, 2016.  Finally, the Stalking Horse Purchase Agreement requires that Closing occur as promptly as practicable after the Sale Hearing, but not later than June 27, 2016 (subject to extensions as agreed in the Stalking Horse Purchase Agreement).

22.     Consistent with these requirements, the Debtor proposes the following timeline for conducting the Sale process:

---

[6]     The parties to the Stalking Horse Purchase Agreement mutually agreed to extend certain of the deadlines contained therein.  Accordingly, the dates listed herein and in the proposed Bidding Protections and Procedures Order reflect the current agreement of the parties.

| Event | Deadline |
|---|---|
| Proposed Bidding Procedures Hearing……... | On or about May 12, 2016 |
| Proposed Bid Deadline …………………….. | On or about June 7, 2016 |
| Auction…………………………………… | On or about June 9, 2016 |
| Sale Hearing………………………..…..... | On or about June 13, 2016 |

23.    Given the Debtor's extensive pre-petition marketing efforts, the proposed timeline is more than sufficient to complete a fair and open sale process that will maximize the value received for the Assets.  The most likely competing bidders are among those who previously indicated interest and had access to the data room during the pre-petition process, and the opportunity to and/or undertook due diligence.  Thus, these parties need a shorter length of time for due diligence to submit competing bids.  If new bidders emerge, which is highly unlikely given the prior marketing efforts, the proposed timeline will provide them with time to perform due diligence given that the process is well understood at this juncture and the terms and conditions of the proposed Stalking Horse Purchase Agreement are clearly set forth.  Thus, the schedule is sufficient, while respecting the necessity to consummate the Sale as quickly as possible to maximize the value received for the Assets.

24.    *Notice of Sale Hearing*.  On the date the notice of motion and hearing of this Motion is filed, the Debtor caused this Motion and all exhibits hereto, including the Stalking Horse Purchase Agreement, the Bidding Procedures and a copy of the proposed Bidding Protections and Procedures Order, by first-class mail, postage prepaid, to be served upon (a) the United States Trustee for Region 7; (b) counsel to the Debtor's DIP Lender/Stalking Horse Purchaser; (c) the creditors listed on the Debtor's consolidated list of 20 largest unsecured creditors, as filed with the Debtor's chapter 11 petition; (d) all parties asserting a security interest in the Purchased Assets to the extent any such interest is reasonably known to the Debtor; (e) various federal, state, county and city tax and regulatory authorities; (f) all entities known to

have expressed an interest in a transaction with respect to the Assets or that have been identified by the Debtor or its advisors as a potential purchaser of the Assets; (g) local and state environmental authorities and the Environmental Protection Agency; (h) local, state and federal authorities and agencies that have issued licenses or permits to the Debtor with respect to the operation and use of the Assets; (i) the contract counterparties whose contracts are identified as being assigned; (j) all of the Debtor's creditors, and (k) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "Sale Notice Parties").

25.     *Notice of Sale*.  Within three (3) days of the entry of the Bidding Protections and Procedures Order, or as soon thereafter as practicable, the Debtor shall cause to be served, by first-class mail, postage prepaid, a sale notice (the "Sale Notice") setting forth, among other things, the dates established for submission of Qualified Bids, the Auction and the Sale Hearing, substantially in the form attached to the Bidding Protections and Procedures Order as **Exhibit 2**, upon the Sale Notice Parties.

26.     *Post-Auction Notice*.  As soon as possible after the conclusion of the Auction, the Debtor shall file, but not serve, a notice identifying the Successful Bidder and Back-Up Bidder.

## C.     Sale Order

27.     The Debtor requests that this Court set the Sale Hearing on or about June 13, 2016.  At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bidding Procedures, the Debtor intends to seek entry of a Sale Order (A) approving the Sale, free and clear of all Claims and Interests, and (B) authorizing the assumption and assignment of the Transferred Contracts.  For purposes of full disclosure, in the Sale Order, the Debtor will seek to sell its Assets free and clear of all liens, interests, claims and encumbrances to the fullest extent possible pursuant to Bankruptcy Code section 363(f), including without limitation, successor

liability or similar theories (except for those Assumed Liabilities and obligations, expressly assumed pursuant to the Stalking Horse Purchase Agreement) and the Purchaser will be protected from liability for and cannot be pursued for any claims owed by the Debtor.  In addition, the Sale Order will have findings that the Sale is not a fraudulent conveyance.  The Stalking Horse Purchase Agreement contains these, and other standard provisions, as conditions to the Sale.  The Bidding Procedures provide proper and adequate notice for these and the other terms and conditions of the Stalking Horse Purchase Agreement.

## BASIS FOR RELIEF REQUESTED

28.     A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business. 11 U.S.C. § 363.  As a general matter, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the tendered purchase price is the highest and best offer under the circumstances of the case. *See, e.g.*, *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales,"a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corp. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

29.     As discussed above, the Debtor determined that the most effective way to preserve the value of the Debtor's assets for the benefit of its stakeholders was through a sale of the Debtor's assets following a thorough marketing process.  The Debtor submits that a Sale of the Assets, along the Bidding Procedures and the timeline proposed herein, will achieve such goal.  In the absence of a sale transaction conducted in accordance with the proposed timeline, the Debtor likely faces a forced liquidation.  In addition, the recoveries for creditors will be

substantially greater if the Sale is consummated rather than being liquidated in a chapter 7 proceeding.  As such, the Debtor submits that it has demonstrated a sound business justification for the relief requested herein.

A.    **Bidding Procedures**

30.    The Debtor submits that the Bidding Procedures are appropriate to ensure that the bidding process is fair and reasonable and will yield the maximum value for its stakeholders. Among other things, the Bidding Procedures (i) provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid, especially given the substantial pre-petition marketing described above, (ii) are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids, and (iii) will provide the Debtor with the opportunity to consider all competing offers and to select the highest or otherwise best offer for the sale of substantially all of the Assets.

31.    The Debtor requests this Court's approval of the Bidding Procedures, including the dates established thereby for an Auction and a Sale Hearing.  Accordingly, the Debtor and all parties-in-interest can be assured that the consideration for the Assets will be fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

B.    **Stalking Horse Protections**

32.    Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction.  The Stalking Horse Protections are intended to maximize the realizable value of the Assets for the benefit of the Debtor's estate.

33.    Courts have identified at least two instances in which bid protections may benefit the estate.  First, protections may be necessary to preserve the value of the estate if they

"promote more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "*O'Brien*"); *see also Reliant Energy Channelview LP v. Kelson Channelview LLC*, 594 F.3d 200, 206-07 (3d Cir. 2010) (hereinafter, "*Reliant*").  Second, if the availability of bidding protections were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  *Reliant*, 594 F.3d at 206-07; *O'Brien*, 181 F.3d at 537.

34.     Application of these standards justifies approval of the Stalking Horse Protections.  The Stalking Horse Protections are necessary to preserve the value of the Debtor's estate because it will enable the Debtor to secure an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than the Stalking Horse Purchase Agreement—a clear benefit to the Debtor's estate.  Moreover, the Stalking Horse Purchaser would not agree to act as a stalking horse without the Stalking Horse Protections given the substantial time and expense that has been incurred in connection with negotiating, preparing and entering into definitive documentation and the risk that it will be outbid at the Auction.

35.     Without the Stalking Horse Protections, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Purchaser.  Furthermore, the bid of the Stalking Horse Purchaser sends a message to all potential bidders that the Assets are at least worth the purchase price in such agreement.  Therefore, without the benefit of the bid

of the Stalking Horse Purchaser (*i.e.,* a bid providing the floor), the bids received at auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Purchaser. Moreover, the Stalking Horse Protections were negotiated at arm's length and approved by the board of managers of the Debtor's sole member.

36.     The Debtor believes that, should an auction be held, the Stalking Horse Protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders."  *Id.* at 662.  First, the Stalking Horse Purchaser would not enter into the Stalking Horse Purchase Agreement  without the Stalking Horse Protections.  Second, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of the Stalking Horse Purchaser.  Third, the bid of the Stalking Horse Purchaser attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Purchaser heavily negotiated, including, among other things, the Stalking Horse Purchase Agreement  and the schedules thereto in making their bid.  In sum, if the Assets are sold to a competing bidder, the Sale likely will be the result of Stalking Horse Purchaser's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid

37.     The Stalking Horse Protections represent, collectively, slightly more than four percent (4%) of the Purchase Price to be paid by the Stalking Horse Purchaser for the Purchased Assets, are comparable to similar fees authorized in comparable transactions in this District, and

are commensurate to the benefit conferred by the Stalking Horse Purchaser upon the Debtor's estate.

## C.      Assumption, Assignment and Rejection Procedures

38.     Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See e.g., In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp*., 872 F.2d 36, 39-40 (3rd. Cir. 1989).

39.     The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc*., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)).  Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, NA.,* 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to Bankruptcy Code section 365(b)(1), for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly

cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

40.     Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract.  *See In re Rickel Home Center, Inc.,* 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also In re Headquarters Doge, Inc.,* 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of Bankruptcy Code section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

41.     Bankruptcy Code section 365(f) provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.,* 103 B. R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

42.     Additionally, adequate assurance of future performance with respect to any Successful Bidder that is not the Stalking Horse Purchaser shall be presented at the Sale Hearing.

Based upon the Debtor's own diligence, it can represent that upon closing, the Stalking Horse Purchaser will have financial resources that are more than sufficient to perform under any executory contracts or unexpired leases it seeks to have the Debtor assume and assign.  If necessary, the Debtor will adduce facts at the Sale Hearing to refute any objection, demonstrating the financial wherewithal of the Stalking Horse Purchaser or any Successful Bidder, and their willingness and ability to perform under the executory contracts or unexpired leases to be assumed and assigned.  The Sale Hearing therefore will provide this Court and other interested parties with ample opportunity to evaluate and, if necessary, challenge the ability of the Stalking Horse Purchaser or any Successful Bidder to provide adequate assurance of future performance under the executory contracts or unexpired leases that the Debtor seeks to assume and assign.

43.     Accordingly, the Debtor respectfully submits that the procedures proposed herein for Transferred Contracts being assumed and assigned on the Closing Date are appropriate and reasonably tailored to provide non-debtor counterparties to such Transferred Contracts with adequate notice in the form of the Assignment and Rejection Notice of the proposed assumption and assignment of the applicable Transferred Contract, as well as proposed Cure Amounts, if applicable.

44.     Furthermore, to the extent that any defaults exist under any Transferred Contract that is to be assumed and assigned in connection with the Sale of the Assets, the Stalking Horse Purchaser, Successful Bidder or the Debtor (as applicable under the Stalking Horse Purchase Agreement  or other purchase agreement) will cure any such default contemporaneously with or as soon as practicable after consummation of an assumption and assignment of such Transferred Contract.

45.     Accordingly, this Court should have a sufficient basis to authorize the Debtor to assume and assign the Transferred Contracts.

**D.      Approval of the Sale**

      **(i)     The Sale is an Appropriate Exercise of the Debtor's Business Judgment**

46.     Bankruptcy Code section 363(b)(1) provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Although Bankruptcy Code section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction.  *See, e.g., In re Eagle Picher Holdings, Inc.*, 2005 Bankr. LEXIS 2894, at ¶ 3 (Banter. S.D. Ohio 2005); *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996); *In re Abbotts Dairies of Penn., Inc.*, 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp*., 722 F.2d 1063, 1071 (2d Cir. 1983).  Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"  *In re S.N.A. Nut Co.,* 186 B.R. 98 (Bonier. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp*., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

47.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination.  *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996); *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (Bankr. D. Del. 1999); *In re Del. &*

*Hudson Ry. Co.,* 124 B.R. 169, 176 (D.D.C. 1991); *Stephens Indus., Inc. v. McClung*, 789 F.2d

386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business

purpose dictates such action").

48.     The Debtor is proposing a fair and open bidding process after already having run

a fair, comprehensive prepetition marketing effort.  The combined result achieves the objective

of obtaining the highest or otherwise best offer and sale of assets for the benefit of the Debtor's

estate.  The Sale of the Assets will be subject to competing bids, enhancing the Debtor's ability

to receive the highest or otherwise best value for the Assets.  Consequently, the fairness and

reasonableness of the consideration to be received by the Debtor will ultimately be demonstrated

by a "market check" through the auction process, which is the best means for establishing

whether a fair and reasonable price is being paid.

49.     For the reasons outlined above, the Debtor believes that its entry into the Stalking

Horse Purchase Agreement  and other ancillary documents is a sound exercise of its business

judgment and supported by the facts and circumstances of this case.

50.     In addition, all creditors and parties-in-interest will receive adequate notice of the

Bidding Procedures and Sale Hearing as set forth above.  Such notice is reasonably calculated to

provide timely and adequate notice to the Debtor's major creditor constituencies, those parties

most interested in this chapter 11 case, those parties potentially interested in bidding on the

Assets and others whose interests are potentially implicated by a proposed Sale.  Accordingly,

consummating the Sale as soon as possible is in the best interests of the Debtor and its

stakeholders and parties-in-interest.

51.     Given the Debtor's sustained liquidity crisis with no end in sight, the Debtor

determined that the most effective way to preserve the value of the Debtor's assets for the benefit

of its stakeholders was through a sale of the Assets following a thorough marketing process.  The Debtor submits that a Sale of the Assets, along the timeline proposed herein, will achieve such goal.  In the absence of a sale transaction conducted in accordance with such timeline, the Debtor will face deterioration in the value of its assets and faces liquidation.  In addition, the Stalking Horse Purchaser would only agree to acquire the Assets pursuant to the Stalking Horse Purchase Agreement if the sale contemplated thereby was conducted in accordance with the timeline proposed herein.  As such, unless the Sale is conducted in accordance with such timeline, the Debtor may lose the benefit of the Stalking Horse Purchaser.

### (ii)      Sale Free and Clear of Liens and Encumbrances

52.      Bankruptcy Code section 363(f) permits a debtor to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).  Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of such Claims and Claims and Interests in property if:

> (a)      applicable nonbankruptcy law permits a sale of such property free and clear of such interest;
>
> (b)      such entity consents;
>
> (c)      such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
>
> (d)      such interest is in *bona fide* dispute; or
>
> (e)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11  U.S.C. § 363(f).

53.      Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five (5) requirements will suffice to permit the sale of the Assets "free and clear" of Claims and Interests.  *Michigan Employment Sec. Comm'n v. Wolverine  Radio Co. (In re*

*Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code

section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and

clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met); *In re*

*Trans World Airlines. Inc.*, No. 01-0056, 2001 WL 1820325, at *3 (Bankr. D. Del. Mar. 27,

2001) ("Bankruptcy courts have long had the authority to authorize the sale of estate assets

free and clear even in the absence of § 363(f)."); *Citicorp Homeowners Servs., Inc. v. Elliot*, 94

B.R. 343, 345 (Bankr. E.D. Pa. 1988) (stating that Section 363(f) of the Bankruptcy Code is

written in the disjunctive; holding that if any of the five conditions of Section 363(f) are met, the

trustee has the authority to conduct the sale free and clear of all liens).

### (iii)   The Stalking Horse Purchaser or a Successful Bidder Should be Entitled to the Protections of Bankruptcy Code Section 363(m)

54.     Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who

purchases assets for value, in good faith, and without notice of adverse claims.  *See In re Abbotts*

*Dairies*, 788 F.2d at 147; *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir.

1993); *In re Willemain V. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).  Specifically, section

363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)]
> ... does not affect the validity of a sale ... to an entity that purchased ... such
> property in good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).

55.     Bankruptcy Code section 363(m) "fosters the 'policy of not only affording finality

to the judgment of the bankruptcy court, but particularly to give finality to those orders and

judgments upon which third parties rely.'"  *In re Chateaugay Corp.*, Case No. 92 CIV. 7054

(PKL), 1993 WL 159969, *3 (S.D.N.Y. May 10, 1993) (*quoting In re Abbotts Dairies of Penn.,*

*Inc.*, 788 F.2d 143 at 147).  *See also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

56.     The Stalking Horse Purchase Agreement  was negotiated at arm's length, with both parties represented by their own counsel.  Additionally, the Debtor will adduce facts at the Sale Hearing demonstrating that the Stalking Horse Purchaser (or any bidder who is deemed a Successful Bidder for the Assets) has negotiated at arm's length, with all parties represented by their own counsel.  Accordingly, the Sale Order will include a provision that the Stalking Horse Purchaser or Successful Bidder, as applicable, is a "good faith" purchaser within the meaning of Stalking Horse Purchaser section 363(m).  The Debtor believes that providing the Stalking Horse Purchaser or Successful Bidder with such protection will ensure that the maximum price will be received by the Debtor for the Assets and that closing of the Sale will occur promptly.

**E.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

57.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease... is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise."  The Debtor requests that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

**F.     Courts in this District Regularly Approve Asset Sales Pursuant to Bankruptcy Code Section 363**

58.     Courts in this district regularly approve motions seeking similar relief in other cases. *See, e.g.*, *In re Sherwin Alumina Co., LLC*, Case No. 16-20012 [Docket No. 433] (Bankr. S.D. Tex. 2016) (Order approving bidding procedures, including bid protections for a stalking horse purchaser, for a stalking horse sale to be consummated in a chapter 11 plan, but if the plan is not confirmed, then consummated pursuant to Bankruptcy Code section 363.); *In re BPZ Resources, Inc.*, Case No. 15-60016 [Docket No. 239] (Bankr. S.D. Tex. 2015) (Order authorizing the sale of substantially all of the debtor's assets free and clear.); *In re ASR-8 Centre LP*, Case No. 14-30174 [Docket No. 110] (Bankr. S.D. Tex. 2014) (Order authorizing debtor to sell real property free and clear.); *In re Buccaneer Resources LLC*, Case No. 14-60041 [Docket No. 489] (Bankr. S.D. Tex. 2014) (Order authorizing the sale of substantially all of the debtors' assets free and clear.); *In re TMT Procurement Corp.*, Case No. 13-33763 [Docket Nos. 1932, 1936, 1338, 1940, 1944, 1945, 1946, 1947, 1948, 1949] (Bankr. S.D. Tex. 2014) (Orders authorizing the sale of numerous vessels under Bankruptcy Code section 363 free and clear.); *In re ATP Oil & Gas Corp.*, Case No. 12-36187 [Docket Nos. 2279, 2666, 2706, 2866, 3278] (Bankr. S.D. Tex. 2013-2014] (Orders authorizing the sale of certain of the debtors' assets, including, deep water assets, production payments, shares in U.K. and Netherlands subsidiaries, and offshore lease free and clear.).   The Debtor submits that the relief requested herein is reasonable, appropriate, and similar to the relief granted in the foregoing cases.   Accordingly, the Debtor requests that the Court enter the relief requested in the Motion.

**G.     The Proposed Timeline is Necessary for the Success of the Debtor's Chapter 11 Case**

59.     The timeline proposed herein is necessary to ensure the successful administration of the Debtor's chapter 11 case and meets the requirement established in the Fifth Circuit for approval of a pre-confirmation sale of assets pursuant to Bankruptcy Code section 363.   As an

initial matter, the relief requested herein will permit the Debtor to consummate the sale of the Debtor's assets and neither the Motion nor the Stalking Horse Purchase Agreement  provide for the distribution of the sale proceeds[7] nor does it determine the classification or treatment of claims against the Debtor.  Concurrently with the filing of the Motion, the Debtor also filed a chapter 11 plan and associated disclosure statement that will provide for the distribution of the sale proceeds and the classification and treatment of claims against the Debtor.  Accordingly, the Debtor submits that the relief requested in the Motion would not constitute an impermissible *sub rosa* plan as in *Braniff.  See Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935 (5th Cir. 1983).

60.     In *Braniff*, the United States Court of Appeals for the Fifth Circuit, found that a proposed sale of the debtor's assets pursuant to Bankruptcy Code section 363 that, among other things, (1) disposed of all claims against the debtor (2) restricted the debtor's creditors' right to vote for or against a plan, and (3) dictated certain provisions of a future plan was an improper *sub rosa* plan that must be denied.  *See* 700 F.2d at 93940.  The court in *Braniff*, however, did not hold that a debtor is prohibited from selling all of its assets in a sale pursuant to Bankruptcy Code section 363 prior to seeking confirmation of a plan.  *See id.*  Indeed, numerous courts, including this Court, have held that there is no such prohibition.  *See, e.g.*, *Inst. Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1228 (5th Cir. 1986) (holding that a party objecting to a section 363 sale on the basis that it is being denied certain protections that would be provided in a plan confirmation context "must specify exactly what protection is being denied."); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 422 (Bankr.

---

[7] The Debtor intends to seek authority  at Closing to use a portion of the sale proceeds to satisfy secured property tax claim for 2015 related to the assets to be sold to allow for the transfer of the assets to the Stalking Horse Purchaser or a Successful Bidder, as appropriate.  Satisfying any secured ad valorem property tax liens at Closing reduces interest, fees and other charges thereby providing more consideration to be available for other creditors.

S.D. Tex. 2009) ("A sale, use, or lease of property under § 363(b) is not *per se* prohibited even though it purports to sell all, or virtually all, of the property of the estate, but such sales (or proposed sales of the crown jewel assets of the estate) are subject to special scrutiny."); *see also Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 37 n. 2 (2008) (recognizing that in certain cases, "a debtor sells all or substantially all its assets under § 363(b)(1)").

61.     In *Gulf Coast* the Court examined the Fifth Circuit precedent regarding pre-confirmation asset sales as well as other developments in the practice since that time and set forth several factors that courts can consider in determining whether to approve a sale under Bankruptcy Code section 363 prior to confirmation of a chapter 11 plan.  404 B.R. at 422–27. The factors identified in *Gulf Coast* are:

1. Is there evidence of a need for speed?

2. What is the business justification?

3. Is the case sufficiently mature to assure due process?

4. Is the proposed Stalking Horse Purchase Agreement sufficiently straightforward to facilitate competitive bids or is the purchaser the only potential interested party?

5. Have the assets been aggressively marketed in an active market?

6. Are the fiduciaries that control the debtor truly disinterested?

7. Does the proposed sale include all of a debtor's assets and does it include the crown jewel?

8. What extraordinary protections does the purchaser want?

9. How burdensome would it be to propose the sale as part of confirmation of a chapter 11 plan?

10. Who will benefit from the sale?

11. Are special adequate protection measures necessary and possible?

12. Was the hearing a true adversary presentation and is the integrity of the bankruptcy process protected?

*Id.*

62.     The Debtor submits that several of the *Gulf Coast* factors are present in the instant case.  As an initial matter, there is a tremendous need for speed in this case.  The proposed DIP financing will only support the Debtor through the proposed timeline.  Indeed, absent the DIP financing, the Debtor would have been forced to file a chapter 7 petition.  The Debtor's DIP financing lender was the only party willing to provide financing to the Debtor, and was only willing to provide enough financing to support the Debtor during the time necessary to conduct the sale.  For the foregoing reasons, the Debtor submits that there is a need for speed in this case.

63.     The Debtor also submits that there is a significant business justification for the proposed sale.  As mentioned above, absent the proposed sale to the Stalking Horse Purchaser and the associated DIP financing, the Debtor was planning to file a chapter 7 proceeding rather than expend its unencumbered funds for operations while other parties continued to conduct diligence.  By initiating a chapter 11 proceeding, the Debtor has been able to (1) not expend estate funds to fund the administration of the case, (2) maintain the Debtor's facility in a condition that will allow construction to resume without significant remediation; (3) ensure that the Debtor's creditors will receive significantly higher distributions rather than in a chapter 7 liquidation; and (4) provide for the possibility that certain of the Debtor's creditor's will have the opportunity to participate in the completion of the facility, rather than having no opportunity if the facility were to be sold for scrap.  These reasons provide a significant business justification for the proposed sale as set forth in this Motion.

64.     The Debtor also submits that although in its infancy, the unique circumstances in this case support a finding that the case is sufficiently mature to ensure due process.  On the Petition Date, the Debtor has effectively put all of its cards on the table for the Court, its

creditors, and any other parties in interest.  The Debtor has filed its schedules of assets and liabilities, statements of financial affairs, a plan, a disclosure statement, a DIP motion, and evidence supporting that is creditors are aware of the Debtor's intentions during the chapter 11 case and support the Debtor's proposed path.  By effectively, filing its case on the Petition Date, the Debtor believes that the proposed sale and its associated timeline are sufficient to provide all necessary parties with due process.  While the proposed sale process timeline is tight, the Debtor is not asking the Court to provide any party in interest with less of a notice period than required by the Bankruptcy Code or Bankruptcy Rules before granting any substantive relief that would prejudice any party.  Furthermore, it is likely that any potential bidder in the proposed sale has already conducted due diligence of the assets, and therefore will spend its time determining whether it wishes to submit a bid and if so, formulating said bid.  Therefore, given the facts and circumstances in this case, the case is sufficiently mature to assure due process.

65.     The Debtor submits that the Stalking Horse Purchase Agreement's terms are standard for sales of assets of similar value and does not contain any provisions that are overly complex for assets of the nature as those to be sold in this case.

66.     As set forth in detail above, the Debtor submits that the assets have been extensively and aggressively marketed by both the Debtor and Guggenheim.

67.     The fiduciaries that control the Debtor are truly disinterested.  As set forth in the First Day Declaration, the Debtor's sole interest holder is a limited liability company whose board of managers of composed by the Debtor's equity sponsors.  Recognizing their inherent conflict with the Debtor's creditors, the board retained David Rush to serve as the Debtor's chief restructuring officer.  While Mr. Rush has kept the board apprised of the negotiations and received approval of the support agreement with the Stalking Horse Purchaser, Mr. Rush has

been in control of the Debtor throughout the negotiations.  Moreover, the Debtor's equity sponsors will receive no proceeds from the sale, as the Debtor's proposed plan provides for the subordination of any of their claims against the Debtor.  Further, Mr. Rush does not hold an interest in the Debtor, nor will he have a role with the Debtor or the Stalking Horse Purchaser at the conclusion of the Debtor's chapter 11 case.

68.     The proposed sale does provide for the sale of the Debtor's "crown jewel" a/k/a its unfinished gas-to-liquids plant in Westlake, Louisiana.  The proposed sale, however, is not merely for the "crown jewel," but substantially all of the Debtor's assets and the Debtor has filed a proposed plan of liquidation to provide for the Debtor's dissolution and wind down.

69.     The proposed sale of the Debtor's assets does provide for the assets to transfer free and clear of any liens and interests, including any privileges under the Louisiana Private Works Act.  The Debtor, however, has secured support of the Debtor's proposed plan of liquidation from the vast majority of the lien creditors and a significant number of the general unsecured creditors, which will provide for the distribution of the sale proceeds to the Debtor's creditors.  Moreover, the Stalking Horse Purchaser will provide for cash that will satisfy a substantial portion of the claims purportedly secured pursuant to the Louisiana Private Works Act and has reached agreements with many of the Debtor's unsecured trade vendors to address their claims and develop a path for working together in the future.  Simply put, the Stalking Horse Purchaser is highly incentivized to develop a productive relationship with the vast majority of the Debtor's vendor creditors.

70.     As set forth above, the Debtor was only able to secure DIP financing on a timeline sufficient to effectuate a sale of the assets pursuant to Bankruptcy Code section 363.  The Debtor, however, has drafted and filed a plan and disclosure statement to provide for a

distribution of the sale proceeds to the Debtor's creditors as soon as possible.  Accordingly, the Debtor's creditors have a baseline estimate of their distributions if the Debtor's assets are sold to the Stalking Horse Purchaser, and are aware that the distribution could increase in the event higher bids are accepted at the Auction.

71.     The Debtor submits that all creditors will benefit from the sale when compared to a chapter 7 filing.  Indeed, the Debtor's largest creditor will receive no distribution in this case in the event the Stalking Horse Purchaser is successful at the Auction.  Moreover, the Debtor's creditors may have an opportunity to work on the facility's construction; an opportunity that would likely not exist if the Debtor's assets were sold in a chapter 7 proceeding.

72.     The Debtor submits that none of the relief requested in the Motion would necessitate the Court's imposition of any special adequate protection measures.

73.     While the last factor will primarily be addressed at the Sale Hearing, the Debtor submits that the integrity of the bankruptcy process is protected in the instant case.  As stated earlier, the Debtor has been fully transparent with its creditors pre-petition and has laid its cards on the table.  It has filed this case in a good-faith effort to provide all parties in interest with the information necessary to evaluate their positions and a process that will provide substantially more for creditors than if the case was filed as a Chapter 7, or claimants with liens under the Louisiana Private Works Act, foreclosed on their liens.

74.     Taken collectively, the Debtor submits that the majority of the *Gulf Coast* factors support granting the relief requested in the Motion.  The proposed sale will provide proceeds that will ultimately provide creditors with a greater recovery than in a chapter 7 proceeding.  The sale will permit a substantial number of the vendors assisting in the construction of the facility to continue working on its construction.  Finally, the proposed Bidding Procedures will provide for

parties who wish to participate in the Auction the time necessary to formulate and submit a bid for the Debtor's assets.  Accordingly, the Debtor requests that the Court grant the relief requested in the Motion.

## **NOTICE**

The Debtor shall serve a copy of this Motion by first class mail upon: (a) the United States Trustee for Region 7; (b) counsel to the Debtor's DIP Lender/Stalking Horse Purchaser; (c) the creditors listed on the Debtor's consolidated list of 20 largest unsecured creditors, as filed with the Debtor's chapter 11 petition; (d) all parties asserting a security interest in the Assets to the extent any such interest is reasonably known to the Debtor; (e) various federal, state, county and city tax and regulatory authorities; (f) all entities known to have expressed an interest in a transaction with respect to the Assets or that have been identified by the Debtor or its advisors as a potential purchaser of the Assets; (g) local and state environmental authorities and the Environmental Protection Agency; (h) local, state and federal authorities and agencies that have issued licenses or permits to the Debtor with respect to the operation and use of the Assets; (i) all of the Debtor's creditors, and (j) all parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtor submits that no further notice is required or needed under the circumstances.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]*

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Debtor requests this Court to enter the

Bidding Protections and Procedures Order, the Sale Order and further relief as the Court may

deem just and appropriate.

Date:   April 14, 2016                                   /s/ Mark W. Wege
       Houston, Texas                             Mark W. Wege (Texas Bar No. 21074225)
                                                  Edward L. Ripley (Texas Bar No. 16935950)
                                                  Jason S. Sharp (Texas Bar No. 24079897)
                                                  KING & SPALDING, LLP
                                                  1100 Louisiana, Suite 4000
                                                  Houston, Texas  77002
                                                  Telephone:  713-751-3200
                                                  Facsimile:  713-751-3290
                                                  Email: MWege@kslaw.com
                                                          ERipley@kslaw.com
                                                          JSharp@kslaw.com

                                          *Proposed Counsel for the Debtor and Debtor
                                          in Possession*