**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

```
---------------------------------------------------------------
                                          :
In re:                                    :        Chapter 11
                                          :
                                          :        Case No. 16-31959
JUNIPER GTL LLC[1]                        :
                                          :
                                          :
                    Debtor.               :
---------------------------------------------------------------
```

**JUNIPER GTL LLC'S DISCLOSURE STATEMENT**
**FOR ITS CHAPTER 11 PLAN OF LIQUIDATION**


KING & SPALDING LLP

Mark W. Wege
Edward L. Ripley
Jason S. Sharp
1100 Louisiana Street, Suite 4000
Houston, Texas 77002


**ATTORNEYS FOR JUNIPER GTL LLC**

---

**THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The last four digits of the Debtor's federal tax identification number are 3161. The above-captioned Debtor's mailing address is 3 Riverway, Suite 1050, Houston, Texas 77056.

25375588.v7

## DISCLAIMER

[THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS AGAINST THE DEBTOR TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN.  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, SUCH DOCUMENTS.  FURTHERMORE, ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO BE ACCURATE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT OR OTHER REVIEW BY AN ACCOUNTING FIRM.  IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN, THIS DISCLOSURE STATEMENT, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, OR THE FINANCIAL INFORMATION INCORPORATED HEREIN OR THEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES.  ALL HOLDERS OF CLAIMS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN, UNLESS SO SPECIFIED.  ALTHOUGH THE DEBTOR HAS MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERY UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW.  PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTOR SHOULD EVALUATE THIS

DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

IN ACCORDANCE WITH THE BANKRUPTCY CODE, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.]

# TABLE OF CONTENTS

**DISCLAIMER**................................................................................................ii

**TABLE OF CONTENTS** ................................................................................iv

**I.    INTRODUCTION** ...................................................................................1

    A.  Overview ...........................................................................................1

    B.  Summary Of The Plan........................................................................1

        1. Liquidation and Wind-Up ..........................................................1

        2. Summary of Classification and Treatment of Claims and Equity Interests ..............3

    C.  Voting And Confirmation Procedures ...............................................3

        1. Who May Vote ..........................................................................3

        2. Voting and Solicitation Procedures............................................4

        3. Voting Instructions ....................................................................5

        4. Acceptance or Rejection of the Plan ..........................................6

        5. Confirmation Hearing ................................................................7

        6. Objections to Confirmation .......................................................7

**II.   GENERAL INFORMATION ABOUT THE DEBTOR AND THE BANKRUPTCY CASE**................................................................................8

    A.  Formation, Business and Capital Structure........................................8

    B.  Debtor's Capital Structure.................................................................9

    C.  Events Leading To Chapter 11...........................................................10

    D.  Prepetition Litigation .......................................................................11

**III.  SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE**....................................12

    A.  First Day Pleadings ..........................................................................12

    B.  Second Day Pleadings, Including Retention of Professionals ......................13

    C.  Marketing of the Debtor's Assets and Entry of the Bid Procedures Order..................14

D. Appointment of Committee ........................................................................15

E. United States Trustee .............................................................................15

F. Rejection and Assumption of Executory Contracts and Unexpired Leases ................15

G. Dissemination of Information About the Case .............................................15

H. Bar Date Order ....................................................................................15

I. Avoidance Actions ................................................................................16

    1. Preferences. ...................................................................................16

    2. Fraudulent Transfer ........................................................................16

IV. THE CHAPTER 11 PLAN ........................................................................17

A. Summary of Classification and Treatment of Claims and Equity Interests ...............17

B. Summary of Plan Classification, Treatment and Voting .................................17

    1. *Class 1 – Level 4 Secured Claims* ......................................................17

    2. *Class 2 – Level 5 Secured Claims* ......................................................17

    3. *Class 3 – Other Secured Claims* ........................................................18

    4. *Class 4 – Priority Employee Claims* ...................................................18

    5. *Class 5 General Unsecured Claims* .....................................................18

    6. *Class 6 - Subordinated Claims.* .........................................................18

    7. *Class 7 – Equity Interests* ...............................................................19

C. Creation of the Liquidating Trust ............................................................19

D. Avoidance Actions ...............................................................................19

E. Provisions Regarding Distributions ..........................................................19

    1. Time and Method of Distributions ........................................................20

    2. Liquidating Trust Distributions ..........................................................20

    3. Reserve for Disputed Claims ..............................................................20

    4. Manner of Distribution Under Plan and Liquidating Trust ...........................20

5.  Delivery of Distributions ........................................................................21

6.  Undeliverable Distributions ..................................................................21

7.  Failure to Claim Undeliverable Distributions ......................................21

8.  Compliance with Tax Requirements/Allocation ...................................21

9.  Time Bar to Cash Payments ..................................................................21

10.     Distributions After Effective Date .....................................................22

11.     Fractional Dollars; De Minimis Distributions ..................................22

12.     Setoffs/Recoupment ...........................................................................22

13.     Preservation of Subordination Rights by Estate ...............................22

V.   **EFFECTS OF CONFIRMATION** .........................................................**23**

A.  Compromise and Settlement of Claims, Equity Interests, and Controversies .............23

B.  Certain Avoidance Actions Released .......................................................23

C.  Injunction ................................................................................................23

D.  Necessity and Approval of Injunctions ...................................................23

E.  Exculpation ..............................................................................................24

VI.  **CONFIRMATION AND CONSUMMATION PROCEDURES** .....................**24**

A.  General Information .................................................................................24

B.  Solicitation of Acceptances ....................................................................24

C.  Considerations Relevant To Acceptance Of The Plan ............................24

VII. **FEASIBILITY OF THE PLAN AND BEST INTERESTS TEST** ..................**25**

A.  Feasibility of the Plan .............................................................................25

B.  Best Interest of Creditors Test.................................................................25

C.  Application of Best Interests Test to the Liquidation Analysis and Valuation of the Debtor................................................................................................................26

VIII.    **CERTAIN RISK FACTORS TO CONSIDER** ......................................**27**

A.  Claims Estimation ...................................................................................27

B.   Certain Risks of Nonconfirmation .................................................................27

C.   Risk of Plan Support Parties Default ............................................................27

IX.  TAX IMPLICATIONS OF THE PLAN ....................................................................**27**

X.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ...........**28**

A.   Introduction .....................................................................................................28

B.   Federal Income Tax Consequences to the Debtor.........................................29

C.   Federal Income Tax Consequences to Holders of Claims ...........................29

1.  General ......................................................................................................29

2.  Possible Treatment as Tax-Free Recapitalization ...................................29

3.  Character of Gain or Loss; Loss Limitations ..........................................30

4.  Amounts Received in Respect of Accrued But Unpaid Interest ..............30

5.  Treatment of the Liquidating Trust .........................................................30

6.  Information Reporting and Backup Withholding......................................31

XI.  CONCLUSION AND RECOMMENDATION .........................................................**31**

I.      **INTRODUCTION**

A.      **Overview**

The Debtor, Juniper GTL LLC, hereby submits this Disclosure Statement (the "Disclosure Statement") for the Debtor's Chapter 11 Plan of Liquidation dated April 14, 2016.[2] This Disclosure Statement is to be used in connection with the solicitation of votes on the Plan. In the event of any inconsistency between this Disclosure Statement and the Plan, the terms of the Plan shall govern and such inconsistency shall be resolved in favor of the Plan.

The purpose of this Disclosure Statement is to enable Creditors whose Claims are Impaired under the Plan, and who are entitled to vote, to make an informed decision in exercising their right to accept or reject the Plan.  Pursuant to the Disclosure Statement Order dated May __, 2016, a copy of which is attached hereto as Exhibit A, the Bankruptcy Court has found that this Disclosure Statement provides adequate information to enable holders of Claims that are Impaired under the Plan to make an informed judgment in exercising their right to vote for acceptance or rejection of the Plan.

B.      **Summary Of The Plan**

1.      **Liquidation and Wind-Up**

The Plan provides for winding-up the affairs of the Debtor following the closing of the Sale. Since the fall of 2015, the Debtor has had no available funds to complete the construction of the Facility.  From before and since that time, the Debtor and its representatives have been pursuing a strategy of seeking additional capital to complete construction and start-up of the Facility and/or seeking to engage in some other transaction to maximize value for creditors.  To that end, following extended negotiations, the Debtor agreed to sell the Facility and substantially all of its assets to the Purchaser under Section 363 of the Bankruptcy Code, pursuant to that certain Stalking Horse and DIP Financing Agreement (the "Stalking Horse Agreement") dated as of April13, 2016, subject to higher and better offers.  The Sale is proceeding on a quicker time line than the Plan and distributions under the Plan are premised on a closing of the Sale.

The Sale is the best outcome for all creditors of the estate.  If the Sale closes, all Class 1 Claims (which are the Level 4 Lien Claims under the Louisiana Private Works Act) will be paid, in full, on the principal amount of their Allowed Claims.  Second, Class 2 (which are the Level 5 Lien Claims under the Louisiana Private Works Act) will be paid Pro Rata from a fund remaining after closing the Sale and satisfying the taxes owed, payments to Class 1, Class 3 (if any), Class 4 and the amount of $300,000 earmarked for Class 5 General Unsecured Creditors (the Debtor allocated $200,000 for distributions and $100,000 for Liquidating Trust expenses). Class 5, General Unsecured Claims, will be paid Pro Rata, from distributions of a Liquidating Trust which includes the $300,000 plus all Avoidance Actions (except for any Causes of Action against the Purchaser, RCI or RDS, in the event the Purchaser closes on the Sale).  Moreover, if the Purchaser closes on the Sale, certain Assumed Trade Creditors will be paid separately by the

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in Article I of the Plan.

25375588.v7

Purchaser and those claims will be waived as against the Debtor and the Liquidating Trust thereby increasing the recoveries to other Class 5 Claims.   Further, if the Purchaser closes on the Sale, other Claims of the Richard entities will be waived.   All Subordinated Claims and Equity Interests are being cancelled and will receive no distributions under the Plan.

To effectuate the Sale and the Plan, the Debtor negotiated the DIP Loan Agreement providing for the funding necessary for the 13 week period to conduct the Sale through the contemplated effective date of the Plan.   The DIP Loan Agreement will ensure that payments are made for post-bankruptcy expenses, Professionals engaged in the Sale and bankruptcy process and a proper winding–up of the affairs of the Debtor.   In that regard, the Debtor negotiated the Stalking Horse Agreement to include support for the Sale and Plan process by the Purchaser and RCI, which holds by far the largest Class 1 Claim.   The Purchaser has in turn, with the Debtor, negotiated similar plan support agreements with holders of Claims in Classes 1 and 2.   They overwhelmingly support the Sale and the distributions to be made under the Plan.   In addition, as noted above, the Purchaser has engaged in separate agreements with certain trade creditors for separate payment.   Based on the information to date, a significant percentage of the Class 5 claims also support the Sale and Plan process.   In sum, a significant amount of time and resources have been spent negotiating the Sale and Plan to maximize value for creditors in an efficient and expeditious process while being entirely transparent to creditors about the outcome and options.

As noted, the Liquidating Trust will be funded with $300,000 in cash for administrative purposes and for any other use as determined by the Liquidating Trustee.   **IT IS UNCERTAIN WHAT UNSECURED CREDITORS WILL RECEIVE, IF ANYTHING, FROM THE PROSECUTION OF THE VESTED CAUSES OF ACTION.   IF PROSECUTION OF THE VESTED CAUSES OF ACTION FAILS TO YIELD SUBSTANTIAL NET PROCEEDS, GENERAL UNSECURED CREDITORS WILL LIKELY RECEIVE VERY LIMITED OR NO RECOVERIES UNDER THIS PLAN.**

The Plan provides that the DIP Loan will be satisfied at the closing of the Sale via either the credit bid of the DIP Lender, or payment of the DIP Loan from another winning bidder.

The Plan classifies all Claims and Interests of the Debtor into 7 Classes.   The following table summarizes the classification and treatment afforded under the Plan as further described in Article IV of this Disclosure Statement.

2

2.      **Summary of Classification and Treatment of Claims and Equity Interests**

| Class | Claim | Status | Voting Rights | Percentage Recovery |
|---|---|---|---|---|
| 1 | Level 4 Lien Claims | Impaired | Entitled to Vote | Paid, in full, on principal amount, but not interest, fees or other costs |
| 2 | Level 5 Lien Claims | Impaired | Entitled to Vote | Pro Rata from funds remaining after satisfying other Class, estimated in the range of 38% on principal amount |
| 3 | Other Secured Claims | Unimpaired | Deemed to Reject | None anticipated |
| 4 | Employee Priority Claims | Unimpaired | Deemed to Accept | None anticipated |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote | Undetermined |
| 6 | Subordinated Claims | Impaired | Deemed to Reject | 0% |
| 7 | Equity Interests | Impaired | Deemed to Reject | 0% |

The Debtor believes that any alternative to confirmation of the Plan, such as conversion to a Chapter 7 case under the Bankruptcy Code or attempts by another party in interest to file a plan, would result in significant delays, litigation, costs, and/or impaired recoveries. As discussed below, the value of the Debtor's assets is greatly exceeded by the amount of its secured liabilities. Thus, any recovery to unsecured creditors from a Chapter 7 liquidation would be highly unlikely. Moreover, the Debtor believes that holders of Allowed Claims will receive greater and earlier recoveries under the Plan than those that would be achieved pursuant to a converted Chapter 7 case or under an alternative plan. **FOR THESE REASONS THE DEBTOR URGES YOU TO RETURN YOUR BALLOT "ACCEPTING" THE PLAN.**

C.      **Voting And Confirmation Procedures**

1.      **Who May Vote**

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" and that are not deemed as a matter of law to have rejected a plan of reorganization under Section 1126 of the Bankruptcy Code are entitled to vote to accept or reject the Plan. Any Class that is "unimpaired" is not entitled to vote to accept or reject a plan of reorganization and is conclusively presumed to have accepted the Plan. As set forth in Section 1124 of the Bankruptcy Code, a Class is "impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that Class are modified or altered. Holders of

3

25375588.v7

Interests (Class 7) will not receive or retain any property under the Plan on account of such Interests and are, therefore, deemed to reject the Plan and are not entitled to vote.

A Claim must be "Allowed" for purposes of voting in order for the holder of such Claim to have the right to vote.  Generally, for voting purposes a Claim is deemed "Allowed" absent an objection to the Claim if (i) a proof of claim was timely filed before the Bar Date, or (ii) if no proof of claim was filed, the Claim is identified in the Debtor's Schedules as other than "disputed," "contingent," or "unliquidated," and an amount of the Claim (greater than zero) is specified in the Schedules, in which case the Claim will be deemed Allowed for the specified amount.  In either case, when an objection to a Claim is filed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection, or allows the Claim for voting purposes.  Accordingly, if you did not receive a Ballot and believe that you are entitled to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes by_____, 2016, or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTOR, THE LIQUIDATING TRUSTEE, AS APPLICABLE, RESERVE THE RIGHT THROUGH THE CLAIM OBJECTION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM FOR DISTRIBUTION PURPOSES UNDER THE PLAN. FURTHER, AS TO CLASS 1 CLAIMS, THE PURCHASER (OR OTHER WINNING BIDDER WHICH CLOSES THE SALE) MAY OBJECT TO CLASS 1 CLAIMS.**

### 2.  Voting and Solicitation Procedures

On April__, 2016, the Debtor filed a motion for an order (i) approving this Disclosure Statement; (ii) approving the Solicitation Package (as defined in the Solicitation Order); (iii) establishing the voting record date for entitlement to the Solicitation Package and to vote on the Plan; (iv) approving procedures for the distribution of the Solicitation Package, (v) approving the form of ballots; (vi) establishing the last date for receipt of ballots; (vii) approving procedures for vote tabulation; (viii) establishing the deadline and procedures for filing objections to confirmation of the Plan; and (ix) approving the form and manner of notice of confirmation hearing and of related issues (the "Solicitation Motion"). (Docket No.___).  The Bankruptcy Court entered an Order granting the Solicitation Motion on _____, 2016 (the "Solicitation Order").  (Docket No. __).

Among other things, the Solicitation Order established the following deadlines related to voting and confirmation of the Plan:

| Event | Date |
|---|---|
| Record Date | **[TO COME]** |
| Solicitation Date | **[TO COME]** |
| Voting Deadline | **[TO COME]** |

25375588.v7

The Solicitation Order approved the Ballots to be submitted to Holders of Claims permitted to vote on the Plan and the notice sent to Holders of claims and Interests.

### 3. Voting Instructions

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with this Disclosure Statement.  No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise.  The Bankruptcy Court has fixed _____, 2016 (the "Record Date") as the date for the determination of the holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan.

The Bankruptcy Court has approved the following voting procedures and standard assumptions to be used in tabulating Ballots:

(a)    For purposes of the numerosity requirements of § 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class will be aggregated as if such creditor held one Claim against the Debtor in such Class, and the votes related to such Claims will be treated as a single vote to accept or reject the Plan.

(b)    Creditors must vote all of their Claims within a particular Class whether to accept or reject the Plan and may not split their vote.  Accordingly, a Ballot (or multiple Ballots with respect to multiple Claims within a single Class) that partially rejects and partially accepts the Plan will be counted as a single affirmative vote to accept the Plan.

(c)    Ballots that fail to indicate an acceptance or rejection of the Plan, but that are otherwise properly executed and received prior to the Ballot Return Date, will not be counted.

(d)    Only Ballots that are timely received with original signatures or electronic signatures will be counted.  Unsigned Ballots will not be counted.  Facsimile Ballots, other than Ballots that comply with the procedures noted in the Motion, will not be counted.

(e)    Any Ballot that is illegible or contains insufficient information to permit the identification of the claimant will not be counted.

(f)    Any Ballot cast by a person or entity that does not hold a Claim in a Class that is entitled to vote to accept or reject the Plan will not be counted.

(g)    Any creditor who has filed or purchased duplicate Claims will be provided with only one Solicitation Package and one Ballot and be permitted to vote only a single Claim, regardless of whether the Debtor has objected to such duplicate claims.

25375588.v7

After carefully reviewing the Plan and this Disclosure Statement, including the annexed exhibits, please indicate your acceptance or rejection of the Plan on the Ballot and return such Ballot in the enclosed envelope to the Debtor's Voting Agent, Donlin, Recano & Company, Inc. ("DRC") _____, 2016 no later than 4:00 p.m. (prevailing Central Time), either by (i) mailing the original Ballot by regular mail to Donlin, Recano & Company, Inc., **Re: Juniper,** Attn: Voting Department, PO Box 192016 Blythebourne Station, Brooklyn, NY 11219,  or (ii) delivering such original Ballot by hand or overnight mail to Donlin, Recano & Company, Inc., **Re: Juniper, A**ttn: Voting Department, 6201 15th Ave, Brooklyn, NY 11219.

**BALLOTS MUST BE *COMPLETED AND RECEIVED* BY DRC NO LATER THAN 4:00 P.M. (PREVAILING CENTRAL TIME) ON _____, 2016 WHICH IS THE VOTING DEADLINE.   ANY BALLOT THAT IS NOT EXECUTED BY A DULY AUTHORIZED PERSON WILL NOT BE COUNTED.    ANY BALLOT THAT IS EXECUTED BUT THAT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE. EXCEPT AS AGREED TO BY THE DEBTOR, ANY BALLOT THAT IS EMAILED WILL NOT BE COUNTED IN THE VOTING TO ACCEPT OR REJECT THE PLAN.**

If you have any questions about the procedure for voting your Claim or the packet of materials you received, please contact the office of the Debtor's legal counsel, as listed above.  If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact the office of the Debtor's legal counsel, as listed above.  Copies of the Plan, Disclosure Statement and other documents filed in this Chapter 11 case may be obtained free of charge on the Voting Agent's website at balloting@donlinrecano.com, and include "Juniper" in the subject line.  Documents filed in this case may also be examined between the hours of 8:00 a.m. and 5:00 p.m., prevailing Central Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, Bob Casey Federal Building, 515 Rusk Street,  Houston, Texas 77002.

**4.**      **Acceptance or Rejection of the Plan**

The Bankruptcy Code requires, as a condition to confirmation of a plan, that each Class of Claims against, or equity Interests in, the Debtor that is impaired under a proposed plan vote to accept such plan.  The Bankruptcy Code defines "acceptance" of a plan by a Class of Claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims in that Class that cast Ballots for acceptance or rejection of the plan.

The Debtor will seek to confirm the Plan under Section 1129(b) of the Bankruptcy Code due to the deemed rejection of the Plan by Classes 6 and 7.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the rejection of the plan by one or more impaired Classes of Claims or Interests.   Under that Bankruptcy Code section, a plan may be confirmed if (a) the plan has been accepted by at least one impaired Class of Claims and (b) the Bankruptcy Court determines that the plan does not discriminate unfairly and is "fair and equitable" with respect to the non-accepting Classes.

25375588.v7

### 5.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.  Pursuant to Section 1128 of the Bankruptcy Code and Rule 3017(c) of the Bankruptcy Rules, the Bankruptcy Court has scheduled the Confirmation Hearing to commence on _____, 2016 at _____ (prevailing Central Time), or as soon thereafter as counsel may be heard, before the Honorable Marvin Isgur, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, 4th Floor, Houston, Texas 77002.  A notice setting forth the time and date of the Confirmation Hearing has been included along with this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of such adjourned hearing date by the Bankruptcy Court in open court at such hearing.

### 6.      Objections to Confirmation

Bankruptcy Rule 2002(b) requires at least 28 days' notice to parties in interest of the time fixed for filing objections to confirmation of a plan.  Any objection, comment, or response to the confirmation of the Plan (including any supporting memoranda) must (a) be in writing; (b) state the grounds for the objection, if any, and the legal and factual bases thereof; (c) reference with specificity the text of the Plan to which the objection, if any, is made; (d) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; and (e) be served on the parties identified below, and be filed with the Bankruptcy Court, together with proof of service, such that they are actually received by such parties and the Court by 4:00 p.m. on _____, 2016.  Objections to confirmation of the Plan should be served on the following parties:

*To the Debtor:*

King & Spalding LLP
1100 Louisiana, Suite 4000
Houston, TX 77002
Attention: Mark W. Wege, Esq. and Edward L. Ripley, Esq.
Facsimile: 713.751.3290
email: mwege@kslaw.com and eripley@kslaw.com


*To the United States Trustee:*

Attn: Nancy L. Holley, Esq.
Bob Casey Federal Building
515 Rusk Street
Houston, Texas 77002

25375588.v7

*To the DIP Lender*:

Westlake GTL, LLC
c/o Hogan Lovells US LLP
Attn: Mark Heimlich
One Tabor Center, Suite 1500
1200 Seventeenth Street
Denver, Colorado 80202
email: mark.heimlich@hoganlovells.com

Richard Design Services Inc
Attn: Mike Krautz, CFO
750 Pearl St.
Beaumont, TX 77701
email: mike.krautz@rig-rds.com

Gable Gotwals
Attn: John Dale
1100 ONEOK Plaza
100 West 5th St.
Tulsa, OK 74103
email: jdale@gablelaw.com

## II.   GENERAL INFORMATION ABOUT THE DEBTOR AND THE BANKRUPTCY CASE

### A.   Formation, Business and Capital Structure

The Debtor is a Delaware limited liability company formed in 2012 for the sole purpose of building and operating a "gas-to-liquids" facility in Westlake, Louisiana (the "Facility"). The Debtor maintains its headquarters in Houston, Texas. Upon completion, the Facility is estimated to convert 13,600 MMBtu/day (million British thermal units/day) of pipeline natural gas into 1,170 bpd (barrels per day) Fischer-Tropsch ("FT") products consisting of 768 bpd of wax, 315 bpd of diesel, and 87 bpd of naphtha. The Facility has been in development since May 2012 by SGC Energia Co, LLC ("SGC Energia") and Great Northern Project Development, LLC ("GNPD"), and since June 2014 together with Calumet Specialty Products Partners, L.P. ("Calumet" and together with SGC Energia and GNPD, the "Equity Sponsors").

The Facility is located on a 4.2 acre parcel, part of which is occupied by a steam methane reformer (the "SMR") that was acquired by the Debtor. The Debtor intended to refurbish the SMR and construct a new FT process area that will convert synthesis gas produced by the SMR into the wax, diesel, and naphtha, as discussed above. The Debtor initiated preliminary groundwork on the Facility in July 2013 and began the bulk of the new construction in April 2014. The refurbishment of the SMR was completed in July 2015. In April 2014, the Debtor entered into a lump sum, fixed price contract with RDS for the engineering, procurement, and construction work associated with the new FT process area. In addition, to provide for the

integration of the SMR and FT processes, design of the facility, and supply of the licenses and permits necessary for the Facility's completion and operation, the Debtor entered into a service and support agreement and an XTLH License agreement with SGC Energia. As of the Petition Date, the construction of the Facility was approximately sixty percent (60%) complete.

In addition to the refurbishment, design, and construction work at the Facility, the Debtor also entered into supply and sales agreements to ensure that the Facility had a supply of natural gas feedstock for the SMR and customers for the products produced by the Facility. Specifically, in June 2013, the Debtor entered into a supply agreement with one of the largest North American independent midstream companies for a five-year, renewable, supply of natural gas, with no take-or-pay provisions, to support the Facility's startup and ramp-up of operations. In July 2013, the Debtor entered into a seven (7) year wax sales and purchase agreement with a leading trader of FT wax, for the offtake of the wax produced at the Debtor's facility once complete. And, in June 2014, the Debtor entered into a seven (7) year sales and purchase agreement with a North American specialty products company for offtake of the diesel produced by the Debtor. Finally, in February 2014, the Debtor executed a sales and purchase agreement with a private petrochemicals company for a six (6) year sale of the naphtha produced at the Facility.[3]

### B.    Debtor's Capital Structure

*Equity in the Debtor*

New Source Fuels, LLC ("NSF"), a special-purpose entity and Delaware limited liability company, owns 100% of the Debtor's equity interests. In turn, Clean Fuels North America LLC ("CFNA") owns 70.6% of the equity interests in NSF and Calumet owns 29.4% of NSF's equity interests. CFNA, a Delaware limited liability company, is a joint venture of SGC Energia and GNPD. The Equity Sponsors have contributed over $80 million to the Facility to date in development, construction, and operating expenses. A chart detailing the Debtor's organizational structure is attached to the Declaration of David Rush in Support of Chapter 11 Petition and First Day Motions (Docket No. 14).

*Debt*

As set forth above, the Facility is not yet completed or operational; therefore, the vast majority of the Debtor's debt is to parties that have provided goods or services related to the Facility's construction. Specifically, as of the Petition Date, the total amount of the Debtor's obligations is approximately $40 million. Of that amount, approximately $37.5 million is for obligations related to the Facility's construction, which includes approximately $27 million by parties claiming liens under the Private Works Act (defined below).

Under the Louisiana Private Works Act, La. R.S. 9-4801, et. seq. (the "Private Works Act"), certain parties, *e.g.*, subcontractors, materialmen, and laborers, among others, can file lien claims against a construction project's owner to secure payment for their work. Claims under the Private Works Act are classified by priority under the statute regardless of when they are filed;

---

3    The Debtor has also received a tax incentive plan and air permit from the state of Louisiana.

for example, claims for *ad valorem* taxes have the highest priority (Level 1), and therefore, have a higher priority than all other claims regardless of when lower priority claims are filed. As of the Petition Date, the Debtor's books and records show Level 1 lien claims in the aggregate amount of $200,000; no Level 2 or Level 3 lien claims; Level 4 lien claims in the aggregate amount of $21.7 million (this amount includes the $17.6 million Lien claim of RCI) and Level 5 lien claims in the aggregate amount of $5.3 million.

In addition to the lien claims asserted under the Private Works Act, the Debtor has certain unsecured subordinated debts arising from operating loans made to the Debtor during its attempts to obtain additional funding for the Facility. Specifically, in January 2016, the Debtor obtained an unsecured loan from SGC Energia in an aggregate amount of approximately $1.23 million. Further, in connection with its negotiations (discussed herein) with Westlake (defined below) and RCI, the Debtor obtained four additional unsecured loans from Westlake and/or RCI in an aggregate amount of $705,000 for the Debtor's operating expenses while the various agreements with Westlake and RCI were being negotiated and finalized.

### C.       Events Leading To Chapter 11

In March 2015, the Debtor's fourth equity investor determined that it could no longer invest in the Facility. In response to the investor's withdrawal, between April 2015 and July 2015, the Debtor engaged in extensive investment diligence with a potential investor. In August 2015, however, the potential investor decided not to pursue an investment with the Debtor. As a result of a liquidity shortfall caused by the withdrawal of the prior equity investor and the Debtor's inability to identify a replacement investor, the Debtor halted construction on the Facility in September 2015. At the time of the halt of the Facility's construction and through the Petition Date, approximately ninety-eight percent (98%) of the Facility's design and engineering work and sixty percent (60%) had been completed.

In November 2015, the Debtor retained Guggenheim Securities, LLC ("Guggenheim") to assist with securing permanent funding for the Facility. Between the Debtor's engagement of Guggenheim in November 2015 and December 2015, Guggenheim contacted approximately 154 parties to determine their interest in investing in or providing debt financing to the Debtor and/or a purchase of the Debtor or its assets. Additionally, an extensive data room was maintained, containing the essential information needed for interested parties to conduct due diligence. Approximately 34 interested parties executed non-disclosure agreements and 9 entities made on-site visits to the Facility and/or the Debtor's locations in Houston. Guggenheim, however, was unable to identify any party who desired to provide capital to the Debtor in its current financial condition.

Concurrent with the Debtor's engagement of Guggenheim, the Debtor also retained FTI Consulting, Inc. ("FTI") to assist it with contingency planning and provide restructuring services in the event the Debtor was unable to secure additional investment. Despite the Debtor's and its professionals' efforts, it became clear in January 2016 that the efforts to secure additional investment would be unsuccessful. Accordingly, on January 19, 2016, David Rush of FTI was appointed to manage the Debtor's business affairs as chief restructuring officer ("CRO") and prepare for a sale of the Debtor's assets. Between January 19, 2016 and mid-March, 2016, Mr. Rush had numerous discussions and negotiations with at least 8 parties interested in purchasing

the Debtor's assets and providing additional monies to pay the Debtor's lien creditors and costs to complete the Facility.  As set forth below, Mr. Rush has been closely involved with the Debtor during the period immediately preceding the Petition Date negotiating terms of a sale of substantially all of the Debtor's assets and debtor-in-possession financing.

The Debtor entered into negotiations with Westlake, an affiliate of a publicly-traded energy company, and RCI, the Facility's general contractor and largest creditor, regarding an orderly sale of the Facility to Westlake and RCI.  The result of these extensive negotiations is that certain Stalking Horse and DIP Financing Support Agreement (the "Support Agreement") dated as of March 13, 2016 by and among the Debtor, Westlake, RDS, and RCI.  The Support Agreement provides for, among other things, the sale of substantially all of the Debtor's assets, including the Facility, to Westlake and RCI as the "stalking horse" (together the "Stalking Horse Purchaser")—subject to higher and better offers—pursuant to Bankruptcy Code section 363 (the "Sale") and post-petition debtor-in-possession financing in an amount not to exceed $3.0 million.

### D.    Prepetition Litigation

Prepetition, the Debtor was party to the following pending litigation:

| Caption of Matter and Case No. | Nature of Proceeding | Court or Agency, Location | Status |
|---|---|---|---|
| Apache Industrial Painting, Inc. v. Juniper GTL LLC, 2016000573, 14th Judicial District Court | Breach of contract, suit to enforce Lien under La. Private Works Act | Calcasieu Parish, La. | Pending, Debtor's answer due March 30, 2016.  Notice of bankruptcy filed or to be filed. |
| Custom Metal Fabricators, Inc. v. Juniper GTL LLC, 2015004815, 14th Judicial District Court | Breach of contract, suit to enforce Lien under La. Private Works Act | Calcasieu Parish, La. | [___].  Notice of Bankruptcy to be filed. |

| | | | |
|---|---|---|---|
| Wesco Distribution, Inc. v. Juniper GTL LLC, 2016000528, 14th Judicial District Court | Breach of contract, suit to enforce Lien under La. Private Works Act | Calcasieu Parish, La | Pending, answer due April 4, 2016. Notice of Bankruptcy to be filed. |
| Wholesale Electric Supply Co. of Houston, Inc. v. Juniper GTL LLC, C643900 Section 22, 19th Judicial District Court | Breach of contract, suit to enforce Lien under La. Private Works Act | East Baton Rouge Parish, La. | [_____]. Notice of Bankruptcy to be filed. |
| Numerous notices for unpaid invoices and/or liens under the La. Private Works Act by suppliers | | | |

## III.   SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A.   First Day Pleadings

On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for District of Delaware, commencing Case No. 16-31959.

On or about the Petition Date, the Debtor filed certain "first day" motions and applications with the Bankruptcy Court seeking certain relief to aid in the efficient administration of this case and to facilitate the Debtor's transition to debtor-in-possession status. The Bankruptcy Court held a hearing on these first-day motions on April 18, 2016.  Among other things, the Bankruptcy Court signed orders which:

- authorized the Debtor to maintain its bank accounts and operate its cash management system during the Chapter 11 case in substantially the same manner

as it was operated prior to the commencement of the Chapter 11 case. (Docket No.___)].

- authorized payment of certain prepetition employee salaries, wages, and benefits and reimbursement of prepetition employee business expenses, which ensured that payroll and benefits to employees during the Chapter 11 case would not be disrupted. (Docket No. ___).]

- authorized the Debtor to retain DRC as the noticing and ballot agent for the Debtor. (Docket No. ___).

In addition, as part of the "first day" motions, the Debtor filed its Emergency Motion Emergency Motion Pursuant to 11 U.S.C. §§ 105, 361, 363, and 364 for Interim and Final Orders (I) Authorizing the Debtor to (A) Obtain Post-Petition Financing and (B) Grant Senior Liens, Junior Liens, and Superpriority Administrative Expense Status; (II) Scheduling a Final Hearing; and (III) Granting Related Relief (the "DIP Motion").  The DIP Motion sought authorization for the Debtor to enter into the DIP Credit Agreement to obtain superpriority postpetition financing, in the amount of $3,000,000.

The DIP Financing Claims are secured by, among other things, junior secured liens upon substantially all of the Debtor's assets, and super priority administrative claims, all subject to certain Prepetition Prior Liens (defined in the Final DIP Order) and certain Excluded Assets which includes a Carve-Out for U.S. Trustee and Bankruptcy Court fees and certain Professional Fee Claims.

On April__, 2016, the Bankruptcy Court granted the DIP Motion on an interim basis in the Interim DIP Order (Docket No. ___), permitting the Debtor to borrow up to $1,200,000 pending entry of a final order.  On May ___, 2016, the Court entered the Final DIP Order permitting the Debtor to borrow up to $3,000,000.  (Docket No. ___).

## B.    Second Day Pleadings, Including Retention of Professionals

The Debtor filed a series of applications and motions to retain professionals and to streamline the administration of this Case.  During this Chapter 11 case, the Bankruptcy Court has authorized the Debtor to retain certain professionals.  In particular, on April__, 2016, the Debtor filed applications to retain each of the following Professionals:

- King & Spalding LLP, as bankruptcy counsel for the Debtor
- FTI, as financial advisor for the Debtor
- Guggenheim Securities, LLC, as investment banker for the Debtor
- DRC, as voting and balloting agent for the Debtor

In addition, on _____, 2016, the Bankruptcy Court entered two administrative orders.  First, the Bankruptcy Court entered an order approving the Debtor's retention of certain attorneys and other professionals in the ordinary course of business to provide services relating to, among other things various legal services, and other matters requiring the advice and

assistance of professionals. (Docket No. __). Second, the Bankruptcy Court signed an order approving procedures for compensating professionals during the Case. (Docket No. __).

### C.    Marketing of the Debtor's Assets and Entry of the Bid Procedures Order

As described above, the Debtor engaged in a lengthy process prior to the Petition Date to raise the additional capital necessary to complete its gas-to-liquids facility in Westlake, Louisiana, both prior to and following the engagement of David Rush as CRO and Guggenheim. Prior to the engagement of the CRO and Guggenheim, the Debtor self-directed an extensive process to identify potential investors. In several instances, potential investors progressed to advanced stages of diligence before making a determination not to move forward. Faced with limited liquidity and macroeconomic headwinds that dimmed the hope of identifying an investor, the Debtor engaged the CRO and Guggenheim to assist in managing liquidity, sourcing third party interim financing and ultimately obtaining the funding necessary to complete construction of the Facility. Under the direction and oversight of the Debtor's CRO, Guggenheim conducted a robust marketing process to obtain funding and marketing of the Assets. Guggenheim actively solicited over 154 entities to gauge the interest in the market for providing interim funding to, investing capital in and/or a purchase of the Debtor or its assets. Additionally, an extensive data room was maintained, containing the essential information needed for interested parties to conduct due diligence. Over 34 interested parties executed non-disclosure agreements, and 9 entities made on-site visits to the Debtor's Facility in Westlake, Louisiana and/or the Debtor's locations in Houston. The Debtor and its professionals believe that the Debtors' assets and business have been thoroughly marketed by an experienced and well-respected investment banking firm under the oversight of the Debtor's independent CRO.

Despite the robust marketing campaign, the Debtor was unable to secure an offer that would satisfy its debt obligations in full outside of a court controlled process. During the marketing process, the Debtor's liquidity became constrained, and the Debtor was left with the prospect of filing a chapter 7 petition, which would result in its creditors likely receiving little or no return and selling the Facility for scrap value in a liquidation. In order to preserve value for creditors, the Debtor sought and obtained subordinated financing to continue its marketing process and seek a potential buyer, either through a chapter 11 Plan, or through a sale process.

In February 2016, the Debtor entered into discussions with the Purchaser for a potential sale of the Facility. Throughout the marketing process and the negotiations with the Stalking Horse Purchaser, the Debtor's CRO provided regular updates to the board of managers of the Debtor's sole member (the "Board"). Following an extended, arm's-length negotiation, the Debtor and the Purchaser agreed on the form of the purchase agreement and other documents related to the sale, the CRO presented the agreement to the Board for review and approval. Subsequently, the Board authorized the Debtor's chapter 11 filing and a sale of substantially all of the Debtor's assets pursuant to the terms of the Stalking Horse Agreement and subject to Bankruptcy Court approval.

The sale of the Facility in an auction with the Purchaser as a stalking horse setting the opening bid ensures that sufficient proceeds are realized from the sale to provide a recovery for all of the Debtor's creditors, represents a valid exercise of the Debtor's business judgment, and is consistent with its fiduciary obligations to its stakeholders, especially when compared to the

alternative of a chapter 7 liquidation where the Debtor's creditors would likely receive little or no recovery.  Accordingly, the Debtor believes that the marketing and sale process pursuant to the Bidding Procedures as set forth in the Bidding Procedures and Sale Motion is in the best interest of its estate and creditors and should be approved.

### D.      Appointment of Committee

No official committees have been appointed in this Case.

### E.      United States Trustee

The U.S. Trustee has assigned Nancy L. Holley to oversee this Chapter 11 Case.  The Debtor has worked cooperatively to address concerns and comments from the U.S. Trustee's office both before and during this case.

### F.      Rejection and Assumption of Executory Contracts and Unexpired Leases

The Purchaser has identified certain executory contracts and unexpired leases it desires to be assumed and assigned to it if it is the winning bidder.  The bid procedures reflect that other Qualified Bidders may similarly identify executory contracts and unexpired leases for purposes of its bid.  Upon the Effective Date, all such contracts identified by the Purchaser (or winning bidder) will be assumed and assigned pursuant to the closing of the Sale with the buyer paying all cure costs and providing adequate assurance of future performance. The bid procedures set out a process for informing the counterparty to the agreement that is has been identified on the assumed and assigned list along with a process for such contract counterparty to object to the cure costs.   Unless an executory contract or unexpired lease is assumed and assigned as part of the Sale process, all other such contracts and leases will be rejected by operation of the Plan (unless an earlier motion to reject has been approved by the Bankruptcy Court).

### G.      Dissemination of Information About the Case

The Debtor has been actively engaged in providing information about the Debtor's business and proceedings in this case to various parties-in-interest.   The Debtor provided creditors extensive information about the Debtor's financial, corporate, and operational status in its Schedules and Statement of Financial Affairs (Docket Nos.__, __) and will provide additional information in the monthly operating reports filed with the Bankruptcy Court.   In addition, the Debtor has complied with the applicable Bankruptcy Rules and Local Rules in serving all pleadings on parties in interest, and has provided formal and informal updates to various creditors through email, mail and various scheduled and unscheduled calls over the course of this case.  Finally, DRC has made all pleadings filed in the case available on its website: https://donlinrecano.com/juniper.

### H.      Bar Date Order

Pursuant to an Order of the Bankruptcy Court dated _____, 2016 (Docket No. __), _____, 2016 is the deadline for all non-governmental pre-petition creditors to file proofs of claim (unless such claim has been allowed by other Bankruptcy Court order).  Pursuant to that same order, _____, 2016 is the deadline for Governmental Units to file proofs of claim.

25375588.v7

## I.    Avoidance Actions

On and after the Effective Date, the trustee of the Liquidating Trust will be a representative of the Debtor's Estate pursuant to Bankruptcy Code section 1123(b)(3) and as such will have the power to prosecute, in the name of the Liquidating Trust, any Vested Causes of Action, which includes Avoidance Actions, *provided that*, if the Purchaser closes on the Sale, any potential Avoidance Actions that could be asserted against the Purchaser, Westlake, RCI or RDS, or their affiliates, are deemed waived and released by operation of the Sale. **UPON THE EFFECTIVE DATE, ALL OF THE DEBTOR'S VESTED CAUSES OF ACTION WILL BE TRANSFERRED TO THE LIQUIDATING TRUST, AND THE LIQUIDATING TRUST WILL BE VESTED WITH THE SOLE AUTHORITY TO REVIEW, INITIATE, AND/OR PURSUE ANY AND ALL TRANSFERRED AVOIDANCE ACTIONS.**

**1.    Preferences.**    Under federal bankruptcy law, a debtor-in-possession may avoid pre-petition transfers of assets of a debtor as "preferential transfers."   To constitute a preferential transfer, the transfer must be (1) of the debtor's property; (2) to or for an antecedent debt; (3) made while the debtor was insolvent; (4) made within 90 days before the filing of a bankruptcy petition or made within one year if to an "insider"[4]; and (5) a transfer that enables the creditor to receive more than it would receive under chapter 7 liquidation of the debtor's assets. For this purpose, the Bankruptcy Code creates a rebuttable presumption that the debtor was insolvent during the 90 days immediately before the filing of the bankruptcy petition.    All payments made by the Debtor to creditors within 90 days prior to the filing of the bankruptcy petition are listed under question 3 of the Debtor's statements of financial affairs.   A copy of the relevant portions of the Debtor's statements of financial affairs relating to payments made within 90 days prior to the filing of the bankruptcy petition are attached hereto as **Exhibit B**.   All payments made by the Debtor to "insiders" within one year prior to the filing of the bankruptcy petition are listed under question 4 of the Debtor's statements of financial affairs.   A copy of the relevant portions of the Debtor's statements of financial affairs relating to payments made to Insiders within one year prior to the filing of the bankruptcy petition are attached hereto as **Exhibit C**.   The Debtor has performed **no** analysis of the potential range of recoveries including any potential reductions due to affirmative defenses.   **UPON THE EFFECTIVE DATE, THE LIQUIDATING TRUST WILL BE VESTED WITH THE SOLE AUTHORITY TO REVIEW, INITIATE, AND/OR PURSUE ANY AND ALL TRANSFERRED PREFERENCE ACTIONS.**

**2.    Fraudulent Transfer**s.   Fraudulent transfer law generally is designed to avoid two types of transactions: (i) conveyances that constitute "actual fraud" upon creditors, and

---

[4] Section 101(31) of the Bankruptcy Code defines an "Insider", in relevant part, as:
      (B) if the debtor is a corporation−
          (i)   director of the debtor;
          (ii)  officer of the debtor;
          (iii) person in control of the debtor;
      (iv)  partnership in which the debtor is a general partner;
      (v)   general partner of the debtor; or
      (vi)  relative of a general partner, director, officer, or person in control of the debtor.
   . . .
      (E) affiliate or insider of an affiliate as if such affiliate was the debtor.
11 U.S.C. § 101(31).

(ii) conveyances that constitute "constructive fraud" upon creditors.  In the bankruptcy context, fraudulent transfer liability arises under sections 548 and 544 of the Bankruptcy Code.  Section 548 permits the debtor-in-possession to "reach back" for a period of two years to avoid fraudulent transfers made by the Debtor or fraudulent obligations incurred by the Debtor, and Section 544 permits the debtor-in-possession to apply applicable state fraudulent transfer law to any such action.  Assuming that Texas state law were to apply, the debtor-in-possession could challenge conveyances, transfers, or obligations made or incurred by the Debtor within the past four (4) years if similar requirements are met.  The Debtor has performed **no** analysis of the potential range of recoveries including any potential reductions due to affirmative defenses. **UPON THE EFFECTIVE DATE, THE LIQUIDATING TRUST WILL BE VESTED WITH THE SOLE AUTHORITY TO REVIEW, INITIATE, AND/OR PURSUE ANY AND ALL TRANSFERRED FRAUDULENT TRANSFER ACTIONS.**

## IV.    THE CHAPTER 11 PLAN

### A.    Summary of Classification and Treatment of Claims and Equity Interests

| Class | Claim | Status | Voting Right |
|-------|-------|--------|--------------|
| 1 | Level 4 Secured Claims | Impaired | Entitled to Vote |
| 2 | Level 5 Secured Claims | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Employee Claims | Unimpaired | Deemed to Accept |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Subordinated Claims | Impaired | Deemed to Reject |
| 7 | Equity Interests | Impaired | Deemed to Reject |

### B.    Summary of Plan Classification, Treatment and Voting

**1.    *Class 1 – Level 4 Secured Claims*.**  Class 1 comprises the Allowed Level 4 Secured Claims which the Debtor estimates in aggregate to be approximately $4.1 million (excluding the Level 4 Lien claim of RCI).  Assuming the closing of the Sale occurs, these claims will be fully satisfied by payment of the principal amount of their claim, with all other amounts owing being waived.   In the case of RCI, if the Purchaser closes on the Sale, its claim amount has been fully satisfied via the credit bid.  Upon the payment provided in the Plan, any Lien will be deemed satisfied and released and the buyer can seek, at its own costs, for Class 1 creditors to execute Lien releases.  The Debtor will be soliciting votes from Class 1.

**2.    *Class 2 – Level 5 Secured Claims*.**  Class 2 comprises the Allowed Level 5 Secured Claims which the Debtor estimates in the aggregate to be approximately $5.3 million. Assuming the closing of the Sale occurs, these claims will be paid Pro rata from the Sale proceeds remaining after paying the class 1, Class 3 (if any), Class 4 and the sum of $300,000 (for Class 5).  Based on current estimates, the Debtor anticipates that the recovery will be in the range of 38% on the principal amount owed, Class 5 claims are waiving any and all other claims

they could assert including interest, costs or fees.  Upon the payment provided in the Plan, any Lien will be deemed satisfied and released and the buyer can seek, at its own costs, for Class 2 creditors to execute Lien releases. The Debtor will be soliciting votes from Class 2.

   **3.**   ***Class 3 – Other Secured Claims***.  Class 3 comprises the Other Secured Claims.  The Debtor does not believe there are any Other Secured Claims since any secured tax claims will be paid at closing of the Sale.  However, if any such Other Secured claim exists it will be fully satisfied by (i) Cash equal to the Allowed amount of such Other Secured Claim; (ii) receipt of any Collateral securing such Claim; (iii) treatment that leaves unaltered the legal, equitable and contractual rights to which such Allowed Other Secured Claim entitles the Holder of such Claim; or (iv) such other treatment as may be agreed upon with the Holder of such Allowed Other Secured Claim, on the one hand, and the Debtor on the other hand.  On the full payment or other satisfaction of the obligations set forth in this paragraph, the Liens securing the Allowed Other Secured Claims shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person or Entity.  Since they are deemed to have accepted the Plan Class 3 claimants will not be solicited.

   **4.**   ***Class 4 – Priority Employee Claims***.  Class 4 comprises the Allowed Priority Employee Claims.  To the extent it has not already been satisfied pursuant to prior Bankruptcy Court Order, each Holder of an Allowed Class 4 Claim shall  receive, in full and final satisfaction of such Allowed Claim, payment in full, in cash, equal to the amount of such Allowed Class 4 Claim.  Payments to holders of Allowed Class 4 Claims shall commence on the later of (i) fifteen (15) days following the Effective Date, or (ii) the first Business Day after such claim becomes an Allowed Claim.  Since they are deemed to have accepted the Plan Class 4 claimants will not be solicited.

   **5.**   ***Class 5 General Unsecured Claims***.  Class 5 comprises the Allowed General Unsecured Claims.  Each Holder of an Allowed Class 5 Claim shall receive, in full and final satisfaction of such Allowed Claim, ratable rights to the Liquidating Trust Assets.  The allowance and distributions from the Liquidating Trust will be determined by the Liquidating Trustee, as otherwise governed by the Plan and the Liquidating Trust Agreement.  Notwithstanding the foregoing, in the event the Purchaser is the winning bidder and closes the Sale, (i) all Assumed Trade Claims shall be deemed fully satisfied, via payment from the Purchaser so that there will be no further payment or distribution on account of such Assumed Trade Claims under this Plan and (ii) any Allowed Class 5 Claim of RCI or RDS shall be deemed fully satisfied so that there will be no further payment or distribution on account of such Claims under this Plan.  The Debtor estimates that the aggregate of all General Unsecured Claims (excluding any claim of RDS) is approximately $8 million (this amount includes approximately $1 million due to Great Northern and SGCE for legacy unpaid expenses.  The Debtor will be soliciting votes from Class 5.

   **6.**   ***Class 6 - Subordinated Claims.*** Class 6 comprises the Allowed Subordinated Claims.  The Debtor estimates the total of Subordinated Claims to be approximately $1.7 million. There will be no distributions to any Class 6 claimant and all such claims are deemed satisfied and cancelled.  As such, Bankruptcy Code Section 1126(g) deems to Class 6 creditors to have rejected the Plan and no votes will be solicited.

25375588.v7

7.  ***Class 7 – Equity Interests***.  Class 7 comprises the Equity Interests.  No distributions shall be made under the Plan on account of any Equity Interest.  As of the Effective Date, any and all Equity Interests are cancelled and deemed satisfied without any further notice or order.  As such, Bankruptcy Code Section 1126(g) deems to Class 7 Holders to have rejected the Plan and no votes will be solicited.

## C.    Creation of the Liquidating Trust

Prior to the Effective Date, the Debtor will retain power and control over the Debtor's Estate.  On the Effective Date, the Debtor and the Liquidating Trustee, on their own behalf and on behalf of Holders of Allowed General Unsecured Claims in Class 5, shall execute the Liquidating Trust Agreement and shall take all other steps necessary to establish the Liquidating Trust for the benefit of the Liquidating Trust Beneficiaries in accordance with the Plan.

On the Effective Date, the Debtor shall be deemed to have automatically transferred to the Liquidating Trust all of its right, title and interest in and to all of the Liquidating Trust Assets, and in accordance with Section 1141 of the Bankruptcy Code, all such assets shall automatically irrevocably vest in the Liquidating Trust free and clear of all Claims and Liens, subject only to the Allowed Claims of the applicable Liquidating Trust Beneficiaries, as set forth in the Plan, and the reasonable fees and expenses of administering the Liquidating Trust, including, without limitation, the reasonable fees and expenses of the Liquidating Trustee, as provided in the Liquidating Trust Agreement.  Thereupon, the Debtor shall have no interest in or with respect to such Liquidating Trust Assets or the Liquidating Trust.  The Liquidating Trust will be irrevocably funded with (i) $300,000 in cash, and (iii) the Vested Causes of Action and proceeds thereof, on the Effective Date of the Plan.

The Debtor has identified _____ to serve as Liquidating Trustee, subject to approval by the Bankruptcy Court prior to the Effective Date.

## D.    Avoidance Actions

On and after the Effective Date, the Debtor will not be responsible for any review of any Avoidance Actions.  The Liquidating Trust will have all responsibility for reviewing, analyzing and prosecuting Vested Causes of Action under the Plan and the Liquidating Trust Agreement.

The Liquidating Trust will have the sole authority to prosecute the Vested Causes of Action.  **ALL CREDITORS AND RECIPIENTS OF PAYMENTS OR TRANSFERS WITHIN 90 DAYS OF THE PETITION DATE (OR WITHIN ONE YEAR FOR INSIDERS) OR WHO RECEIVED PAYMENTS OR TRANSFERS FOR LESS THAN REASONABLY EQUIVALENT VALUE WITHIN FOUR YEARS OF THE PETITION DATE, WITH ACTUAL OR CONSTRUCTIVE NOTICE OF THIS BANKRUPTCY CASE, ARE HEREBY PUT ON NOTICE THAT SUCH TRANSACTIONS WILL BE REVIEWED FOR POTENTIAL RECOVERY.  AS ALL SUCH ACTIONS ARE EXPRESSLY PRESERVED FOR THE BENEFIT OF THE LIQUIDATING TRUST.**

## E.    Provisions Regarding Distributions

25375588.v7

1.      **Time and Method of Distributions**

Any distributions and deliveries to be made under this Plan shall be made on the Effective Date or as soon as practicable thereafter, unless otherwise specifically provided for by this Plan.  If any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

2.      **Liquidating Trust Distributions**

The Liquidating Trustee, on behalf of the Liquidating Trust, or such other Person or Entity as may be designated in accordance with the Liquidating Trust Agreement, will make the distributions to Liquidating Trust Beneficiaries required under the Plan in accordance with the Liquidating Trust Agreement and in accordance with the priorities set forth herein and the other provisions of the Plan, and administer and liquidate any assets in the Liquidating Trust and otherwise wind down the Estate, including the following:  (a) general administration costs (*e.g.*, trustee/trust fees, etc.), (b) access to and review of information for any and all potential Claims, (c) access to and review of information for any and all Vested Causes of Action, (d) analysis and assessment related to Claims objection/resolution, (e) analysis and assessment related to Vested Causes of Action, (f) preparation of Claims objection/resolution, (g) preparation of Vested Causes of Action (excluding the actual prosecution thereof) and (h) distribution of proceeds (*e.g.*, claims agent, etc.).  Whenever any distribution to be made under the Plan or the Liquidating Trust Agreement is due on a day other than a Business Day, such distribution shall be made, without interest, on the immediately succeeding Business Day, but any such distribution will have been deemed to have been made on the date due.

3.      **Reserve for Disputed Claims**

The Debtor, or Liquidating Trustee, as applicable, may maintain a reserve for any distributable amounts required to be set aside on account of Disputed Claims and shall distribute such amounts (net of any expenses, including any taxes relating thereto), as provided herein and in the Liquidating Trust Agreement, as such Disputed Claims are resolved by Final Order, and such amounts shall be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date, provided that no interest shall be distributable or accrue with respect thereto.

4.      **Manner of Distribution Under Plan and Liquidating Trust**

Any distribution in Cash to be issued under the Plan or the Liquidating Trust Agreement shall, at the election of the issuer, be made by check drawn on a domestic bank or by wire transfer from a domestic bank.

5.       **Delivery of Distributions**

Subject to the provisions of Bankruptcy Rule 2002(g), and except as otherwise provided herein, distributions and deliveries to Holders of record of Allowed Claims shall be made at the address of each such Holder set forth on the Debtor's books and records unless superseded by the address set forth on Proofs of Claim filed by any such Holders.  By the Effective Date, the Debtor shall provide the Liquidating Trustee with the addresses and access to other books and records relating to the Liquidating Trust Beneficiaries, including all taxpayer identification information.

6.       **Undeliverable Distributions**

If any distribution to the Holder of an Allowed Claim under the Plan or the Liquidating Trust Agreement is returned as undeliverable, no further distributions shall be made to such Holder unless and until the issuer of the distribution is notified in writing of such Holder's then-current address.   Any Holder ultimately receiving a distribution that was returned as undeliverable shall not be entitled to any interest or other accruals of any kind on such distribution.  Nothing contained in the Plan or the Liquidating Trust Agreement shall require the issuer of any distribution to attempt to locate any Holder of an Allowed Claim.

7.       **Failure to Claim Undeliverable Distributions**

Any Holder of an Allowed Claim that does not assert its rights pursuant to the Plan or the Liquidating Trust Agreement to receive a distribution within three (3) months from and after the date such distribution is returned as undeliverable shall have such Holder's Claim for such undeliverable distribution discharged and shall be forever barred from asserting any such Claim against the Debtor, the Liquidating Trust, the Liquidating Trustee and its respective professionals, or the Liquidating Trust Assets.   In such case, any consideration held for distribution on account of such Claim shall belong to the Liquidating Trust for distribution by the Liquidating Trustee to the remaining Liquidating Trust Beneficiaries in accordance with the terms of the Plan and the Liquidating Trust Agreement.  After final distributions have been made in accordance with the terms of the Plan and the Liquidating Trust Agreement, if the amount of undeliverable Cash remaining is less than $15,000, the Liquidating Trustee, in his or her sole discretion, may donate such amount to a charity without further notice or order of the Bankruptcy Court.

8.       **Compliance with Tax Requirements/Allocation**

The issuer of any distribution under the Plan or the Liquidating Trust shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all distributions pursuant to the Plan or the Liquidating Trust shall be subject to any such applicable withholding and reporting requirements.  For tax purposes, distributions received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest, if any.

9.       **Time Bar to Cash Payments**

Checks issued on account of Allowed Claims shall be null and void if not negotiated within sixty (60) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the issuer of the check by the Holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made within three (3) months from and after the date of issuance of such check. After such date, all Claims in respect of voided checks shall be discharged and forever barred, and the Liquidating Trust shall be entitled to retain all monies related thereto for distribution to the Liquidating Trust Beneficiaries in accordance with the terms of the Plan and Liquidating Trust Agreement.

### 10. Distributions After Effective Date

Distributions made after the Effective Date to Holders of Claims that are not Allowed as of the Effective Date, but which later later become Allowed, shall be deemed to have been made on the Effective Date. Except as otherwise specifically provided in the Plan or the Liquidating Trust Agreement, no interest shall be payable on account of any Allowed Claim not paid on the Effective Date.

### 11. Fractional Dollars; De Minimis Distributions

Notwithstanding anything contained herein to the contrary, payments of fractions of dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan or the Liquidating Trust would otherwise be called for, the actual payment made will reflect a rounding of such fraction to the nearest dollar (up or down), with half dollars being rounded down. No payment shall be made on account of any distribution less than twenty-five dollars ($25) with respect to any Allowed Claim unless a request therefor is made in writing to the issuer of such payment on or before ninety (90) days after the Effective Date; _provided_, _however_, the Liquidating Trustee may make a payment of any amount with respect to any Allowed Class 6 Claim in its sole discretion.

### 12. Setoffs/Recoupment

The Debtor, or the Liquidating Trustee (as applicable) may, pursuant to applicable non-bankruptcy law, set off or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan or Liquidating Trust Agreement on account thereof (before any distribution is made on account of such Claim), the Claims, rights and Causes of Action of any nature the Debtor, or the Liquidating Trust may hold against the Holder of such Allowed Claim; _provided_, _however_, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, or Liquidating Trust of any such Claims, rights and Causes of Action that the Debtor or the Liquidating Trust may possess against such Holder; and, _provided_, _further_, that nothing contained herein is intended to limit any Creditor's rights of setoff or recoupment prior to the Effective Date in accordance with the provisions of Sections 362 and 553 of the Bankruptcy Code, or other applicable law.

### 13. Preservation of Subordination Rights by Estate

Except as otherwise provided herein, all subordination rights and claims relating to the subordination by the Debtor or the Liquidating Trustee of any Allowed Claim shall remain valid,

enforceable and unimpaired in accordance with Section 510 of the Bankruptcy Code or otherwise.

## V.   EFFECTS OF CONFIRMATION

### A.   Compromise and Settlement of Claims, Equity Interests, and Controversies

Pursuant to Sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of substantially all Claims, Equity Interests, and controversies relating to the contractual, legal, and equitable rights that a Holder of a Claim or Equity Interest may have with respect to any Claim or Equity Interest or any distribution to be made on account of such Claim or Equity Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Equity Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, the Estate, and Holders, and is fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle claims against it.

### B.   Certain Avoidance Actions Released

*In the event the Purchaser closes on the Sale, all Avoidance Actions that have been or could be assessed against Westlake, the Purchaser, RCI or RDS, or any of their affiliates, were forever waived, released or extinguished pursuant to the Sale.  In such event, those released claims are not part of the Liquidating Trust assets.*

### C.   Injunction

*Except as otherwise expressly provided in the Plan, all Persons and Entities shall be permanently enjoined, from and after the Effective Date, from (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or relating to any Claim or Equity Interest against the Debtor, the Estate or its assets, or the  or its assets, unless a previous order modifying the stay provided under Section 362 of the Bankruptcy Code was entered by the Bankruptcy Court; (b) enforcing, attaching, collecting or recovering by any manner or means of any judgment, award, decree or order against the Debtor, the Estate or the Liquidating Trust; (c) creating, perfecting, or enforcing any encumbrance of any kind against the property or interests in property of the Debtor, the Estate or the Liquidating Trust, in each case in respect of any Claims or Equity Interests arising prior to the Confirmation Date; and (d) commencing or continuing in any manner any Claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever, including any Claims or Causes of Action that have been or could be asserted by or on behalf of the Debtor or the Estate or that are derivative or duplicative of any such Claims or Causes of Action, that are released pursuant to the Plan or the Confirmation Order.*

### D.   Necessity and Approval of Injunctions

The injunctions set forth in this Article X are integral and critical parts of the Plan and the settlements implemented pursuant to the Plan, and the Debtor, Liquidating Trust and Liquidating Trustee have relied on the efficacy and conclusive effects of such injunctions and on the Bankruptcy Court's retention of jurisdiction to enforce such injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, Causes of Action, and other rights under the Plan.

E.  **Exculpation**

*The Debtor, [the Committee], the Liquidating Trustee, and the Liquidating Trust, and their respective officers, directors, employees, and agents (and their respective attorneys, consultants, financial advisors, investment bankers, accountants, and other retained professionals) shall neither have nor incur any liability to any Person or Entity (including any Holder of a Claim or Equity Interest) for any pre- or post-petition act taken or omitted to be taken in connection with or related to the formulation, negotiation, preparation, dissemination, implementation, administration, confirmation or occurrence of the Effective Date, the Disclosure Statement, the Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with, or in contemplation of, the restructuring of the Debtor or the Chapter 11 Case.*

## VI.  CONFIRMATION AND CONSUMMATION PROCEDURES

A.  **General Information**

All creditors whose Claims are impaired by the Plan (except those parties holding Claims in Classes 3, 4 or 6 or Interests in Class 7) may cast their votes for or against the Plan.  As a condition to confirmation of the Plan, the Bankruptcy Code requires that one Class of Impaired Claims votes to accept the Plan.  Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of Impaired Claims as acceptance by holders of at least two thirds of the dollar amount of the Class and by more than one half in number of Claims.  Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.  Voting is accomplished by completing, dating, signing and returning the Ballot by the Voting Deadline.  Ballots will be distributed to all creditors entitled to vote on the Plan and is part of the Solicitation Package accompanying the Disclosure Statement.  The Ballot indicates (i) where the Ballot is to be filed and (ii) the deadline by which creditors must return their Ballots.  See Article I of this Disclosure Statement for a more detailed explanation of who will receive Ballots and voting procedures.

B.  **Solicitation of Acceptances**

This Disclosure Statement has been approved by the Bankruptcy Court as containing "adequate information" to permit creditors and equity interest holders to make an informed decision whether to accept or reject the Plan.  Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to, or concurrently with, such solicitation.

C.  **Considerations Relevant To Acceptance Of The Plan**

25375588.v7

The Debtor's recommendation that all Creditors should vote to accept the Plan is premised upon the Debtor's view that the Plan is preferable to other alternatives, such as conversion of the Bankruptcy Case to a chapter 7 bankruptcy case which would likely be more time-consuming, more expensive, and likely result in reduced Distributions to creditors. It appears unlikely to the Debtor that an alternate plan of reorganization or liquidation can be proposed that would provide for payments in an amount equal or greater than the amounts proposed under the Plan. If the Plan is not accepted, it is likely that the interests of all creditors will be further diminished.

## VII.   FEASIBILITY OF THE PLAN AND BEST INTERESTS TEST

### A.   Feasibility of the Plan

The Bankruptcy Code requires that, for a liquidating plan to be confirmed, the Debtor must demonstrate that it has provided adequate means and funding for the plan to be implemented. The Debtor believes that it and the Liquidating Trust will be able to timely perform all obligations described in the Plan and, therefore, that the Plan is feasible.

As set forth in the budget attached hereto as Exhibit D, the Debtor believes it is able to pay for all post-petition costs and fees as well as payments required by the Plan.

Payments to creditors under the Plan, will be funded through the proceeds of the Sale and other assets on hand.

**HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED TO REVIEW CAREFULLY THE RISK FACTORS INCLUDED IN ARTICLE X OF THIS DISCLOSURE STATEMENT THAT MAY AFFECT THE FINANCIAL FEASIBILITY OF THE PLAN.**

### B.   Best Interest of Creditors Test

In certain circumstances, to be confirmed, the Plan must pass the "Best Interest Of Creditors Test" incorporated in section 1129(a)(7) of the Bankruptcy Code. The test applies to individual creditors and Interest holders (stockholders) that are both (i) in Impaired Classes under the Plan, and (ii) do not vote to accept the Plan. Section 1129(a)(7) of the Bankruptcy Code requires that such Creditors and Interest holders receive or retain an amount under the Plan not less than the amount that such holders would receive or retain if the Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Secured creditors generally are paid first from the sales proceeds of properties securing their liens. If any assets are remaining in the bankruptcy estate after the satisfaction of secured creditors' claims from their collateral, Administrative Claims generally are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their Allowed claims in relationship to the total amount of Allowed claims held by all

unsecured creditors with the same priority.  Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

### C.     Application of Best Interests Test to the Liquidation Analysis and Valuation of the Debtor

The Debtor believes that the Plan meets the "best interests" test of section 1129(a)(7) of the Bankruptcy Code because members of each Impaired Class will receive at least as much consideration under the Plan as they would receive in a liquidation in a hypothetical chapter 7 case.  As set forth in the liquidation analysis attached hereto as Exhibit E, creditors will receive an equal or better recovery through the distributions contemplated by the Plan because the professionals proposing the Plan have been working in this Bankruptcy Case since their inception and are familiar with the background and progress of this Bankruptcy Case.  On the other hand, conversion of this Bankruptcy Case to a chapter 7 liquidation proceeding will require the appointment of a trustee, who will likely need additional time to become familiar with the Bankruptcy Case, and a statutory fee will be paid to the chapter 7 trustee.  While gaining familiarity with this case, a chapter 7 trustee will expend time payable by any remaining cash on hand in the Debtor's Estate, thereby reducing the potential distribution to creditors.  Conversion of the case to Chapter 7 is an event of default under the DIP Loan Agreement and the DIP Lender will likely stop further funding.  While there is some unencumbered cash, any amounts available are greatly exceeded by the pre-petition liabilities.  In addition, the agreements of the various creditors in Classes 1 and 2 will be voided and all creditors are then free to assert all claims pursuant to applicable law, thus the total allowed claims will likely be substantially higher in a Chapter 7 case.  Under the Plan, distributions to creditors will commence as soon as practicable (and in accordance with the Plan) after the later of the Effective Date or the date on which such Claim becomes an Allowed Claim, whereas conversion of this case to a chapter 7 liquidation proceeding will substantially delay distributions and reduce the amount of distributions currently available to creditors.

In addition, the value of the Debtor's assets is greatly exceeded by the amount of debt secured by those assets.  Thus, in a liquidation, all assets (or their value) would be recovered by secured creditors, leaving unsecured creditors with no realistic possibility of recovery.  This scenario is described in detail in Exhibit E.  Further, a chapter 7 trustee would likely have to reject (or be deemed to reject) all of the Debtor's executory contracts and leases, a significant amount of which will likely be assumed under the Plan.  In this event, there will be substantial contract rejection damage claims which would dilute even more the potential recovery any individual creditor receives on  account of any avoidance actions.  In contrast to the likely chapter 7 result, the Plan provides for payment of the principal amount of Class 1 claims and a significant payment on account of Class 2 claims.

Moreover, if the case were to be converted prior to the closing of the sale, there is no assurance the Purchaser, or another buyer would be willing to pay the negotiated price due to further delay and deterioration of the Facility.  In such event, the Assumed Trade Payables will revert back to Class 5 claims and increase the amounts owed to general unsecured creditors.

25375588.v7

## VIII.   CERTAIN RISK FACTORS TO CONSIDER

The following disclosures are not intended to be inclusive and should be read in connection with the other disclosures contained in this Disclosure Statement and the exhibits attached hereto.  You should carefully consider the risks described below in addition to the other information contained in this document. It is recommended that you consult your legal, financial, and tax advisors regarding the risks associated with the Plan and the Distributions you may receive thereunder.

### A.   Claims Estimation

There can be no assurance that the estimated Claim amounts assumed for the purposes of preparing the Plan are correct.  The actual amount of Allowed Claims likely will differ in some respect from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.   Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated for the purpose of preparing the Plan.

### B.   Certain Risks of Nonconfirmation

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A rejecting Creditor or holder of an Interest might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court were to determine that the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it were to find that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization.

### C.   Risk of Plan Support Parties Default

Based on the Debtor's extensive experience with the Plan Support Parties and their affiliated entities, the Debtor is confident that the Plan Support Parties have the ability and willingness to consummate the Sale. However, there is no certainty that the Plan Support Parties will take these actions.

## IX.   TAX IMPLICATIONS OF THE PLAN

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor does not intend to seek any ruling from the IRS on the tax consequences of the Plan. Even if the Debtor decides to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.   In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request. Thus, there can be no assurance that the IRS will not challenge the various positions the Debtor has taken, or intends to

take, with respect to the tax treatment of the Plan, or that a court would not sustain such a challenge.

## X.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

### A.    Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain Holders of Claims. This discussion does not address the U.S. federal income tax consequences to Holders of Claims who are unimpaired, otherwise entitled to payment in full in Cash under the Plan, or deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary (or less favorable) position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary or different position would not be sustained by a court.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to certain classes of taxpayers subject to special rules (including, without limitation, Holders that are not "United States persons" as defined in the Tax Code, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold Claims through, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons that acquired Claims at a "market discount," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address U.S. federal taxes other than income taxes.

This discussion assumes that the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

***The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon a Holder's individual circumstances.***

B.      **Federal Income Tax Consequences to the Debtor**

The Debtor is a disregarded entity for tax purposes and income and losses pass through to the parent, NSF.  The Debtor does not file a separate tax return.  Accordingly, there are no tax implications to the Debtor via the bankruptcy that affect the Plan.

C.      **Federal Income Tax Consequences to Holders of Claims**

1.      **General**

Subject to the discussion in the following paragraphs, (i) a Holder of an Allowed Claim generally will recognize taxable gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between the "amount realized" in respect of such Claim under the Plan and its tax basis in such Claim, (ii) the Holder's tax basis in any property received generally should equal the fair market value of such property as of the Effective Date, and (iii) the Holder's holding period for the property should begin on the day following the Effective Date. In general, a Holder's amount realized will equal the amount of cash plus the fair market value of any property received (or deemed received in the case of Holders that are beneficiaries of the Liquidating Trust) in respect of such Claim (or, if the property received in respect of a Claim is a debt instrument for federal income tax purposes, the "issue price" of such debt instrument as determined under applicable Treasury regulations).

2.      **Possible Treatment as Tax-Free Recapitalization**

If a Holder of a Claim that is classified as a "security" of the Debtor for U.S. federal income tax purposes receives from the Debtor in respect of such Claim property that constitutes stock of or a "security" issued by the Debtor, then the exchange of such Claim for such property may qualify as a "recapitalization" under Section 368 of the Tax Code.  In that case, a Holder generally (i) should not recognize any gain or loss on its receipt of such property, (ii) should have a tax basis in the property received equal to its tax basis in such Claim and (iii) should have a holding period for such property that includes its holding period for such Claim.  However, a Holder may be required to recognize gain if, in addition to receiving property that is a "security," the Holder receives cash or other property that is not a "security" in respect of such Claim.

The term "security" is not defined in the Tax Code or in the Treasury regulations issued thereunder and has not been clearly defined by judicial decisions.  As applied to debt obligations, the meaning of the term "security" is unclear.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt obligation, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether the debt obligation is intended to give the holder a continuing proprietary interest in the issuer.  One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of 10 years or more constitute securities.  Holders are urged to consult their own tax advisors regarding the possibility that the receipt of property in respect of a Claim pursuant to the Plan may qualify as a recapitalization.

3.        **Character of Gain or Loss; Loss Limitations**

The character of any gain or loss recognized by a Holder as capital or ordinary and, in the case of capital gain or loss, as long-term or short-term, will be determined by a number of factors, including, but not limited to, the tax status of the holder, the nature of the applicable Claim in the Holder's hands, the purpose and circumstances of its acquisition of the Claim, the Holder's holding period of the Claim, the extent to which the Holder previously claimed a bad debt deduction for all or a portion of the Claim, and the extent, if any, to which the Holder acquired the Claim at a market discount.  The deductibility of capital losses is subject to certain limitations.  In addition, other special rules could apply that might preclude a Holder from claiming a current deductible loss for tax purposes that would otherwise be allowed upon consummation of the Plan.  Holders are urged to consult their own tax advisors regarding the characterization of any gain or loss recognized, and the possible application of any rules limiting the deductibility of any loss recognized, in connection with the Plan.

4.        **Amounts Received in Respect of Accrued But Unpaid Interest**

Pursuant to the Plan, amounts received in respect of Allowed Claims will be allocated for tax purposes first to the principal amount of such Claims, with any excess allocated to any unpaid accrued interest.  However there is no assurance that the IRS will respect such allocation for federal income tax purposes.  In general, to the extent that an amount received (whether stock, cash or other property) by a Holder of a Claim is received in satisfaction of interest that accrued during its holding period, such amount will be taxable to the Holder as interest income if not previously included in the Holder's gross income.  Conversely, a Holder generally recognizes a deductible loss to the extent that it does not receive payment of interest that has previously been included in its income.  Holders of Claims are urged to consult with their tax advisors regarding the allocation of consideration and deductibility of unpaid interest (including the characterization of any deductible loss in respect of any unpaid interest as a capital or ordinary loss).

5.        **Treatment of the Liquidating Trust**

The Liquidating Trust will be established for the primary purpose of liquidating its assets, in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

The Liquidating Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Liquidating Trust Beneficiaries treated as grantors and owners of the Liquidating Trust.  For all federal income tax purposes, all parties (including the Debtor, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) are required to treat the transfer of the Liquidating Trust Assets by the Debtor to the Liquidating Trust (as set forth in the Liquidating Trust Agreement) as a transfer of such assets by the Debtor to the Liquidating Trust Beneficiaries entitled to distributions from the Liquidating Trust Assets, followed by a transfer by such beneficiaries to the Liquidating Trust.  Thus, the Liquidating Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for federal income tax purposes.

The Liquidating Trustee will file tax returns with the IRS for the Liquidating Trust as a grantor trust in accordance with Treasury Regulation Section 1.671-4(a).  The Trustee will also send to each beneficiary of the Liquidating Trust a separate statement setting forth the beneficiary's allocable share of items of income, gain, loss, deduction or credit and will instruct the beneficiary to report such items on such beneficiary's federal income tax return.

The Liquidating Trustee may invest the Liquidating Trust Assets transferred to the Liquidating Trust, the proceeds thereof, or any income earned by the Liquidating Trust in accordance with the Liquidating Trust Agreement.  However, the scope of any such investments will be limited to include only those investments that a Liquidating Trust, within the meaning of Treas. Reg. § 301.7701-4(d), may be permitted to hold, pursuant to the Treasury regulations, or any modification in the IRS guidelines (whether set forth in IRS rulings, other IRS pronouncements or otherwise).

The Liquidating Trustee will require any Liquidating Trust Beneficiary or other party receiving a distribution to furnish to the Liquidating Trustee in writing such beneficiary's social security number or other taxpayer identification number ("TIN") as assigned by the IRS and the Liquidating Trustee may condition any distribution to any Liquidating Trust Beneficiary or other party receiving a distribution upon receipt of such TIN.

### 6.      Information Reporting and Backup Withholding

All amounts paid to Holders of Allowed Claims under the Plan are subject to any applicable withholding tax requirements.  Under certain circumstances, interest, dividends, and other reportable payments, may be subject to "backup withholding," currently at a rate of 28%. Backup withholding generally applies if the holder (a) fails to furnish its TIN, (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN.

## XI.    CONCLUSION AND RECOMMENDATION

Based on the foregoing analysis of the Debtor, its assets, and the Plan, the Debtor believes that the best interests of all parties would be served through confirmation of the Plan. FOR THESE REASONS, THE DEBTOR URGES ALL CREDITORS THAT ARE ENTITLED TO VOTE ON THE PLAN TO VOTE TO "ACCEPT" THE PLAN.

[SIGNATURE ON NEXT PAGE]

25375588.v7

Dated: April 14, 2016

Respectfully submitted,

Juniper GTL LLC

By: /s/ _____

Name: David Rush _____

Title: Chief Restructuring Officer _____

Counsel:
Mark W. Wege (Texas Bar No. 21074225)
Edward L. Ripley (Texas Bar No. 16935950)
Jason S. Sharp (Texas Bar No. 24079897)
KING & SPALDING, LLP
1100 Louisiana, Suite 4000
Houston, Texas  77002
Telephone:  713-751-3200
Facsimile:  713-751-3290
Email: MWege@kslaw.com
          ERipley@kslaw.com
          JSharp@kslaw.com

*Proposed Counsel for the Debtor and Debtor
in Possession*

## <u>EXHIBITS TO DISCLOSURE STATEMENT</u>

Exhibit A: Disclosure Statement Approval Order [**TO COME**]

Exhibit B: Debtor's Statement of Financial Affairs Response to Question 3 [**TO COME**]

Exhibit C: Debtor's Statement of Financial Affairs Response to Question 4 [**TO COME**]

Exhibit D: Debtor's 13 week DIP budget (subject to court approval) [**TO COME**]

Exhibit E: Liquidation Analysis [**TO COME**]

25375588.v7